## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS                      )
301 N. Guadalupe Street, Ste. 201        )
Santa Fe, New Mexico 87501,              )
                                         )
    and                      )        Case No. 21-cv-175
                                         )
PHYSICIANS FOR SOCIAL RESPONSIBILITY     )
1111 14th St. N.W., Ste. 700             )
Washington, D.C. 20005,                  )
                                         )
    Plaintiffs,               )
                                         )
    v.                        )
                                         )
SCOTT DE LA VEGA, Acting Secretary,      )
U.S. Department of the Interior          )
1849 C Street N.W.                       )
Washington, D.C. 20240,                  )
                                         )
    and                       )
                                         )
U.S. BUREAU OF LAND MANAGEMENT           )
1849 C Street N.W.                       )
Washington, D.C. 20240,                  )
                                         )
    Defendants.               )

---

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT
## AND  INJUNCTIVE RELIEF

---

## INTRODUCTION

1.    Plaintiffs WildEarth Guardians and Physicians for Social Responsibility

(collectively, "Conservation Groups") challenge Federal Defendants' approval of 1,153 oil and

gas leases encompassing over 1.3 million acres of public lands across Colorado, New Mexico,

Utah, and Wyoming. Between December 2016 and December 2020, BLM approved and sold the

leases at issue without fully analyzing the direct, indirect, and cumulative impacts of oil and gas

leasing on our climate in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and its implementing regulations, 40 C.F.R §§ 1500.1–1518.4.

2.      Global climate change is the greatest threat that humanity has ever faced. The scientific consensus is clear: as a result of greenhouse gas ("GHG") emissions, the global climate is rapidly destabilizing with catastrophic results. Rising seas, more extreme heatwaves, increased drought and flooding, larger and more devastating wildfires and hurricanes, and other terrifying changes are now upon us, the deadly consequence of the fossil fuel industry's reckless interference with the stability of the global climate. GHG emissions from the production and combustion of fossil fuels, such as coal, oil, and gas, are the predominant drivers of climate change.

3.      Federal public lands used for fossil fuel extraction contribute 24% of the United States' GHG emissions. If federal lands were their own country, their GHG emissions would be ranked fifth globally. Moreover, future development of unleased federal minerals represents a "carbon bomb" that would likely push global climate change to catastrophic levels with incalculable consequences for the American people, the rest of humanity, and the global environment. Yet, Federal Defendants have failed to seriously consider the cumulative climate impacts of opening up vast swaths of public lands for fossil fuel production, as exemplified by their approval of thousands of new oil and gas leases covering millions of acres of public lands in the West without the full analysis required by NEPA.

4.      The Bureau of Land Management ("BLM"),[1] a federal agency within the

---

[1] Throughout the Complaint, Federal Defendants are collectively referred to as BLM.

Department of Interior, manages the majority—nearly 700 million acres—of public minerals. About half of this federal mineral estate contains oil and/or natural gas, and over 25 million acres of federally managed lands are currently leased to private companies for oil and gas. The BLM's onshore Oil and Gas Leasing Program contributes vast amounts of GHG pollution to the atmosphere.

5.      While the Obama Administration instituted various policies to address climate impacts from federal lands, the Trump Administration has in contrast embraced a reckless "energy dominance" agenda and attempted to reverse many of these policies. Many of these attempts have been struck down in court. Ultimately, the law is clear—NEPA requires the federal government to not only *quantify* direct, indirect, and cumulative GHG emissions from federal actions, but also *analyze* the impacts of these emissions on our climate.

6.      BLM, however, continues to recklessly lease large swaths of the American West to oil and gas development without comprehensively estimating the cumulative GHG emissions from this development and analyzing the severity of resulting climate impacts from the addition of thousands of tons of GHG emissions into the atmosphere, as NEPA requires. At issue here are 28 BLM oil and gas lease sales across four Western states—Colorado, New Mexico, Utah, and Wyoming—where the agency failed to comply with NEPA by refusing to lawfully analyze GHG emissions and climate impacts. Conservation Groups challenge each of the leasing authorizations for the BLM lease sales provided in Table A at the end of this complaint.

7.      In approving the 28 challenged oil and gas lease sales, Federal Defendants (1) failed to properly quantify direct greenhouse gas emissions from the lease parcels and analyze the climate impacts of these direct emissions; (2) failed to properly quantify indirect (downstream) greenhouse gas emissions and analyze the climate impacts of these indirect

emissions; and/or (3) failed to properly quantify cumulative greenhouse gas emissions and analyze the cumulative climate impacts in conjunction with past, present, and reasonably foreseeable oil and gas development within the American West region as well as BLM's national oil and gas leasing program.

8.     BLM's process for approving the lease authorizations challenged herein is a prime example of the fundamental disconnect between the ongoing climate crisis and the federal oil and gas leasing program. BLM shows no signs of acknowledging or addressing this disconnect. Instead, BLM continues its ongoing pattern of unlawfully authorizing and issuing leases—without taking a hard look at or acknowledging the significance of the accumulating impacts of rampant oil and gas development and subsequent combustion to our climate.

9.     On March 19, 2019, this Court rejected BLM's excuses for failing to fully consider the climate impacts of oil and gas development, and forced the agency to suspend nine oil and gas leasing decisions authorizing issuance of 282 leases until BLM completed an analysis that complied with NEPA. In *WildEarth Guardians v. Zinke* ("*WildEarth Guardians I*"), 368 F. Supp. 3d 41 (D.D.C. 2019), the Court held that BLM violated NEPA when it failed to fully analyze all reasonably foreseeable GHG emissions and climate change impacts of its oil and gas leasing decisions in Wyoming. Among other things, the Court found that BLM failed to (1) quantify GHG emissions from oil and gas leasing and development, and (2) analyze GHG emissions from all past, present, and reasonably foreseeable oil and gas leasing decisions from public lands on a regional and national scale. *See id.* at 67-78.

10.     Within a matter of weeks of the Court's remand in *WildEarth Guardians I*, BLM issued a new Supplemental Environmental Assessment ("EA") purporting to address the Court's mandate to take a hard look at the direct, indirect, and cumulative climate impacts of GHG

4

emissions resulting from its Wyoming leasing decisions. BLM's Supplemental EA and Finding of No Signficant Impact ("FONSI") both concluded that oil and gas development on the 283 Wyoming leases—totaling 303,995.7 acres of public lands—would have no significant climate impact.

11.     Finding that BLM again failed to properly analyze the direct, indirect, and cumulative impacts on our climate, Conservation Groups amended and supplemented their complaint, challenging the Federal Defendants' rushed supplemental environmental analysis and decision to reapprove the Wyoming leases. After Conservation Groups' claims were fully briefed, the Court issued an order holding that Federal Defendants' violated NEPA and the Court's prior opinion, by failing to take a hard look at the climate impacts of GHG emissions resulting from the Wyoming lease sales. *WildEarth Guardians v. Bernhardt* ("*WildEarth Guardians II*"), No. 16-1724-RC, 2020 WL 6701317 at *15 (D.D.C. Nov. 13, 2020). The Court again remanded the BLM's NEPA analysis so that the agency could properly address the identified deficiencies, and enjoined the agency from authorizing new oil and gas drilling until it satisfies its NEPA obligations. *Id.*

12.     *WildEarth Guardians I* and *II* exposed systemic failures in BLM's oil and gas leasing program. In response to *WildEarth Guardians I*, BLM further recognized the deficiency of its NEPA analyses regarding GHG emissions and climate change impacts for similar oil and gas leasing decisions in Utah and Colorado, and agreed to a voluntary remand of those decisions.

13.     In a separate but related case, Conservation Groups challenged BLM's approval of 23 oil and gas lease sales across five Western states based on the agency's failure to fully analyze the direct, indirect, and cumulative impacts of oil and gas leasing on climate. *WildEarth Guardians v. Bernhardt* ("*WildEarth Guardians III*"), No. 20-cv-0056-RC (D.D.C.). Before

Conservation Groups' claims were briefed, the Court granted Federal Defendants' motion for a voluntary remand of 24 of the 27 challenged oil and gas leasing decisions, covering 20 of the 23 lease sales. 2020 WL 6255291, at *1-2.

14.     However, BLM has failed to remedy similarly unlawful NEPA analyses supporting the leasing authorizations challenged herein, despite BLM's similar failure here to consider direct, indirect and cumulative GHG emissions and climate impacts in accordance with NEPA, as explained in *WildEarth Guardians I*, 368 F. Supp. 3d 41, and *WildEarth Guardians II*, 2020 WL 6701317 at *15.

15.     As a result, Conservation Groups hereby bring this civil action for declaratory and injunctive relief against BLM, challenging as arbitrary federal leasing authorizations encompassed in 28 separate lease sales across four Western states in violation of NEPA and its implementing regulations.

## JURISDICTION & VENUE

16.     This action arises under NEPA, 42 U.S.C. §§ 4321–4370h, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because the action raises a federal question. The Court has authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

18.     This action reflects an actual, present, and justiciable controversy between Conservation Groups and BLM within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201. Conservation Groups' interests will be adversely affected and irreparably injured if BLM continues to violate NEPA as alleged herein, and if it affirmatively implements the decisions challenged herein. These injuries are concrete and particularized and fairly traceable to BLM's

6

challenged decisions, providing the requisite personal stake in the outcome of this controversy

necessary for this Court's jurisdiction.

19.     The requested relief would redress the actual, concrete injuries to Conservation

Groups caused by BLM's failure to comply with duties mandated by NEPA and its

implementing regulations.

20.     The challenged agency actions are final and subject to judicial review pursuant to

5 U.S.C. §§ 702, 704, 706.

21.     Conservation Groups have exhausted any and all available and requested

administrative remedies.

22.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because both

Federal Defendants and one of the Plaintiffs, Physicians for Social Responsibility, reside in this

judicial district, and a substantial part of the events or omissions giving rise to the claims have

occurred in this district due to decisions made here by Federal Defendants. The underlying

decisionmaking and guidance, with respect to BLM's Oil and Gas Leasing Program as

disseminated to the agency's field offices, have occurred in this district due to decisions made by

Federal Defendants.

**PARTIES**

23.     PLAINTIFF WILDEARTH GUARDIANS ("Guardians") is a non-profit

membership organization based in Santa Fe, New Mexico, with offices throughout the Western

United States, including in Denver, Colorado; Boise, Idaho; Missoula, Montana; Portland,

Oregon; Seattle, Washington; and Tucson, Arizona. Guardians has over 275,000 members and

supporting activists, many of whom live, work, and/or recreate on and near the public lands and

minerals that are the subject of this Complaint. Guardians' mission is to protect and restore the

7

wildlife, wild places, wild rivers, and health of the American West. To fulfill this mission, Guardians and its members work to confront the harmful impacts of fossil fuel production and consumption and to advance a transition to clean, renewable energy in order to safeguard public health, the environment, and the climate.

24.     Plaintiff PHYSICIANS FOR SOCIAL RESPONSIBILITY ("PSR") is a nonprofit organization based in Washington, D.C., with chapters across the country and over 30,000 members and activists. PSR works with health professionals and other advocates to protect human life from the gravest threats to health and survival—in particular, the development and use of nuclear weapons and the catastrophic consequences of climate change and other environmental damage.

25.     Conservation Groups' members and supporters regularly use and enjoy the cultural resources, wildlands, wildlife habitat, rivers, streams, and healthy ecosystems on and adjacent to the federal public lands where the challenged leases are located in Colorado, New Mexico, Utah, and Wyoming. Specifically, Conservation Groups' members and supporters use the lands and areas affected by BLM's lease authorizations for camping, fishing, hiking, hunting, photographing scenery and wildlife, wildlife viewing, aesthetic enjoyment, and engaging in other vocational, scientific, and recreational activities. Conservation Groups' members derive recreational, inspirational, scientific, educational, and aesthetic benefit from their activities on lands within the leasing authorizations challenged herein, and on lands that are around or within view of lands affected by the leasing authorizations challenged herein. Some examples of Conservations' Groups members deriving enjoyment from public lands affected by the challenged leasing authorizations include, but are not limited to:

a.  Conservation Groups' members frequently recreate on public lands throughout Colorado that are impacted by the challenged oil and gas leases. Members frequently recreate on public lands in the Pawnee National Grassland, in and near the Arapaho National Wildlife Refuge, and on public lands adjacent to the White River near the town of Rangely, all areas where challenged oil and gas leases are located. In these areas and other parts of Colorado, members have both viewed areas that will be impacted by development of the leases and directly set foot on many of the challenged oil and gas leases.

b.  Conservation Groups' members frequently recreate on public lands throughout New Mexico that are impacted by the challenged oil and gas leases. Members frequently recreate on public lands east of the Guadalupe Mountains, east of Carlsbad Caverns National Park, and southeast of the town of Roswell, all areas where challenged oil and gas leases are located. In these areas and in other parts of New Mexico, members have both viewed areas that will be impacted by development of the leases and directly set foot on many of the challenged oil and gas leases.

c.  Conservation Groups' members frequently recreate on public lands throughout Utah that are impacted by the challenged oil and gas leases. Members frequently recreate on public lands in the Fishlake National Forest east of the town of Richfield and along the East Fork of the Sevier River in northern Garfield and southern Piute Counties, all areas where challenged oil and gas leases are located. In these areas and in other parts of Utah, members

have both viewed areas that will be impacted by development of the leases and directly set foot on many of the challenged oil and gas leases.

d.   Conservation Groups' members frequently recreate on public lands throughout Wyoming that are impacted by the challenged oil and gas leases. Members frequently recreate on public lands in and around the Adobe Town Wilderness Study Area in southern Wyoming, in and around the Honeycomb Buttes, Oregon Buttes, and Whitehorse Creek Wilderness Study areas in central Wyoming, west of the town of Casper, in and around the Fortification Creek Wilderness Study Area in northeast Wyoming, in and around the Thunder Basin National Grassland south of the town of Gillette, in and around the Great Divide Basin in south-central Wyoming, and in the Upper Green River Basin south of the town of Pinedale, all areas where challenged oil and gas leases are located. In these areas and in other parts of Wyoming, members have both viewed areas that will be impacted by development of the leases and directly set foot on many of the challenged oil and gas leases.

26.   Conservation Groups' members and supporters intend to continue to use and enjoy the lands affected by the challenged leasing authorizations. Conservation Groups' members and supporters also intend to continue to use and enjoy lands that are around or within view of lands affected by the leasing authorizations challenged herein, as well as federal public lands impacted by subsequent lease development. Conservation Groups' members and supporters intend to use these lands to enjoy cultural resources, wildlands, wildlife habitat, rivers, streams, and healthy environments frequently and on an ongoing basis long into the future, including in 2021 and in subsequent years.

10

27.     Conservation Groups' members' enjoyment of public lands in and adjacent to the leases challenged herein will be adversely affected and diminished as a result of BLM's leasing actions. Conservation Groups' members have not only recreated on public lands that include the lease sale parcels that are the subject of this lawsuit, but they also enjoy public lands adjacent to these parcels. The reasonably foreseeable development of these lease parcels will industrialize these treasured landscapes, produce visible air pollution that is offensive and threatening to health and safety, create noise that disrupts wildlife and recreational enjoyment, and lead to connected development that will further adversely impact nearby public lands, including road construction, truck traffic, and the construction of oil and gas pipelines and processing facilities needed to sustain the production of oil and gas on the lease parcels that are the subject of this lawsuit.

28.     Conservation Groups and their members have a procedural interest in BLM's full compliance with NEPA's planning and decisionmaking processes when authorizing oil and gas development on public lands in the American West and in and around the lease sale areas in particular, as well as BLM's attendant duty to substantiate its decisions in the record for these authorizations.

29.     A favorable ruling in this case would redress the harms that Conservation Groups' members and supporters stand to suffer as a result of BLM's actions. If BLM follows NEPA's procedural and substantive requirements and properly considered the climate impacts of its actions, it may reach a different decision and not offer many of the leases for sale and issuance. This would reduce and/or eliminate the threat of reasonably foreseeable oil and gas development, preventing the diminishment of the enjoyment of public lands used by Conservation Groups' members. A favorable ruling would reduce or eliminate harm to the Conservation Groups'

members. At the very least, a favorable ruling may delay development of oil and gas infrastructure on the leased parcels until BLM has taken a hard look and fully disclosed the direct, indirect, and cumulative climate impacts of its oil and gas leasing decisions, as required by law.

30.     Defendant SCOTT DE LA VEGA[2], sued in his official capacity as the Acting Secretary of the U.S. Department of the Interior, is responsible for managing the public lands and resources in the American West—including Colorado, New Mexico, Utah, and Wyoming—and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

31.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT, an agency within the United States Department of the Interior, is responsible for managing public lands and resources in Colorado, New Mexico, Utah, and Wyoming, including federal onshore oil and gas resources and the leasing program for those resources. In this managerial capacity, BLM is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

## LEGAL BACKGROUND

**I.     National Environmental Policy Act**

32.     NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1. Through NEPA, Congress recognized that "each person should enjoy a healthful environment"—and that the federal government will by all practicable means "assure

---

[2] Pursuant to Fed. R. Civ. P. 25(d), Acting Secretary of the Interior Scott De La Vega has been automatically substituted for former Secretary David L. Bernhardt.

12

for all Americans safe, healthful, productive, and esthetically and culturally pleasing

surroundings," and "attain the widest range of beneficial uses of the environment without

degradation, risk to health or safety, or other undesirable and unintended consequences," among

other policies. 42 U.S.C. § 4331(b). One critical goal of NEPA was to put consideration of

environmental impacts on equal footing with consideration of economic impacts. Thus, NEPA

requires agencies to "develop methods and procedures … which will insure that presently

unquantified environmental amenities and values may be given appropriate consideration in

decisionmaking along with economic and technical considerations." *Id.* § 4332(2)(B).

33.     NEPA regulations in 40 C.F.R. §1500.1(c) explain that:

> Ultimately, of course, it is not better documents but better decisions that
> count. NEPA's purpose is not to generate paperwork – even excellent
> paperwork – but to foster excellent action. The NEPA process is intended
> to help public officials make decisions that are based on understanding of
> environmental consequences, and take actions that protect, restore, and
> enhance the environment.

34.     NEPA achieves its purpose through "action forcing procedures . . . requir[ing]

that agencies take a *hard look* at environmental consequences." *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 350 (1989) (internal citations omitted) (emphasis added).

35.     "Agencies shall integrate the NEPA process with other planning at the earliest

possible time to insure that planning and decisions reflect environmental values, to avoid delays

later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.

36.     Federal agencies must comply with NEPA before there are "any irreversible and

irretrievable commitments of resources which would be involved in the proposed action should it

be implemented." 42 U.S.C. § 4332(2)(C)(v). For oil and gas, "the leasing stage is the point of

no return with respect to GHG emissions." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 66.

Thus, BLM is required to fully analyze the reasonably foreseeable impacts of GHG emissions at the leasing stage. *Id.*

37.     To accomplish this purpose, NEPA requires federal agencies to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, indirect, and cumulative environmental effects, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16. The scope of the analysis must include "[c]umulative actions," or actions that "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same statement," and "[s]imilar actions," or actions that "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together." 40 C.F.R. § 1508.25(a)(2), (3).

38.     An EIS "is sometimes required[] for broad Federal actions such as the adoption of new agency programs." 40 C.F.R. § 1502.4(b). Thus, "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." *Id.* § 1502.4(a). Accordingly, a programmatic EIS is appropriate to address a "steady flood of activity" from a federal agency that results in harmful pollution. *Nat'l Wildlife Fed'n v. Benn*, 491 F. Supp. 1234, 1249-50 (S.D.N.Y. 1980).

39.     Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative effects are "the impact on the environment which results from the

14

incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. "Effects" are synonymous with "impacts." *Id.* § 1508.8.

40.     These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. § 1508.8.

41.     BLM's analysis must do more than merely identify impacts; it must also "evaluate the severity" of effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); 40 C.F.R. § 1502.16(a)–(b) (recognizing that agency must explain the "significance" of effects).

42.     An agency may also prepare an environmental assessment ("EA") to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

43.     If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI"). *Id.* § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13. An assessment of whether or not an impact is "significant" is based on a consideration of the "context and intensity" of the impact. *Id.* § 1508.27. "Context" refers to the scope of the proposed action, including the interests affected. *Id.* § 1508.27(a). "Intensity" refers to the severity of the impact and must be evaluated with a host of factors in mind, including but not limited to [u]nique characteristics of the geographic area[,]" "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks[,]" and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.* § 1508.27(b).

44.     NEPA allows an agency to "tier" a site-specific environmental analysis for a project to a broader EIS for a program or plan under which the subsequent project is carried out. *Id.* § 1508.28. When an agency tiers a site-specific analysis to a broader EIS, "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." *Id.* § 1502.20.

45.     As a general rule, tiering a site-specific EA to another NEPA document is only appropriate where "the conditions and environmental effects described in the broader NEPA document are still valid" or the site-specific EA addresses any exceptions. 43 C.F.R. § 46.140. If the programmatic EIS sufficiently analyzes the impacts of the site-specific action, the agency is not required to perform additional analysis of impacts. *Id*. § 46.140(a). However, if the impacts analysis in the programmatic EIS "is not sufficiently comprehensive or adequate to support further decisions," the agency's EA must explain this and provide additional analysis. *Id* § 46.140(b).

46.     In some cases, BLM may prepare a Determination of NEPA Adequacy ("DNA") to assess whether existing documents demonstrate compliance with NEPA. DNAs are not NEPA documents themselves and can only be used to determine the sufficiency of previously issued NEPA documents.

## II.     The Administrative Procedure Act

47.     The Administrative Procedure Act ("APA") provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.* § 704.

16

48.     Under the APA, a reviewing court shall "hold unlawful and set aside agency

action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." *Id.* § 706(2)(A). A court must also compel agency action unlawfully withheld or

unreasonably delayed. *Id.* § 706(1).

## III.    **Legal Framework for Federal Oil and Gas Lease Authorizations**

### A.    <u>Mineral Leasing Act</u>

49.     Under the Mineral Leasing Act of 1920 ("MLA"), as amended, the Secretary of

the Interior is responsible for managing and overseeing mineral development on public lands, not

only to ensure safe and fair development of the mineral resource, but also to "safeguard[] … the

public welfare." 30 U.S.C. § 187.

50.     The Secretary has certain discretion, constrained by the laws at issue in this case,

to determine where, when, and under what terms and conditions mineral development should

occur. 43 C.F.R. § 3101.1-2. The grant of rights in a federal mineral lease is subject to a number

of reservations of authority to the federal government, including reasonable measures concerning

the timing, pace, and scale of development. *Id.*

51.     Not all of the parcels offered for sale in any given BLM lease sale are awarded

through competitive bidding. For example, in 2018, BLM reported that of the 3,073 lease sale

parcels offered for sale, only 1,336 received bids. Parcels offered but not sold at auction are

made available for private sale for two years after the competitive lease sale. 30 U.S.C. §

226(b)(1)(A).

52.     BLM's MLA regulations also state that "[t]he authorized officer may suspend the

offering of a specific parcel while considering a protest or appeal against its inclusion in a Notice

of Competitive Lease Sale." *Id.* § 3120.1-3.

17

**B.** **BLM's Oil and Gas Planning and Management**

53.     BLM manages onshore oil and gas development through a three-phase process. Each phase is distinct, serves distinct purposes, and is subject to distinct rules, policies, and procedures.

54.     In the first phase, BLM prepares a Resource Management Plan ("RMP") in accordance with 43 C.F.R. §§ 1600 *et seq.*, and BLM's Land Use Planning Handbook (H-1601-1). An RMP projects present and future uses of public lands and resources by establishing management priorities, as well as guiding and constraining BLM's implementation-stage management. With respect to fluid mineral leasing decisions, BLM generally determines which federal minerals will be open to leasing and under what conditions. BLM's determinations are to be based on a hard look analysis of the direct, indirect, and cumulative impacts to the human environment of predicted implementation-stage development in the RMP's corresponding EIS.

55.     Along with the RMP, BLM generally develops a reasonably foreseeable development scenario ("RFDS") outlining the projected pace and scope of oil and gas development within the RMP planning area. An RFDS does not include any analysis of environmental impacts and is not a NEPA document.

56.     In the second phase, oil and gas companies typically nominate leaseholds for sale through the submission of an "Expression of Interest." *See* 43 C.F.R. § 3120.1-1 (providing that "lands included in any expression of interest … shall be offered for competitive bidding"). BLM then assesses whether these lands are available, identifies the boundaries for lands to be offered for lease, and proceeds to offer up those lands through a lease sale. Leases are sold in accordance with 43 C.F.R. §§ 3120 *et seq.*, and agency guidance, including BLM Instruction Memorandum ("IM") 2010-117, which applies to all oil and gas leases issued between May 17, 2011 and

18

January 29, 2018, and BLM IM No. 2018-034,[3] which applies to all oil and gas leases issued

between January 30, 2018 to current day. The BLM state office generally oversees the lease sale,

while the BLM field office where the specific lease parcels are located conducts NEPA review,

solicits public comment, and applies appropriate site-specific leasing stipulations.

57.     BLM regulations allow for the public to protest the sale of specific parcels. 43

C.F.R. § 3120.1-3. Although BLM may proceed with a lease sale after a protest has been filed,

BLM must resolve any and all protests received prior to issuing a lease parcel to a successful

bidder. BLM Competitive Leases Handbook H-3120-1, Section II.G. ("Every effort must be

made to decide the protest prior to the sale."); IM 2018-034 ("State offices should attempt to

resolve protests in a signed decision before the sale of the protested parcels.").

58.     NEPA regulations mandate that agencies "shall to the fullest extent possible …

[e]ncourage and facilitate public involvement in the decisions which affect the quality of the

human environment." 40 C.F.R. § 1500.2(d). BLM regulations also require public participation

during oil and gas lease sales. *See* 40 C.F.R. § 3120.1-3 (requiring a protest period), § 3120.4-1

(requiring notice of a competitive lease sale).

59.     BLM is also required to take a hard look at the impacts from the lease sale before

parcels are sold. "A hard look requires that BLM assess the 'reasonably foreseeable' impacts of a

---

[3] In *Western Watersheds Project v. Zinke*, the District of Idaho found IM 2018-034 to be "both
procedurally and substantively invalid under FLPMA and NEPA," and set aside IM 2018-034's
inadequate public participation provisions within the Greater Sage-Grouse Habitat Management
Areas at issue in that case. 441 F. Supp. 3d 1042, 1073, 1085 (D. Idaho 2020), *reconsideration
denied, partial stay granted*, No. 1:18-CV-00187-REB, 2020 WL 2462817 (D. Idaho May 12,
2020). The Court further issued an order setting aside and vacating BLM oil and gas lease sales
issued under IM 2018-034's inadequate public participation provisions. *Id.* at 1086-89.

proposed action before an 'irretrievable commitment[ ] of resources' is made that would trigger

those impacts." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 64 (citing 42 U.S.C. §

4331(2)(C)(v), *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999)).

"[T]he leasing stage is the point of no return with respect to GHG emissions." *Id.* at 66.

60.     Prior to the point BLM sells a lease, BLM may refuse to lease public lands, even

if public lands were made available for leasing pursuant to the RMP. *Udall v. Tallman*, 380 U.S.

1, 4 (1965).

61.     Prior to a BLM lease sale, BLM has the authority to subject leases to terms and

conditions, which can serve as "stipulations" to protect the environment. 43 C.F.R. § 3101.1-3.

Once BLM issues leases, it may only impose conditions of approval ("COAs") that are delimited

by the terms and conditions of the lease. *Id.* § 3101.1-2.

62.     Once sold, the lease purchaser has the right to use as much of the leased land as is

necessary to explore and drill oil and gas within the lease boundaries, subject to stipulations

attached to the lease. *Id.*

63.     The Secretary of the Interior has the authority to cancel leases that have been

"improperly issued." 43 C.F.R. § 3108.3(d). A lease may be canceled where BLM has not

complied with NEPA prior to lease issuance. *Clayton W. Williams, Jr.*, 103 IBLA 192 (1988).

64.     The third-phase occurs once BLM issues a lease. In order to develop the minerals,

the lessee is required to submit an application for permit to drill ("APD") to BLM. 43 C.F.R. §

3162.3-1(c). At this stage, BLM may condition the approval of the APD on the lessees' adoption

of "reasonable measures" whose scope is delimited by the lease and the lessees' surface use

rights. *Id.* § 3101.1-2.

65.     Oil and gas operations must be conducted in accordance with BLM regulations at

43 C.F.R. §§ 3160 *et seq*.

## FACTUAL BACKGROUND

**I.     The Climate Crisis**

66.     The scientific consensus is clear: as a result of GHG emissions, our climate is rapidly destabilizing with potentially catastrophic results, including rising seas, more extreme heatwaves, increased drought and flooding, larger and more devastating wildfires and hurricanes, and other destructive changes. It is now conclusively-established that GHG emissions—in particular carbon dioxide and methane—from the production and combustion of fossil fuels, such as coal, oil, and gas, are the predominant drivers of climate change.

67.     Carbon dioxide ("$CO_2$") is the leading cause of climate change and the largest source of GHG emissions in the United States. According to a 2019 EPA report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2017*,[4] carbon dioxide comprised 82 percent of total U.S. GHG emissions, or 5,270.7 million metric tons. EPA's data indicates that fossil fuel combustion accounted for 93.2 percent of $CO_2$ emissions in 2017.

68.     Methane is an extremely potent GHG, with a global warming potential 86 times greater than $CO_2$ over a 20-year period. Over a 100-year period, methane has a climate impact 28 to 36 times greater than $CO_2$ on a ton-for-ton basis. Large amounts of methane are released during the extraction, processing, transportation, and delivery of oil and gas, with significant climate impacts.

69.     The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-

---

[4] Available online at: https://www.epa.gov/sites/production/files/2019-04/documents/us-ghg-inventory-2019-main-text.pdf.

winning scientific body within the United Nations that reviews and assesses the most recent

scientific, technical, and socio-economic information relevant to our understanding of climate

change. In its 2014 assessment report on climate change,[5] the IPCC provided a summary of our

understanding of human-caused climate change:

- Human influence on the climate system is clear, and recent anthropogenic emissions of [GHGs] gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems.

- Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.

- Anthropogenic [GHGs] greenhouse gas emissions have increased since the pre-industrial era, driven largely by economic and population growth, and are now higher than ever. This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years. Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been the dominant cause of the observed warming since the mid-20[th] century.

- In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans. Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.

- Continued emission of [GHGs] will cause further warming and long-lasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in [GHG] emissions which, together with adaptation, can limit climate change risks.

- Surface temperature is projected to rise over the 21st century under all assessed emission scenarios. It is very likely that heat waves will occur more

---

[5] IPCC, Climate Change 2014 Synthesis Report, Summary for Policymakers, available at http://www.ipcc.ch/pdf/assessment-report/ar5/syr/AR5_SYR_FINAL_SPM.pdf.

often and last longer, and that extreme precipitation events will become more intense and frequent in many regions. The ocean will continue to warm and acidify, and global mean sea level to rise.

70.     The IPCC recently issued a special report[6] in October 2018 that examined, in more depth, the impacts of global warming of 1.5°C above pre-industrial levels as compared to 2.0°C. The IPCC's findings included:

- Climate models project robust differences in regional climate characteristics between present-day and global warming of 1.5°C, and between 1.5°C and 2°C. These differences include increases in: mean temperature in most land and ocean regions (high confidence), hot extremes in most inhabited regions (high confidence), heavy precipitation in several regions (medium confidence), and the probability of drought and precipitation deficits in some regions (medium confidence).

- By 2100, global mean sea level rise is projected to be around 0.1 metre lower with global warming of 1.5°C compared to 2°C (medium confidence).

- On land, impacts on biodiversity and ecosystems, including species loss and extinction, are projected to be lower at 1.5°C of global warming compared to 2°C. Of 105,000 species studied, 6% of insects, 8% of plants and 4% of vertebrates are projected to lose over half of their climatically determined geographic range for global warming of 1.5°C, compared with 18% of insects, 16% of plants and 8% of vertebrates for global warming of 2°C (medium confidence).

- For oceans, coral reefs are projected to decline by a further 70–90% at 1.5°C (high confidence) with larger losses (>99%) at 2°C (high confidence).

- Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5°C and increase further with 2°C. Limiting warming to 1.5°C could reduce the number of people both exposed to climate-related risks and susceptible to poverty by up to several hundred million by 2050 (medium confidence).

---

[6] IPCC Special Report, Global Warming of 1.5°: Summary for Policy Makers (2018), http://report.ipcc.ch/sr15/pdf/sr15_spm_final.pdf.

- Pathways limiting global warming to 1.5°C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (high confidence). These systems transitions are unprecedented in terms of scale, but not necessarily in terms of speed, and imply deep emissions reductions in all sectors, a wide portfolio of mitigation options and a significant upscaling of investments in those options (medium confidence).

- Estimates of the global emissions outcome of current nationally stated mitigation ambitions as submitted under the Paris Agreement would lead to global [GHG] gas emissions in 2030 of 52–58 GtCO2eq yr−1 (medium confidence). Pathways reflecting these ambitions would not limit global warming to 1.5°C, even if supplemented by very challenging increases in the scale and ambition of emissions reductions after 2030 (high confidence). Avoiding overshoot and reliance on future large-scale deployment of carbon dioxide removal (CDR) can only be achieved if global CO2 emissions start to decline well before 2030 (high confidence).

71.    The western United States is particularly susceptible to the effects of climate change. The West is experiencing increasing temperatures and prolonged droughts. The impacts of these changes are widespread across our forests, wildlife, and human communities, threatening the West's resilience in the face of continued warming. These impacts also have significant importance to local economies that are reliant on consistent precipitation and snowfall for surface and groundwater recharge, agriculture, recreation, and other uses.

72.    According to the Fourth National Climate Assessment,[7] released in 2018, temperatures have already "increased across almost all of the Southwest region[8] from 1901 to 2016," magnifying the impacts of drought and wildfire. For example, hotter temperatures have already contributed to reductions in snowpack, amplifying drought conditions in the Colorado

---

[7] Reidmiller *et al.*, USGCRP, Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II (2018), https://nca2018.globalchange.gov/.
[8] The Southwest region includes Colorado, New Mexico, and Utah.

River Basin, the Rio Grande, and other critical watersheds. It is also estimated that the area burned by wildfire across the western United States between 1984 and 2015 was twice what would have burned had climate change not occurred.

73.     Future projections for the West are even more alarming. In the Southwest, climate change threatens to lead to "to aridification (a potentially permanent change to a drier environment) … through increased evapotranspiration, lower soil moisture, reduced snow cover, earlier and slower snowmelt, and changes in the timing and efficiency of snowmelt and runoff." Climate change-related drought has already had massive impacts on food production and the agricultural economy of rural areas in the Southwest, and poses a long-term threat to food security in the region.

74.     For the Northern Great Plains, which includes Wyoming, the Fourth National Climate Assessment found "[t]he highly variable climate of the Northern Great Plains poses challenges for the sustainable use of water, land, and energy resources by competing urban, suburban, rural, and tribal populations." Climate change is expected "to exacerbate those challenges, which include 1) effectively managing both overabundant and scarce water resources, 2) supporting adaptation of sustainable agricultural systems, 3) fostering conservation of ecosystems and cultural and recreational amenities, 4) minimizing risk to energy infrastructure that is vulnerable to climate change and extreme weather events, and 5) mitigating climate impacts to vulnerable populations."

## II.     Federal Climate Policy

75.     In 2001, at the start of the George W. Bush Administration, the Secretary of the Interior established Interior policy that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision

making." Secretarial Order 3226, *Evaluating Climate Change Impacts in Management Planning* (January 19, 2001). Secretarial Order 3226 established the responsibility of Interior agencies, such as BLM, to "consider and analyze potential climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."

76.     In a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources,* the U.S. Governmental Accountability Office ("GAO"), concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored.

77.     Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (September 14, 2009), reinstated the provisions of Order 3226, and recognized that "the realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that Interior is "responsible for helping protect the nation from the impacts of climate change."

78.     In Executive Order No. 13514, *Federal Leadership in Environmental, Energy, and Economic Performance* (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their GHG emissions from direct and indirect activities." 74 Fed. Reg. 52,117 (Oct. 8, 2009) (revoked by Executive Order No. 13693, revoked by Executive Order No. 13834). This directive was followed up by Executive Order No. 13693, *Planning for Federal Sustainability in the Next Decade* (March 25, 2015), which reaffirmed the federal government's

commitment to reducing GHG emissions. 80 Fed. Reg. 15,871 (March 25, 2015).

79.     In 2009, the Environmental Protection Agency ("EPA") issued a formal finding under the Clean Air Act, 42 U.S.C. § 7521(a), that the changes in our climate caused by elevated concentrations of GHGs in the atmosphere are reasonably anticipated to endanger the public health and welfare of current and future generations. 74 Fed. Reg. 66,496 (Dec. 15, 2009). EPA concluded that "the body of scientific evidence compellingly supports" the finding and recognized the potential human-induced climate change to have "far-reaching and multidimensional" impacts. *Id.* at 66,497. In 2015, EPA acknowledged more recent scientific assessments that "highlight the urgency of addressing the rising concentrations of $CO_2$ in the atmosphere." 80 Fed. Reg. 64,661 (Oct. 23, 2015). The D.C. Circuit upheld this decision as supported by the vast body of scientific evidence on the subject. *See Coal. for Responsible Regulation, Inc. v. EPA.*, 684 F.3d 102, 120-22 (D.C. Cir. 2012).

80.     The White House Council on Environmental Quality ("CEQ") has also recognized the unique nature of climate change and the challenges it imposes on NEPA compliance. On August 1, 2016, the CEQ released its *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews* (hereafter, "2016 Climate Guidance") (withdrawn on April 5, 2017, 82 Fed. Reg. 16,576 (Apr. 5, 2017)). Applicable to all proposed federal agency actions, "including land and resource management actions," *id.* at 9, the 2016 Climate Guidance recognized that:

> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. *Therefore, a statement that*

*emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA.* Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact.

*Id.* at 10-11 (emphasis added).

81.     The 2016 Climate Guidance also stated that "[i]n the context of long-range energy, transportation, and resource management strategies … it would be useful and efficient to provide an aggregate analysis of GHG emissions or climate change effects in a programmatic analysis and then incorporate by reference that analysis into future NEPA reviews." In particular, CEQ identified "issuing leases for oil and gas drilling" as a "site-specific action[] that may benefit from being able to tier to a programmatic NEPA review."

82.     Just as the Trump Administration's denial of the climate crisis does not alter scientific reality, its withdrawal of the 2016 CEQ Climate Guidance and other climate policies does not alter BLM's obligation under NEPA to take a hard look and fully assess the significance of the climate impacts of its oil and gas leasing decisions. In failing to make such an assessment, BLM has refused to avail itself to readily-available, scientifically-accepted tools for evaluating the significance of GHG emissions.

### A.     The Social Cost of Carbon

83.     In recognition of the consequences of human-caused climate change, federal agencies have developed a protocol for assessing the social cost of carbon dioxide emissions. The social cost of carbon is "an estimate of the monetized damages associated with an

incremental increase in carbon emissions in a given year."[9] Conversely, the social cost of carbon can represent "the value of damages avoided for a small emission reduction (i.e., the benefit of a $CO_2$ reductions)." The EPA has explained:

> The [social cost of carbon protocol] is meant to be a comprehensive estimate of climate change damages and includes changes in net agricultural productivity, human health, property damages from increased flood risk, and changes in energy system costs, such as reduced costs for heating and increased costs for air conditioning. However, given current modeling and data limitations, it does not include all important damages.[10]

84.    A federal Interagency Working Group ("Working Group"), consisting of multiple federal agencies, has prepared estimates of the cost that carbon pollution has on society. The Working Groups prepared its first Social Cost of Carbon estimates in 2010, which was subsequently updated in 2013, 2015, and 2016.[11]

85.    The Working Group's Social Cost of Carbon estimates vary according to assumed discount rates and presumptions regarding the longevity and damages caused by carbon pollution in the atmosphere, which for 2015 produced a range of between $11 and $105 per metric ton of $CO_2$. Accepted practice typically applies the median value to determine the social costs of a given project, although the range of values provided by the Working Group is also useful for comparing alternatives and evaluating the significance of climate impacts from a program or project. For 2020, the median Social Cost of Carbon value is $42 per metric ton, which increases

---

[9] EPA Fact Sheet, The Social Cost of Carbon (2016), https://www.epa.gov/sites/production/files/2016-12/documents/social_cost_of_carbon_fact_sheet.pdf.
[10] Id.
[11] Interagency Working Group, Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 at 3 (2016).

over time as additional carbon emissions become more costly to society. The Social Cost of Carbon is considered an extremely conservative value for a variety of reasons, including that it fails to account for numerous climate impacts.

86.     A number of the underlying Resource Management Plans for the lease sales monetize the benefits of oil and gas development.

87.     BLM has used the Social Cost of Carbon to assess the impacts of its oil and gas lease sales in the past, but did not utilize this available tool to analyze the impacts of any of the challenged lease sales.

**B.     Carbon Budgeting**

88.     Carbon budgeting is another well-established method for estimating the impacts from GHG emissions. A "carbon budget" offers a cap on the remaining amount of GHG emissions that can be emitted while still keeping global average temperature rise below scientifically-based warming thresholds.

89.     The 2018 IPCC special report on *Global Warming of 1.5°C* provided a revised global carbon budget for a 66 percent probability of limiting warming to 1.5°C, estimated at 420 $GtCO_2$ and 570 $GtCO_2$ depending on the temperature dataset used, from January 2018 onwards. At the current emissions rate of 42 $GtCO_2$ per year, this carbon budget would be expended in just 10 to 14 years, underscoring the urgent need for transformative national and global action to transition from fossil fuel use to clean energy. *Id*.

90.     Using the IPCC's revised carbon budget, a 2019 Oil Change International Report found that "oil, gas, and coal in existing fields and mines would push the world far beyond 1.5°C

while exhausting a 2°C budget as well."[12] Thus, there is no room for new fossil fuel development if we are to keep warming below 1.5 or even 2°C.[13]

91.     U.S federal fossil fuel resources (both leased and unleased) on public lands contain enough recoverable coal, oil and gas that, if extracted and burned, would result in as much as 492 GtCO$_2$, surpassing the entire *global* carbon budget for a 1.5°C target and nearly eclipsing the 2°C target.[14] Unleased federal fossil fuels comprise 91% of these potential emissions, with already leased federal fossil fuels accounting for as much as 43 GtCO$_2$, using up the most if not all of the remaining U.S. carbon budget.[15] In short, *any* new leasing of federal fossil fuel resources is inconsistent with a carbon budget that would seek to avoid catastrophic climate change.

92.     Instead of ratcheting down emissions, the United States is gearing up for a carbon burst fueled by expanding oil and gas production.[16] A 2019 Oil Change International Report found:

- Between now and 2030, the United States is on track to account for 60 percent of world growth in oil and gas production, expanding extraction at least four times more than any other country. This is the time period over which climate scientists say global carbon dioxide (CO$_2$) emissions should

---

[12] Oil Change International, Drilling Toward Disaster 1, 11 (2019), http://priceofoil.org/2019/01/16/report-drilling-towards-disaster/.

[13] *Id.*

[14] EcoShift Consulting, The Potential Greenhouse Gas Emissions from U.S. Federal Fossil Fuels 1, 3 (2016).

[15] To conform to a 1.5°C target, the estimated U.S. carbon budget is 25 GtCO2eq to 57 GtCO2eq on average, depending on the sharing principles used to apportion the global budget across countries. Robiou du Pont, Yann et al., EQUITABLE MITIGATION TO ACHIEVE THE PARIS AGREEMENT GOALS, 7 NATURE CLIMATE CHANGE 38, Supplemental Tables 1 and 2 (2017).

[16] Oil Change International, Drilling Toward Disaster 1, 11 (2019), http://priceofoil.org/2019/01/16/report-drilling-towards-disaster/.

be roughly halved to stay in line with the 1.5°C target in the Paris Agreement.

- Between 2018 and 2050, the United States is set to unleash the world's largest burst of $CO_2$ emissions from new oil and gas development (Figure ES-2). U.S. drilling into new oil and gas reserves – primarily shale – could unlock 120 billion metric tons of $CO_2$ emissions, which is equivalent to the lifetime $CO_2$ emissions of nearly 1,000 coal-fired power plants.

- If not curtailed, U.S. oil and gas expansion will impede the rest of the world's ability to manage a climate-safe, equitable decline of oil and gas production. We find that, under an illustrative 1.5°C pathway for oil and gas taken from the Intergovernmental Panel on Climate Change (IPCC), U.S. production would exhaust nearly 50 percent of the world's total allowance for oil and gas by 2030 and exhaust more than 90 percent by 2050.[17]

93.    If BLM ceased new leasing and renewal of existing non-producing leases, total projected oil production would be reduced by 12% in 2025 and 65% by 2040, while natural gas production could be reduced by 6% in 2025 and 59% by 2040.[18]

94.    This avoided production would significantly reduce future U.S. emissions, and is desperately needed to avoid catastrophic climate change. Cessation of new and renewed leases for federal fossil fuel extraction could reduce annual $CO_2$ emissions by about 100 Mt by 2030.[19]

## III.    Greenhouse Gas Pollution from BLM's Oil and Gas Management Program

95.    BLM is responsible for the management of nearly 700 million acres of federal onshore subsurface minerals. As of 2018, BLM has leased 25.5 million acres of public lands for oil and gas, containing 38,147 individual oil and gas lease parcels and 96,000 active producible oil and gas wells.

---

[17] *Id.* at 6.
[18] P. Erickson & M. Lazarus, How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect $CO_2$ Emissions and 2 °C goals, Stockholm Institute, WP 2016-02 16 (2016).
[19] *Id.* at 26.

96.     NEPA's implementing regulations define a "program" as "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18. BLM's oil and gas leasing activities fall within this definition of a program because they are "connected agency decisions allocating agency resources to implement" the MLA for the purpose of exploration or development of oil and natural gas resources. *Id.*

97.     BLM expressly refers to its oil and gas leasing activities as a program. According to BLM's website, "BLM manages the Federal government's onshore oil and gas program with the goals of facilitating safe and responsible energy development while providing a fair return for the American taxpayer. For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States."

98.     All of the leasing authorizations challenged herein are part of BLM's comprehensive Oil and Gas Leasing Program to implement the Mineral Leasing Act.

99.     BLM's Oil and Gas Leasing Program contributes vast amounts of GHGs into the atmosphere, threatening the climate, the natural environment, and public health. In 2018, the U.S. Geological Survey released its first ever inventory of GHG emissions associated with federal coal and oil and gas production. The report revealed that on average between 2005 to 2014, fossil fuel production on federal public lands contributed 23.7 % of all U.S. $CO_2$ emissions

or 1,279 million metric tons.[20] This is the equivalent of annual GHG emissions from over 329

coal-fired power plants in one year. Taking into account releases of methane and other GHGs,

federal fossil fuel production generated nearly 25% of all U.S. GHG emissions over that same

time period. Emissions in 2014 from petroleum products and natural gas were estimated at

498.93 million metric tons of carbon dioxide equivalent ($CO_2e$), equaling the emissions from 128

coal-fired power plants.[21]

100.    In spite of the worsening climate crisis, Federal Defendants continue to authorize

the sale and issuance of hundreds of federal oil and gas leases on public lands across the

American West without meaningfully acknowledging or fully evaluating the climate change

implications of their actions.

**IV.    BLM's Oil and Gas Leasing Program and BLM's Individual Leasing Decisions Fail
to Consider Climate Change.**

101.    BLM made the leasing decisions challenged herein for four western states—

Colorado, New Mexico, Utah, and Wyoming—through separate administrative processes for

each lease sale. In general, the NEPA process for each sale included: a scoping period, a

comment period on the draft EA, and a protest period before the actual lease sale. Plaintiff

WildEarth Guardians fully participated during the administrative process for each of the

decisions challenged herein, raising the issues underlying the NEPA claims in this case.

102.    A list of the challenged lease sales is included in Table A at the end of this

---

[20] M.D. Merrill et al., U.S. Geological Survey, Federal Lands Greenhouse Gas Emissions and
Sequestration in the United States—Estimates for 2005–14 at 1, 7 (2018),
https://pubs.er.usgs.gov/publication/sir20185131.
[21] *Id.*

Complaint. Conservation Groups specifically challenge each of BLM's leasing authorizations associated with the lease sales identified in Table A, including the associated EAs, FONSIs, and decision records, as well as all applicable Supplemental EAs and Supplemental FONSIs.[22] Deficiencies in BLM's NEPA analysis concerning the direct, indirect, and cumulative GHG emissions resulting from each sale, and the impacts of these emissions on climate change, are common amongst each of the challenged decisions.

103.    BLM has never analyzed the vast contribution of GHG emissions or climate impacts of its Oil and Gas Leasing Program at the programmatic level. Likewise, BLM has not done so in the Resource Management Plans to which many of the challenged lease authorizations tier. This failure is carried forward to the agency's site-specific leasing decisions, including the decisions challenged herein, which fail to sufficiently quantify or analyze the direct, indirect, or cumulative impacts of foreseeable GHG emissions that will result from the BLM's leasing authorizations and the impact of these emissions on the environment, human health, and our climate.

A.    **Direct Impacts of Oil and Gas Leasing.**

104.    Although some minor variation exists among the challenged leasing EAs, many of the challenged EAs include at least one of the following deficiencies in BLM's treatment of direct impacts of GHG emissions related to oil and gas development on the challenged leases: (1)

---

[22] Because BLM prepared multiple decision records for several of the Colorado and Utah lease sales, Conservation Groups understand there to be 40 separate original decision records for the 28 separate lease sales challenged herein. On January 14, 2021, BLM Utah also finalized a Supplemental EA  and FONSI for the Utah lease sales. (DOI-BLM-UT-0000-2021-0001-EA). Conservation Groups intend to challenge *all* BLM leasing decisions associated with the lease sales identified in Table A.

BLM failed to calculate direct emissions for the full duration of any future development; and (2) BLM illegally relied on broad, field office wide emissions as opposed to site-specific per well emissions to assess direct emissions.

105.    As a result of only calculating annual direct emissions when authorizing oil and gas development and GHG emissions that will continue for decades, BLM continues to obscure the full impacts from its lease sale.

106.    Where BLM relied on broad, field office wide emissions, BLM generally asserts that analyzed emissions this way because it is not possible to estimate production-level GHG emissions or analyze the effects of these emissions until lessees submit parcel-specific development plans at the subsequent permitting stage. This is incorrect. As the Court recognized in *WildEarth Guardians I*, 368 F. Supp. 3d at 68-69, BLM has "a mix of information" available to the agency at the leasing stage that allows BLM to "reasonably quantify" GHG emissions including raw data in leasing EAs that "allow[s] BLM to project the pace and scope of oil and gas development on the leased parcels," state GHG inventories, Resource Management Plan EISs, and various technical reports. In other words, the relevant and necessary data is available at the leasing stage to project well development from each lease parcel at the leasing sale stage. BLM has simply refused to apply existing information and disclose the resulting effects to the public.

107.    In its leasing EAs, BLM admits: "future development of these leases would result in emissions of … GHG pollutants." BLM also recognizes that "leasing is considered to be an irretrievable commitment of resources." Yet, after foregoing climate analysis at the programmatic level, BLM again postpones fully estimating and analyzing the scale of these GHG emissions until the permitting stage when it receives an application to drill. Critically, at

this final stage, BLM's authority is limited to imposing mitigation measures consistent with the terms of the lease, and can no longer prevent development altogether. Indeed, this Court recognized in *WildEarth Guardians I*, 368 F. Supp. 3d at 66, that "the leasing stage is the point of no return with respect to emissions." Thus, there is no doubt that BLM is required to estimate direct GHG emissions at the leasing stage.

      **B.**    **Indirect Impacts of Oil and Gas Leasing.**

108.    Although some minor variations between the challenged EAs exist, in general, BLM's indirect GHG emissions analyses in the leasing EAs suffer from two main deficiencies: (1) BLM failed to calculate indirect emissions for the full duration of any future development; and (2) BLM illegally relied on broad, field office wide emissions as opposed to site-specific per well emissions to assess indirect emissions.

109.    As a result of only calculating annual indirect emissions, BLM continues to obscure the full impacts from its lease sale. And, because downstream impacts caused by the oil and gas extracted from the leases are reasonably foreseeable on a parcel by parcel basis, NEPA requires BLM to analyze the impacts of downstream GHG emissions resulting from its leasing decisions. BLM's failure to properly do so here violates NEPA.

      **C.**    **Cumulative Impacts of Oil and Gas Leasing.**

110.    The issuance of leases covering 890 parcels resulting from the 19 lease sales at issue in this case will result in new oil and gas development on over one million acres of public lands across four states in the American West. BLM must consider the cumulative impacts of these new leases in the context of ongoing oil and gas production across our public lands as necessary to understand both the contribution of the GHG emissions from the challenged leasing decisions, as well as the contribution of GHG emissions from BLM's Oil and Gas Leasing

Program to state, regional, and national GHG emissions and their associated effects.

111.    BLM data for fiscal year 2019 shows that 18.6 million acres—of the 26.3 million total acres—of public lands already leased for oil and gas development are in Colorado, New Mexico, Utah, and Wyoming. Approximately 10.6 million of these leased acres on public lands in Colorado, New Mexico, Utah, and Wyoming were actively producing oil and gas in fiscal year 2019.

112.    For each of the oil and gas leasing EAs, although BLM provides a generalized discussion of anticipated climate impacts within the region encompassing a given lease sale, none of the leasing EAs fully estimated the contribution of GHG emissions from the lease authorizations in conjunction with GHG emissions from past, present, and reasonably foreseeable GHG-emitting oil and gas activities on public lands at a regional and national scale, including BLM lease sales occurring during the same time period in the region. Nor did BLM analyze the resulting climate impacts of cumulative GHG emissions from these activities in the leasing EAs.

113.    In some leasing EAs, BLM only estimated cumulative emissions within the BLM field office where the lease sale parcels were located, and did not consider the contribution of GHG emissions from a particular field office in conjunction with GHG emissions from past, present, and reasonably foreseeable GHG-emitting oil and gas activities on public lands within the region or nation.

114.    In other leasing EAs, BLM continues to fail to quantify cumulative GHG emissions from the lease sale. BLM cites to state, national, and global emission levels, in some EAs, to conclude emissions from a particular lease sale represent only a small fraction of these emissions, and are therefore insignificant. In so doing, however, BLM is defining the cumulative

38

impacts area with respect to GHG emissions at state, national, and global scales. Using this baseline, the appropriate scope of the agency's cumulative analysis must similarly be at these scales, which would include disclosing and considering the cumulative emissions from BLM's Oil and Gas Leasing Program—including emissions from all 96,000 active producible wells managed by BLM—and the contribution of a challenged lease sale to these emissions. BLM must not only disclose and quantify these emissions, but also consider the effect that these emissions will have on resource values and communities across the planning areas, and to our nation as a whole.

115.    In all of the leasing EAs, BLM fails to properly and lawfully assess the significance of cumulative lease sale emissions.

116.    In its leasing EAs, BLM emissions estimates from the proposed action, as then compared to state and national emissions, do not provide BLM or the public with a context for understanding the effects to climate from BLM's other leasing authorizations both individually and in the aggregate. Climate data and GHG quantification tools and methodologies, such as the social cost of carbon and/or carbon budgeting, are readily available to BLM, and are already in widespread use throughout the Federal and private sectors, state and local governments, and globally.

117.    In *WildEarth Guardians I*, 368 F. Supp. 3d at 79 n.80, the Court did not order BLM to use a particular methodology to assess the significance of cumulative emission levels from oil and gas development; however, as part of the remand of the unlawful leasing decisions the Court did order BLM to "reassess whether the social cost of carbon or another methodology for quantifying climate change may contribute to informed decisionmaking." The Court also made clear that "BLM may not forgo using the social cost of carbon simply because courts have

thus far been reluctant to mandate it" as a proxy for understanding the significance of emission impacts. *Id*.

118.    In *WildEarth Guardians II*, the Court similarly held that BLM "either had to explain why using a carbon budget analysis would not contribute to informed decisionmaking, in response to WildEarth's comments, or conduct an 'accurate scientific analysis' of the carbon budget." 2020 WL 6701317, at *12. Because "[t]he agency did neither," BLM's analysis "fell short" of the required standard under NEPA. *Id.*

119.    So too here. Because tools for analyzing climate impacts from various emission levels were available to BLM at the time of the leasing authorizations challenged herein, the agency was required to apply such measures, or explain in its Leasing EAs its decision to forgo use of any or all available tools. Failure to do so results in cumulative impact analyses in the Leasing EAs that are arbitrary and capricious.

120.    The social cost of carbon estimates the cost to society of each additional ton of GHG pollution emitted into the atmosphere, thereby providing a fairly comprehensive estimate of climate change damage resulting from a project's GHG emissions. The social cost of carbon methodology provides greater context for the significance of foreseeable leasing emissions, as compared to BLM's current practice, which simply compares lease sale emissions to nationwide and global emissions, and thus characterizes those emissions as de minimis.

121.    For example, as noted above, in 2018, the USGS estimated that oil and gas production on federal lands generated approximately 498.9 million metric tons of $CO_2$e in

2014.[23] At the median social cost for 2020 of $42 per ton, in the aggregate BLM's Oil and Gas Program had an annual social cost of more than $20.95 billion. With the costs of carbon emissions rising every year, the future cost to society of BLM's Oil and Gas Program will be substantially higher if BLM continues its leasing activities unabated.

122.    Comparing a lease sale's total cumulative GHG emissions to the United States' remaining carbon budget can also provide a measurement by which to assess the significance of a lease sale's aggregate GHG emissions. Carbon budgeting allows for future emissions to be placed into context of the current global and national thresholds to limit GHG emissions and thereby avert catastrophic climate change. The application of carbon budgeting demonstrates that any new leasing of federal fossil fuel resources is inconsistent with emission limits that would avoid catastrophic climate change.

123.    Many of the lease authorizations challenged herein did not apply the social cost of carbon protocol, carbon budgeting, or any other economic or scientific tools for understanding the context and intensity of the impacts of BLM's leasing decisions on climate. Some lease authorizations purported to apply carbon budgeting but did so improperly.

124.    Although BLM does not include specific economic calculations of oil and gas benefits in all of the leasing EAs, BLM's underlying RMPs generally do include such calculations in many cases, which absent a discussion of the economic costs of GHG emissions from oil and gas development creates a biased account that misleads decisionmakers and the public. Moreover, in many of the lease sales, BLM includes information on royalty rates, bonus

---

[23] Merrill et al., *supra*, note 19, at 7 tbl. 1.

bid rates, and rental rates. BLM's focus on the economic benefits of leasing coupled with the agency's refusal to address the climate costs of leasing and subsequent development undermines NEPA's purpose of informed decisionmaking "based on [an] understanding of environmental consequences." 40 C.F.R. § 1500.1(c). It also violates NEPA's mandate to "develop methods and procedures … which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(2)(B).

125.    BLM's failure to address the cumulative impacts of leasing and subsequent development undermines NEPA's purpose of informed decisionmaking "based on [an] understanding of environmental consequences." 40 C.F.R. § 1500.1(c).

## V.    Background for Specific BLM Leasing Decisions

### A.    <u>Colorado Lease Sales</u>

126.    BLM held oil and gas lease sales in Colorado on June 27, 2019; September 26, 2019; March 26, 2020; September 24, 2020; and December 17, 2020. Taken together, these new BLM lease sales resulted in 162 parcels sold, totaling 173,904.54 acres of federal minerals across Colorado.

127.    Plaintiff WildEarth Guardians fully engaged in the public participation periods for each of these lease sales.

128.    Specifically, Plaintiff WildEarth Guardians:

- Protested BLM's June 27, 2019 lease sale on May 23, 2019; BLM denied this protest on June 26, 2019; BLM issued two FONSIs and two decision records approving the Royal Gorge Field Office parcels and Northwest District parcels on June 26, 2019;

42

- Protested BLM's September 26, 2019 lease sale on August 26, 2019; BLM denied this protest on September 25, 2019; BLM issued two FONSIs and two decision records approving the Royal Gorge Field Office parcels and Northwest District parcels September 25, 2019;

- Protested BLM's March 26, 2020 lease sale on February 24, 2019; BLM denied this protest on March 25, 2020; BLM issued two FONSIs and two decision records approving the Royal Gorge Field Office parcels and Northwest District parcels on March 25, 2020;

- Protested BLM's September 24, 2020 lease sale on August 24, 2020; BLM denied this protest on September 23, 2020; BLM issued a FONSI and decision record for 43 Royal Gorge Field Office parcels on November 24, 2020; BLM issued a FONSI and decision record for four Royal Gorge Field Office parcels on September 22, 2020; BLM issued a Determination of NEPA Adequacy on April 21, 2020 and a decision record on September 22, 2020 for three Royal Gorge Field Office parcels; BLM issued two FONSIs and two decision records for 5 total parcels in the Northwest District on September 22, 2020; and

- Protested BLM's December 17, 2020 lease sale on November 18, 2020; BLM denied this protest on December 16, 2020; BLM issued a FONSI and decision record approving the Kremmling Field Office and Little Snake Field Office parcels on December 16, 2020.

**B.**   **New Mexico Lease Sales**

129.    BLM held oil and gas lease sales in New Mexico on March 28, 2019; June 20, 2019; September 5, 2019; November 7, 2019; February 6, 2020; May 20-21, 2020; August 26,

2020; and October 29, 2020. Taken together, these new BLM lease sales resulted in 120 parcels sold, totaling 77,634.40 acres of federal minerals across New Mexico.

130.    Plaintiff WildEarth Guardians fully engaged in the public participation periods for each of these lease sales.

131.    Specifically, Plaintiff WildEarth Guardians:

- Protested BLM's March 28, 2019 lease sale on February 18, 2019; BLM denied this protest on December 30, 2019; BLM issued a FONSI and decision record approving this lease sale on December 30, 2019;

- Protested BLM's June 20, 2019 lease sale on May 1, 2019; BLM denied the protest on April 30, 2020; BLM issued a FONSI and decision record approving this lease sale on April 30, 2020;

- Protested BLM's September 5, 2019 lease sale on July 17, 2019; BLM denied the protest on July 31, 2020; BLM issued a FONSI and decision record approving this lease sale on July 31, 2020;

- Protested BLM's November 7, 2019 lease sale on September 19, 2019; BLM denied the protest on December 31, 2020; BLM issued a FONSI and decision record approving this lease sale on December 31, 2020;

- Protested BLM's February 6, 2020 lease sale on December 18, 2019; BLM denied the protest on December 31, 2020; BLM issued a FONSI and decision record approving this lease sale on December 31, 2020;

- Protested BLM's May 20-21, 2020 lease sale on April 1, 2020; BLM denied the protest on December 31, 2020; BLM issued a FONSI and decision record approving this lease sale on December 31, 2020;

44

- Protested BLM's August 26, 2020 lease sale on July 1, 2020; BLM denied the protest on September 30, 2020; BLM issued a FONSI and decision record approving this lease sale on September 30, 2020; and

- Protested BLM's October 29, 2020 lease sale on September 2, 2020; BLM denied the protest on October 28, 2020; BLM issued a FONSI and decision record approving this lease sale on October 28, 2020.

C.    **Utah Lease Sales**

132.    BLM held oil and gas lease sales in Utah on December 13, 2016, March 23, 2017, June 13, 2017, September 12, 2017, December 12, 2017, March 30, 2018, June 12, 2018, September 11, 2018, December 11, 2018, March 25-26, 2019, June 11, 2019, and September 9, 2019. Taken together these new lease sales challenged herein resulted in 421 parcels sold, totaling 651,437.84 acres of federal minerals across Utah.

133.    Plaintiff WildEarth Guardians fully engaged in the public participation periods for each of these lease sales.

134.    Specifically, Plaintiff WildEarth Guardians:

- Protestested BLM's December 13, 2016 lease sale on November 14, 2016; BLM denied the protest on February 10, 2017; BLM issued a FONSI and decision record approving the leases on February 10, 2017;

- Protested BLM's June 13, 2017 lease sale on April 10, 2017; BLM denied the protest on July 25, 2017; BLM issued a FONSI and decision record approving the issuance of the leases on July 25, 2017;

- Submitted NEPA comments regarding BLM's September 12, 2017 lease sale; BLM issued a FONSI and decision record approving the issuance of the leases on September 22, 2017;

- Protested BLM's December 12, 2017 lease sale on September 28, 2017; BLM denied the Price Field Office protest on January 3, 2018; BLM issued a FONSI and decision record approving the issuance of the leases on January 9, 2018;

- Protested BLM's March 20, 2018 lease sale on December 20, 2017; BLM denied the protest on May 17, 2018; BLM issued a FONSI and decision record approving the issuance of the leases on May 17, 2018;

- Protested BLM's June 12, 2018 lease sale on May 7, 2018; BLM denied the protest on August 7, 2018; BLM issued a FONSI and decision record approving the Richfield Field Office leases on August 9, 2019;

- Protested BLM's September 11, 2018 lease sale on August 6, 2018; BLM denied the protest on October 23, 2018; BLM issued a FONSI and decision record approving the lease sale on October 23, 2018;

- Protested BLM's December 11, 2018 lease sale on November 5, 2018; BLM denied the protests for the different field offices on February 8 and 9, 2019; BLM issued separate FONSIs and decision records for the leases in different field offices on February 8 and 9, 2019;

- Protested BLM's March 25, 2019 lease sale on March 1, 2019; BLM denied the Vernal Field Office protest on September 3, 2019; BLM issued a FONSI and decision record approving Vernal Field Office parcels on September 4, 2019;

46

- Protested BLM's June 11, 2019 lease sale on May 6, 2019; BLM denied the protests on October 8, 2019; BLM issued a FONSI and decision record approving this lease sale on October 8, 2019;

- Protested BLM's September 9, 2019 lease sale on August 26, 2019; BLM denied the protest of the Moab Field Office parcels on December 17, 2019; BLM issued a FONSI and decision record approving the Moab Field Office parcels on December 18, 2019; and

- Provided two separate written comment letters on October 27, 2020 regarding BLM's Supplemental EA "Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah," DOI-BLM-UT-0000-2021-0001-EA, covering leases sold from November 2014 to February 2019, including at BLM Utah's December 2016, March 2017, June 2017, September 2017, December 2017, March 2018, June 2018, September 2018, December 2018 lease sales challenged herein; on January 14, 2021, BLM issued a FONSI and 35 separate decisions lifting the suspensions on the 226 separate leases addressed by the Supplemental EA.

**D.**    **Wyoming Lease Sales.**

135.    BLM held oil and gas lease sales in Wyoming on September 17, 2019, December 10, 2019, and March 24, 2019. Taken together, these recent BLM lease sales resulted in 475 parcels sold, totaling 612,067.87 acres of federal minerals across Wyoming.

136.    Plaintiff WildEarth Guardians fully engaged in the public participation periods for each of these lease sales.

137.    Specifically, Plaintiff WildEarth Guardians:

- Protested BLM's September 17, 2019 lease sale on August 19, 2019; BLM denied this protest on September 16, 2019; BLM issued a FONSI and decision record approving the lease sale that same day;

- Protested BLM's December 10, 2019 lease sale on November 11, 2019; BLM denied this protest on December 9, 2019; BLM issued a FONSI and decision record approving the lease sale that same day; and

- Protested BLM's March 24, 2019 lease sale on February 18, 2020; BLM denied this protest on March 23, 2020; BLM issued a FONSI and decision record approving the lease sale that same day.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Failure to Take a Hard Look at the Severity of Direct, Indirect, and Cumulative Impacts of Greenhouse Gas Pollution
### (Violation of NEPA)

138.    Conservation Groups incorporate by reference all preceding paragraphs.

139.    Pursuant to NEPA and its implementing regulations, BLM must take a hard look at the direct, indirect, and cumulative environmental consequences of their proposed actions. 42 U.S.C. §§ 4332(2)(C)(i)-(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, and 1508.14.

140.    For all of the leasing authorizations identified in Table A, BLM failed to take the required hard look at the direct, indirect, and cumulative GHG emissions, and the resulting impacts of those emissions on climate change.

141.    For all of the leasing authorizations identified in Table A, BLM also failed to analyze these cumulative and similar actions together, even though the lease authorizations are similar in terms of their climate impacts, timing, and geography. 40 C.F.R. § 1508.25(a)(3).

142.    To comply with NEPA, BLM was required to take a hard look at the direct, indirect, and cumulative GHG emissions and the severity of the impacts of those emissions on climate change for the leasing authorizations identified in Table A. BLM has never taken a comprehensive hard look at the climate impacts of its Oil and Gas Leasing Program, therefore BLM's leasing EAs cannot tier to a broader programmatic analysis in lieu of doing a comprehensive analysis of climate impacts at the leasing stage. BLM is required to provide a hard look analysis of these impacts before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

143.    BLM's assertions, in the leasing EAs, that it will estimate GHG emissions and analyze the significance of those emissions at the subsequent drilling stage does not obviate the obligation to consider the significance of those emissions at the *leasing* stage, the point at which BLM makes an irretrievable commitment of federal resources. *WildEarth Guardians I*, 368 F. Supp. 3d at 66.

144.    Where information relevant to foreseeable adverse impacts is unavailable, agencies must nonetheless evaluate "such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.22(b)(4). There are several accepted approaches for evaluating the impacts of GHG emissions to climate and society, including the Social Cost of Carbon and Carbon Budgeting frameworks.

145.    BLM failed to take a hard look at the direct, indirect, and cumulative impacts to the climate from GHG emissions, and failed to discuss the severity of these impacts, when authorizing hundreds of new oil and gas leases through the challenged leasing decisions. More broadly, BLM has demonstrated a systemic failure to account for these impacts in the agency's

49

Oil and Gas Leasing Program affecting federal lands across the American West. BLM's systemic and leasing decision specific failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA, 42 U.S.C.§ 4332(C)(ii), and its implementing regulations at 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27, and the APA at 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Failure to Prepare an EIS (Violation of NEPA)

146.    Conservation Groups incorporate by reference all preceding paragraphs.

147.    BLM's authorizations and issuance of the leases sold through the leasing authorizations challenged herein constitute major federal actions under NEPA.

148.    BLM does not have to prepare an EIS where it has demonstrated that the proposed action "will not have a significant effect on the human environment[.]" 40 C.F.R. § 1508.13. To assess whether or not an impact is significant, BLM must consider the "context and intensity" of the impact. 40 C.F.R. § 1508.27.

149.    BLM failed to evaluate the context and intensity of the environmental impacts resulting from its leasing authorizations challenged herein—in particular impact to climate change from GHG emissions—as required by NEPA. BLM also failed to provide convincing statements of reasons justifying its decisions to forgo an EIS analyzing the impacts of the leasing authorizations challenged herein, as required by NEPA.

150.    BLM's leasing authorizations will result in high levels of GHG emissions that could significantly impact climate. NEPA requires that BLM identify such impacts and assess their context and intensity to support its decisions to forego an EIS, which BLM failed to do.

151.    "[T]he appropriate time for preparing an EIS is prior to a decision, when the

decisionmaker retains a maximum range of options." *WildEarth Guardians I*, 368 F. Supp. 3d at

66 (citing *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D. C. Cir. 1983). "[T]he leasing stage is

the "point of no return with respect to [GHG] emissions" because after the leasing stage BLM

can only impose conditions that limit or mitigate GHG emissions; the agency cannot prohibit

development of lease parcels once leases are issued. *Id.*

152.    BLM violated NEPA by failing to prepare an EIS before approving the leasing

authorizations challenged herein. BLM's failure was arbitrary, capricious, an abuse of discretion,

in excess of statutory authority and limitations, short of statutory right, and not in accordance

with the law and procedures required by law. 5 U.S.C. §§ 706(2)(A), (C), (D).

## THIRD CLAIM FOR RELIEF

## Failure to Prepare Programmatic EIS for Federal Oil and Gas Program (NEPA Violation)

153.    Conservation Groups incorporate by reference all preceding paragraphs.

154.    BLM expressly refers to its oil and gas leasing operations as a program.

155.    Pursuan to BLM's onshore Oil and Gas Leasing Program, BLM holds oil and gas

lease sales for federal lands on a quarterly basis.

156.    The BLM's onshore Oil and Gas Leasing Program contributes vast amounts of

GHG pollution to the atmosphere.

157.    BLM has never taken a comprehensive hard look at the climate impacts of its Oil

and Gas Leasing Program

158.    NEPA's implementing regulations define a "program" as "a group of concerted

actions to implement a specific policy or plan; systematic and connected agency decisions

allocating agency resources to implement a specific statutory program or executive directive." 40

C.F.R. § 1508.18.

51

159.    An EIS "is sometimes required[] for broad Federal actions such as the adoption of new agency programs." 40 C.F.R. § 1502.4(b). Thus, "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." *Id.* § 1502.4(a). Accordingly, a programmatic EIS is appropriate to address a "steady flood of activity" from a federal agency that results in harmful pollution. *Nat'l Wildlife Fed'n v. Benn*, 491 F. Supp. 1234, 1249-50 (S.D.N.Y. 1980).

160.    BLM's oil and gas leasing activities fall within this definition of a program because they are "connected agency decisions allocating agency resources to implement" the MLA for the purpose of exploration or development of oil and natural gas resources. *Id*.

161.    BLM's failure to prepare a programmatic EIS for its Oil and Gas Leasing Program is arbitrary and capricious and unlawful. 5 U.S.C. §§ 706(2)(A), (C), (D).

## RELIEF REQUESTED

WHEREFORE, Conservation Groups respectfully request that this Court:

A.    Declare that Federal Defendants' leasing authorizations challenged herein are arbitrary and violate NEPA and its implementing regulations;

B.    Vacate Federal Defendants' leasing authorizations and accompanying EAs and FONSIs challenged herein;

C.     Set aside and vacate all of the leases issued pursuant to the leasing authorizations challenged herein;

D.    Enjoin Federal Defendants from approving or otherwise taking action on any applications for permits to drill on the oil and gas leases challenged herein until Federal Defendants have fully complied with NEPA and its implementing regulations;

E.    Order Federal Defendants to prepare an EIS analyzing the direct, indirect, and

cumulative effects of the leasing authorizations challenged herein, including the incremental

impact of the challenged leases, together with the other past, present, and foreseeable cumulative

impacts from BLM's Oil and Gas Leasing Program;

F.      Retain continuing jurisdiction of this matter until Federal Defendants fully

remedy the violations of law complained of herein, in particular to ensure Federal Defendants

take a meaningful hard look at the direct, indirect, and cumulative impacts of GHG emissions

from BLM's Oil and Gas Leasing Program to climate;

G.      Award the Conservation Groups their attorneys' fees, costs, and other expenses

incurred in pursuing this action as provided by applicable law; and

H.      Issue such relief as this Court may deem just, proper, and equitable.


Respectfully submitted this 17th day of February, 2021.

/s/ Daniel L. Timmons                    /s/ Shiloh S. Hernandez
Daniel L. Timmons                        Shiloh S. Hernandez
Bar No. NM002                            MT Bar No. 9970 (*Admitted Pro Hac Vice*)
WildEarth Guardians                      Western Environmental Law Center
301 N. Guadalupe Street, Suite 201       103 Reeder's Alley
Santa Fe, NM 87501                       Helena, MT 59601
(505) 570-7014                           (406) 204-4861
dtimmons@wildearthguardians.org          hernandez@westernlaw.org


/s/ Samantha Ruscavage-Barz              /s/ Kyle Tisdel
Samantha Ruscavage-Barz                  Kyle Tisdel
Bar No. CO0053                           Bar No. NM006
301 N. Guadalupe Street, Suite 201       Western Environmental Law Center
Santa Fe, NM 87501                       208 Paseo del Pueblo Sur, Suite 602
(505) 410-4180                           Taos, NM 87571
sruscavagebarz@wildearthguardians.org    (575) 613-8050
                                         tisdel@westernlaw.org

*Attorneys for Plaintiffs*

53

**TABLE A**

**BLM Lease Sales**

| State | Date of Sale | Field Office(s) | Acreage | Parcels |
|---|---|---|---|---|
| Colorado | June 27, 2019 | Royal Gorge, White River, Grand Junction | 8,176.84 | 17 |
| | Sept. 26, 2019 | Kremmling, Little Snake, White River, Royal Gorge | 42,148.72 | 49 |
| | March 26, 2020 | Royal Gorge, Kremmling, Little Snake, White River, Grand Junction | 10,414.62 | 9 |
| | Sept. 24, 2020 | Royal Gorge, White River, Little Snake, Kremmling | 69,726.19 | 55 |
| | Dec. 17, 2020 | Kremmling, Little Snake | 43,438.17 | 32 |
| New Mexico | March 28, 2019 | Carlsbad | 521.56 | 6 |
| | June 20, 2019 | Carlsbad | 1,559.85 | 8 |
| | September 5, 2019 | Carlsbad | 2,808.12 | 12 |
| | November 7, 2019 | Carlsbad | 3,415.52 | 10 |
| | February 6, 2020 | Carlsbad | 13,341.46 | 48 |
| | May 20-21, 2020 | Carlsbad, Roswell | 45,374.07 | 93 |
| | August 26, 2020 | Carlsbad | 2,762.00 | 9 |
| | October 29, 2020 | Carlsbad, Roswell | 7,730.86 | 11 |
| Utah | December 13, 2016 | Vernal | 10,510.41 | 24 |
| | March 23, 2017 | Monticello | 4,174.46 | 4 |
| | June 13, 2017 | Richfield | 23,613.19 | 20 |
| | September 12, 2017 | Fillmore | 14,943.09 | 9 |
| | December 12, 2017 | Price | 32,035.34 | 15 |
| | March 30, 2018 | Moab, Monticello | 51,482.94 | 43 |
| | June 12, 2018 | Richfield | 3,707.75 | 3 |
| | September 11, 2018 | Price, Richfield | 204,222.46 | 94 |
| | December 11, 2018 | Moab, Monticello, Price, Richfield, Vernal | 151,760.94 | 105 |
| | March 25-26, 2019 | Vernal | 135,280.5 | 90 |
| | June 11, 2019 | Salt Lake | 9,822.52 | 7 |
| | September 9, 2019 | Moab | 9,884.24 | 7 |
| Wyoming | Sept. 17, 2019 | Statewide | 263,666.65 | 175 |

| | Dec. 10, 2019 | Statewide | 123,257.56 | 123 |
|---|---|---|---|---|
| | March 24, 2020 | Statewide | 71,688.65 | 75 |
| **TOTAL** | | | **1,361,468.68** | **1,153** |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2021, I personally mailed copies of the foregoing

Amended Complaint via U.S. Postal Service first class, certified mail, return receipt requested,

addressed to the following Defendants and representatives:

Acting U.S. Secretary of Interior Scott De La Vega
Department of Interior
1849 C Street NW, Rm. 5665
Washington, D.C. 20240

U.S. Bureau of Land Management
760 Horizon Drive
Grand Junction, CO. 81506

Acting U.S. Attorney General Monty Wilkinson
U.S. Department of Justice
950 Pennsylvania, NW
Washington D.C. 20530-0001

Civil Process Clerk
U.S. Attorney's Office
District of Columbia
555 4th Street NW
Washington D.C.  20530


*/s/ Daniel L. Timmons*
Daniel L. Timmons
Counsel for Plaintiffs