# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS; and
PHYSICIANS FOR SOCIAL
RESPONSIBILITY,

                Plaintiffs,

v.

DEB HAALAND,[1]  Secretary, U.S.
Department of the Interior; and U.S. BUREAU
OF LAND MANAGEMENT,

                Defendants,

AMERICAN PETROLEUM INSTITUTE;
STATE OF WYOMING,

                Intervenor-Defendants.

No. 1:21-cv-00175-RC

---

## INTERVENOR-DEFENDANT AMERICAN PETROLEUM INSTITUTE'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS IN PART, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

Steven J. Rosenbaum
Bradley K. Ervin
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

June 9, 2021

*Attorneys for American Petroleum Institute*

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Secretary of the Interior Deb Haaland has been automatically substituted for former Secretary David L. Bernhardt.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 3

    A.    BLM's Management of Oil and Gas Leasing. ....................................... 3

    B.    Plaintiffs' Challenges to BLM's Leasing Authorizations........................ 5

ARGUMENT ........................................................................................................... 11

I.    The MLA's Statute of Limitations Bars Plaintiffs' Challenges to 23 of the 28 Leasing Decisions. ........................................................................................ 12

    A.    Section 226-2 Applies to Plaintiffs' NEPA Claims Brought Under the APA.................................................................................................... 13

        1.    Section 226-2's Specific Statute of Limitations Applies to Plaintiffs' APA Cause of Action.............................................. 13

        2.    NEPA Does Not Salvage Plaintiffs' Time-Barred Challenges. ............... 18

    B.    Plaintiffs Do Not Qualify for the Extraordinary Remedy of Equitable Tolling.................................................................................................. 23

II.    Plaintiffs' Challenges to the December 2017 and June 2018 Utah Lease Sales Are Barred by *Res Judicata*. ........................................................................... 25

    A.    Plaintiffs Raise the Same Cause of Action as Plaintiff WildEarth Raised in a Prior Federal Lawsuit. ..................................................................... 26

    B.    Plaintiffs' Challenge Involves the Same Parties as *Rocky Mountain Wild*........... 28

    C.    *Rocky Mountain Wild* Resulted in a Final Judgment on the Merits..................... 29

    D.    The *Rocky Mountain Wild* Decision Was Rendered by a Court of Competent Jurisdiction. ...................................................................... 30

III.    Laches Bars Plaintiffs' Challenges to Leasing Decisions Issued Prior to the *Bernhardt* Complaint. ................................................................................... 31

    A.    Laches Applies to Plaintiffs' NEPA Claims. ....................................... 31

    B.    Extraordinary Circumstances Justify Dismissal of Plaintiffs' Challenges to Leasing Decisions Issued Prior to the *Bernhardt* Complaint. ............................. 32

        1.    Plaintiffs Failed Diligently to Pursue Their Claims.................................. 34

2.      Plaintiffs' Conscious Delay in Seeking Legal Remedies Prejudices
        Lessees. ................................................................................................... 38

CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

## Cases

*Alford v. Providence Hosp.*,
  60 F. Supp. 3d 118 (D.D.C. 2014) ................................................................ 11, 25, 31

*Allied-Bruce Terminix Co. v. Dobson*,
  513 U.S. 265 (1995) ........................................................................................... 15

*Apache Survival Coal. v. United States*,
  21 F.3d 895 (9th Cir. 1994) ............................................................................... 39

*Arpaio v. Robillard*,
  459 F. Supp. 3d 62 (D.D.C. 2020) ..................................................................... 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 11

*AT&T Inc. v. FCC*,
  452 F.3d 830 (D.C. Cir. 2006) ...................................................................... 15, 23

*Banks v. Warner*,
  No. 94-56732, 1995 WL 465773 (9th Cir. Aug. 7, 1995) ..................................... 5

*Bethesda Lutheran Homes and Servs. v. Born*,
  238 F.3d 853 (7th Cir. 2001) ............................................................................. 28

*Block v. N. Dakota ex rel. Bd. Of Univ. & Sch. Lands*,
  461 U.S. 273 (1983) .............................................................................. 12, 22, 23

*Brownback v. King*,
  141 S. Ct. 740 (2021) ......................................................................................... 30

*California Save Our Streams Council, Inc. v. Yeutter*,
  887 F.2d 908 (9th Cir. 1989) ........................................................................ 19, 23

*California v. Watt*,
  668 F.2d 1290 (D.C. Cir. 1981) ......................................................................... 19

*California v. Watt*,
  712 F.2d 584 (D.C. Cir. 1983) ........................................................................... 19

*Carmellino v. District 20 of New York City Dept. of Educ.*,
  No. 03-cv-5942-PKC, 2004 WL 736988 (S.D.N.Y. Apr. 6, 2004) ........................ 28

*Chirco v. Crosswinds Communities, Inc.*,
  474 F.3d 227 (6th Cir. 2007) ............................................................................. 32

*City of Rochester v. Bond*,
  603 F.2d 927 (D.C. Cir. 1979) ........................................................................... 18

*Cmtys. Against Runway Expansion, Inc. v. FAA*,
  355 F.3d 678 (D.C. Cir. 2004) ........................................................................... 19

*Commonwealth of Va. v. Ferriero*,
   --- F. Supp. 3d ---, 2021 WL 848706 (D.D.C. Mar. 5, 2021) ................................. 11

*Conservation Law Foundation v. Mineta*,
   131 F. Supp. 2d 19 (D.D.C. 2001) ..................................................................... 22

*Conway v. Watt*,
   717 F.2d 512 (10th Cir. 1983) ........................................................................... 3

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
   563 F.3d 466 (D.C. Cir. 2009) ........................................................................... 19

*Ctr. for Sustainable Economy v. Jewell*,
   779 F.3d 588 (D.C. Cir. 2015) ........................................................................... 19

*Daingerfield Island Protective Society v. Lujan*,
   920 F.2d 32 (D.C. Cir. 1990) ............................................................................. 38

*Demby v. Schweiker*,
   671 F.2d 507 (D.C. Cir. 1981) ........................................................................... 16

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ........................................................................................... 9

*Edwardsen v. U.S. Dep't of the Interior*,
   268 F.3d 781 (9th Cir. 2001) ............................................................................. 18

*El-Amin v. Virgilio*,
   251 F. Supp. 3d 208 (D.D.C. 2017) ................................................................... 30

*Envtl. Def. Fund, Inc. v. Alexander*,
   614 F.2d 474 (5th Cir. 1980) ............................................................................. 38

*Geertson Farms, Inc. v. Johanns*,
   439 F. Supp. 2d 1012 (N.D. Cal. 2006) ............................................................. 19

*Goos v. Interstate Com. Comm'n*,
   911 F.2d 1283 (8th Cir. 1990) ........................................................................... 18

*Gordon v. Cathey*,
   No. 13-cv-00229-FDW-DCK, 2013 WL 5561642 (W.D.N.C. Oct. 8, 2013) ......... 29

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019) ........................................................................... 13

*Gull Airborne Instruments, Inc. v. Weinberger*,
   694 F.2d 838 (D.C. Cir. 1982) ........................................................................... 33

*Harvey v. Udall*,
   384 F.2d 883 (10th Cir. 1967) ........................................................................... 3

*Holland v. Bibeau Construction Co.*,
   774 F.3d 8 (D.C. Cir. 2014) ............................................................................... 32

*Howard v. Pritzker*,
   775 F.3d 430 (D.C. Cir. 2015) ..................................................................... 14, 19

iv

*Hurd v. District of Columbia*,
  864 F.3d 671 (D.C. Cir. 2017)............................................................................... 13

*Impact Energy Res., LLC v. Salazar*,
  693 F.3d 1239 (10th Cir. 2012) ............................................................... 13, 14, 24

*Irwin v. Dep't of Veterans Affairs*,
  498 U.S. 89 (1990)............................................................................................. 14, 24

*Jackson v. Modly*,
  949 F.3d 763 (D.C. Cir. 2020) ................................................................. 13, 18, 24

*Jenkins v. District of Columbia*,
  288 F. Supp. 3d 308 (D.D.C. 2018)....................................................................... 25, 27

*Jones v. Gordon*,
  792 F.2d 821 (9th Cir. 1986) ....................................................................................... 21

*Kannikal v. Att'y Gen. United States*,
  776 F.3d 146 (3rd Cir, 2015) ....................................................................................... 14

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
  909 F.3d 446 (D.C. Cir. 2018) ..................................................................................... 26

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)...................................................................................................... 13

*Major v. Plumbers Loc. Union No. 5 of United Ass'n of Journeymen & Apprentices of the
  Plumbing & Pipe-Fitting Indus. Of the U.S. & Canada, AFL-CIO*,
  370 F. Supp. 2d 118 (D.D.C. 2005) .............................................................................. 12

*Maniaci v. Georgetown Univ.*,
  510 F. Supp. 2d 50 (D.D.C. 2007)................................................................................ 11

*Matter of Defend H2O v. Town Bd. of the Town of East Hampton*,
  147 F. Supp. 3d 80 (E.D.N.Y. 2015) ........................................................................... 37

*Mazaleski v. Harris*,
  481 F. Supp. 696 (D.D.C. 1979)................................................................................... 29

*McIntyre v. Fulwood*,
  892 F. Supp. 2d 209 (D.D.C. 2012) ............................................................................. 30

*Media Access Project v. FCC*,
  883 F.2d 1063  (D.C. Cir. 1989) ................................................................................. 19

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ................................................................................... 13

*Menominee Indian Tribe of Wisconsin v. United States*,
  614 F.3d 519 (D.C. Cir. 2010) ..................................................................................... 37

*Miami Bldg. & Constr. Trades Council v. Sec'y of Defense*,
  143 F. Supp. 2d 19 (D.D.C. 2001) ........................................................................ 17, 18

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)..................................................................................................... 14, 15

*Myeress v. Heidenry*,
  No. 19-cv-21568-RAR, 2019 WL 7956172 (S.D. Fla. Nov. 25, 2019) .................................. 29

*NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*,
  753 F.2d 131 (D.C. Cir. 1985) ....................................................................................... 31

*Nagahi v. INS*,
  219 F.3d 1166 (10th Cir. 2008) .................................................................................... 14

*Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*,
  462 U.S. 810 (1983) ...................................................................................................... 16

*Nat'l Parks & Conservation Ass'n v. Hodel*,
  679 F. Supp. 49 (D.D.C. 1987) ............................................................................... 31, 40

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ...................................................................................................... 33

*Natural Res. Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ...................................................................................... 19

*New Era Publications Int'l v. Henry Holt & Co.*,
  873 F.2d 576 (2d Cir. 1989) .......................................................................................... 33

*New Jersey Dep't of Envtl. Prot. & Energy v. Long Island Power Auth.*,
  30 F.3d 403 (3rd Cir. 1994) .......................................................................................... 18

*Norton v. S. Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ........................................................................................................ 14

*Nuclear Info. & Res. Serv. v. U.S. Dep't of Transp.*,
  457 F.3d 956 (9th Cir. 2006) ................................................................................... 18, 19

*Oviedo v. Washington Metro. Area Transit Auth.*,
  948 F.3d 386 (D.C. Cir. 2020) ...................................................................................... 23

*Page v. United States*,
  729 F.2d 818 (D.C. Cir. 1984) ...................................................................................... 26

*Park County Resource Council v. U.S. Dep't of Agric.*,
  817 F.2d 609 (10th Cir. 1987) ............................................................................ 21, 22, 23

*Peek v. SunTrust Bank, Inc.*,
  --- F. App'x ---, 2021 WL 2010678 (D.C. Cir. May 11, 2021) ............................................ 26

*Peek v. SunTrust Bank, Inc.*,
  313 F. Supp. 3d 201 (D.D.C. 2018) ............................................................................... 26

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014) ........................................................................................... 31, 32, 33

*Pit River Tribe v. U.S. Forest Serv.*,
  615 F.3d 1069 (9th Cir. 2010) ...................................................................................... 32

*Ramos v. Dominican Republic*,
  No. 12-cv-0481, 2012 WL 1067562 (D.D.C. Mar. 22, 2012) .................................................. 29

*Realty Income Trust v. Eckerd,*
  564 F.2d 447 (D.C. Cir. 1977) ............................................................... 32

*Richmond v. St. Joseph Care Ctr. West,*
  190 F.3d 500 (7th Cir. 1999) ................................................................ 29

*Robinson v. Pezzat,*
  818 F.3d 1, 8 (D.C. Cir. 2016) ............................................................. 12

*\*Rocky Mountain Wild v. Bernhardt,*
  No. 19-cv-00929, 2020 WL 7264914 (D. Utah Dec. 10, 2020) ........................................ 29, 30

*Rocky Mountain Wild, et al. v. Bernhardt, et al.,*
  No. 18-cv-02468 (D. Colo. June 5, 2019) ................................................................ 11

*Rosenthal v. State of Nev.,*
  514 F. Supp. 907 (D. Nev. 1981) ......................................................... 29

*Sae Young Kim v. Nat'l Certification Comm'n for Acupuncture and Oriental Med.,*
  888 F. Supp. 2d 78 (D.D.C. 2012) ......................................................... 28

*Save the Peaks Coalition v. U.S. Forest Serv.,*
  669 F.3d 1025 (9th Cir. 2012) ............................................................. 36

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC,*
  137 S.Ct. 954 (2017) ......................................................................... 31

*Sellers v. Nationwide Mut. Fire Ins. Co.,*
  986 F.3d 1267 (11th Cir. 2020) ........................................................... 28

*Sheridan v. NGK Metals Corp.,*
  No. 06-cv-5510, 2008 WL 2156718 (E.D. Pa. May 22, 2018) ............................... 28

*Sierra Club v. Fed. Energy Regul. Comm'n,*
  827 F.3d 36 (D.C. Cir. 2016) ................................................................. 9

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  239 F. Supp. 3d 77 (D.D.C. 2017) ......................................................... 32

*Swindol v. Aurora Flight Scis. Corp.,*
  805 F.3d 516 (5th Cir. 2015) .................................................................. 5

*Truett v. St. Tammany Parish Fire Dist. No. 12,*
  909 F. Supp. 2d 552 (E.D. La. 2012) ..................................................... 30

*Tulare Cnty. v. Bush,*
  306 F.3d 1138 (D.C. Cir. 2002) ........................................................... 13

*\*Turtle Island Restoration Network v. U.S. Dep't of Commerce,*
  438 F.3d 937 (9th Cir. 2006) ..................................................... 20, 21, 22

*United States v. Gonzales,*
  520 U.S. 1 (1997) .............................................................................. 15

*Veg-Mix, Inc. v. U.S. Dep't of Agric.,*
  832 F.2d 601 (D.C. Cir. 1987) ............................................................. 27

*Velikonja v. Ashcroft*,
   355 F. Supp. 2d 197 (D.D.C. 2005) ................................................................. 25, 26

*WildEarth Guardians v. Bernhardt, et al.*,
   No. 19-cv-00505 (D.N.M. June 3, 2019) .............................................................. 10

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019) ......................................................................... 3

*\*WildEarth Guardians, et al. v. Bernhardt, et al.*,
   No. 20-cv-00056-RC (D.D.C. Jan. 9, 2020) ..................................... 1, 10, 34, 35

*WildEarth Guardians, et al. v. Jewell, et al.*,
   No. 16-cv-01724-RC (D.D.C. Aug. 25, 2016) .................................................. 1, 10

*Wilson v. Fullwood*,
   772 F. Supp. 2d 246 (D.D.C. 2011) ..................................................................... 30

## Statutes

5 U.S.C. §§ 551, *et seq.* ......................................................................................... 1

5 U.S.C. § 706(2)(A) .............................................................................................. 35

16 U.S.C. § 1374(d)(6) ........................................................................................... 21

16 U.S.C. § 1855(f) ................................................................................................ 20

28 U.S.C. § 1331 ............................................................................................... 18, 30

28 U.S.C. § 2344 .................................................................................................... 18

28 U.S.C. § 2401 ............................................................... 13, 14, 18, 20, 22, 31

30 U.S.C. § 181 ........................................................................................................ 3

30 U.S.C. § 226(b)(1)(A) ........................................................................................ 3

30 U.S.C. § 226(e) ........................................................................................... 3, 4, 37

30 U.S.C. § 226(g) .................................................................................................. 37

30 U.S.C. § 226(p)(2)(A) ........................................................................................ 37

*\*30 U.S.C. § 226-2 ................................................................. 1, 4, 14, 16, 22

42 U.S.C. § 4332(C)(ii) ........................................................................................... 35

42 U.S.C. §§ 4321, *et seq.* ....................................................................................... 1

Act of Feb. 25, 1920, 41 Stat. 437 ......................................................................... 3

## Other Authorities

*Attorney General's Manual on the Administrative Procedure Act* ............................. 13

*\*S. Rep. No. 86-1549 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3313 .............. 4, 12, 15, 16, 23

## **Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................................................... 11, 12, 18, 31

Federal Rule of Civil Procedure 12(c) ........................................................................................... 11

Federal Rule of Civil Procedure 24(c) ........................................................................................... 11

Federal Rule of Civil Procedure 56 .......................................................................................... 12, 31

## **Regulations**

40 C.F.R. § 1508.25 ........................................................................................................................ 35

40 C.F.R. § 1508.27 ........................................................................................................................ 35

40 C.F.R. § 1508.7 .......................................................................................................................... 35

40 C.F.R. § 1508.8 .......................................................................................................................... 35

43 C.F.R. § 3120.1-2(b) ................................................................................................................... 3

43 C.F.R. § 3120.5-3 ........................................................................................................................ 3

43 C.F.R. § 3162.3-1(c) ................................................................................................................. 37

43 C.F.R. § 3162.5-1(a) ................................................................................................................. 37

## INTRODUCTION

This lawsuit challenges the oil and gas leasing decisions by Defendants Secretary of the Interior and the Bureau of Land Management ("BLM," collectively, the "Federal Defendants") to conduct 28 lease sales on public lands in Colorado, New Mexico, Utah, and Wyoming between December 2016 and December 2020. *See* Am. Compl. (Dkt. No. 13), ¶ 1 & Table A.  Plaintiffs WildEarth Guardians ("WildEarth") and Physicians for Social Responsibility (collectively, "Plaintiffs") contend that the Federal Defendants' leasing actions violated the National Environmental Policy Act ("NEPA), 42 U.S.C. §§ 4321, *et seq*. and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq*., because they were allegedly taken "without fully analyzing the direct, indirect, and cumulative impacts of oil and gas leasing on our climate[.]"  Am. Compl., ¶ 1.

For the past several years, Plaintiffs have submitted comments and protests to BLM— including with respect to the presently challenged lease sales, *see* Am. Compl., ¶¶ 126–37—and filed numerous lawsuits raising these same essential challenges to onshore oil and gas lease sales conducted by Federal Defendants across the western United States.  Indeed, Plaintiffs filed two lawsuits in 2016 and 2020 challenging, collectively, 33 oil and gas lease sales, which remain pending before this Court and the D.C. Circuit.  *See WildEarth Guardians, et al. v. Jewell, et al.* ("*Jewell*"), No. 16-cv-01724-RC, Dkt. No. 1 (D.D.C. Aug. 25, 2016); *WildEarth Guardians, et al. v. Bernhardt, et al.* ("*Bernhardt*"), No. 20-cv-00056-RC, Dkt. No. 1 (D.D.C. Jan. 9, 2020).  In these circumstances, Plaintiffs' present lawsuit largely comes too late.

Plaintiffs' challenges to a large majority of the 28 leasing decisions are barred by three threshold limitations on judicial review.  First, the Federal Defendants issued the challenged leasing decisions pursuant to the Mineral Leasing Act, which imposes a 90-day statute of limitations on challenges—like Plaintiffs'—to a decision involving any oil and gas lease.  30

U.S.C. § 226-2 ("Section 226-2").  Congress expressly imposed this short limitations period as part of an effort to promote oil and gas development, and imposed it on claims—like Plaintiffs' NEPA claims—brought pursuant to the Administrative Procedure Act.  That limitations period is broadly worded, must be strictly enforced, and had already run with respect to 23 of the 28 challenged leasing decisions when Plaintiffs filed suit.  The corresponding claims should be dismissed.

Second, during the lengthy delay between the December 12, 2017 and June 12, 2018 Utah lease sales and the filing of the instant lawsuit, plaintiff WildEarth was a named plaintiff in a separate challenge, filed in Utah federal district court, to leases issued from these two very same lease sales.  *See Rocky Mountain Wild, et al. v. Bernhardt, et al.*, No. 19-cv-00929, Dkt. No. 1 (D. Utah June 5, 2019).  *Res judicata* bars the present claims that WildEarth did (or could have) lodged in the prior lawsuit, and the operation of *res judicata* cannot be evaded simply by the presence of Physicians for Social Responsibility as a co-plaintiff in this case.  Dismissal is again warranted with respect to the challenge to these two Utah lease sales.

Finally, even assuming that Section 226-2's limitations period did not bar the bulk of Plaintiffs' leasing decision challenges, the equitable doctrine of laches precludes Plaintiffs' claims with respect to the 17 leasing decisions that occurred before Plaintiffs' filed their nearly identical January 2020 *Bernhardt* D.D.C. complaint.  Notwithstanding their acknowledged contemporaneous knowledge of the 17 challenged leasing decisions, *see* Am. Compl., ¶¶ 126–37, Plaintiffs sat on their claims while filing that similar lawsuit against similar lease sales.  That conscious delay threatens the significant investments of lessees as they seek to fulfill their development obligations under the Mineral Leasing Act.  Equity prevents such prejudice, and justifies a summary judgment pursuant to laches.

In short, Plaintiffs waited months (and in some instances years) to file suit challenging these leasing decisions despite knowledge of the decisions, and participating in the administrative processes before they issued, and despite filing the nearly identical *Bernhardt* complaint after the majority of the challenged leasing decisions issued. Statutory, common law, and equitable limitations each prohibit Plaintiffs' delay.

## BACKGROUND

### A.   BLM's Management of Oil and Gas Leasing.

Through the Mineral Leasing Act ("MLA"), *see* 30 U.S.C. § 181, Congress mandated that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly," *id.* § 226(b)(1)(A). *See also* Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437 (purpose of MLA is "[t]o promote the mining of . . . oil . . . on the public domain"); *Conway v. Watt*, 717 F.2d 512, 514 (10th Cir. 1983) (congressional purpose behind the MLA "was the development of western portions of the country"); *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (MLA's "purpose . . . was to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise") (quotation omitted); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 52 (D.D.C. 2019) ("[W]hile oil and gas leasing is mandatory, the Secretary has discretion to determine where, when, and under what terms and conditions oil and gas development should occur.").

Lease sales are conducted through a competitive bidding process. *See* 43 C.F.R. § 3120.1-2(b); *id.* § 3120.5-3. The Secretary of the Interior ("Secretary")—acting through BLM—awards the oil and gas lease to the party that has the highest bid at the lease sale "60 days following payment by the successful bidder of the remainder of the" bid made at the lease sale. *See* 30 U.S.C. § 226(b)(1)(A). The leases are issued "for a primary term of 10 years." 30 U.S.C. § 226(e). As an incentive to fulfill the MLA's developmental purpose, the term of the lease is

extended by the lessee's diligence in conducting development operations and by production of oil or gas on the lease.  *See id*. ("Each lease shall continue so long after its primary term as oil or gas is produced in paying quantities."); *id*. ("Any lease issued under this section for land on which . . . actual drilling operations were commenced prior to the end of its primary term and are being diligently prosecuted at that time shall be extended for two years and so long thereafter as oil or gas is produced in paying quantities.").

In 1960, Congress amended the MLA's leasing provisions.  Among other things, Congress enacted Section 226-2, which provides:

> No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter.

30 U.S.C. § 226-2.  Through this provision, Congress sought to create a "statute of limitations providing that any action under the Administrative Procedure Act to review a decision of the Secretary involving an oil and gas lease must be initiated within 90 days after the final decision of the Secretary."  S. Rep. No. 86-1549 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3313, 3317.  *See also id*. at 3337.  More broadly, the 1960 MLA amendments aimed to reverse "a potentially dangerous slackening in exploration for development of domestic reserves of oil and gas" by "remov[ing] certain legislative obstacles to exploration for development of the mineral resources of the public lands and spur greater activity for increasing our domestic reserves."  *Id*. at 3314–15.

B.        Plaintiffs' Challenges to BLM's Leasing Authorizations.

In compliance with the congressional directive to conduct oil and gas lease sales at least quarterly, BLM approved and conducted between 2016 and 2020 the following 28 lease sales across Colorado, New Mexico, Utah, and Wyoming that are challenged in the instant litigation:

Table 1:  Challenged Lease Sales.[2]

| Colorado | New Mexico | Utah | Wyoming |
|---|---|---|---|
| Sale Date: <br> June 27, 2019 <br> Decision Record: <br> June 26, 2019 <br> Lease Parcels: <br> 17 | Sale Date: <br> March 28, 2019 <br> Decision Record: <br> December 30, 2019 <br> Lease Parcels: <br> 6 | Sale Date: <br> December 13, 2016 <br> Decision Record: <br> February 10, 2017 <br> Lease Parcels: <br> 24 | Sale Date: <br> September 17-18, 2019 <br> Decision Record: <br> September 16, 2019 <br> Lease Parcels: <br> 175 |

---

[2] *See* Am. Compl., ¶¶ 126–37 & Table A.  The decisional documents and results for each lease sale are available for each State office on BLM's website.  *See* BLM, Colorado Oil and Gas Lease Sales, *available at* https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/colorado (last visited June 9, 2021); BLM, New Mexico Oil and Gas Lease Sales, *available at* https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/new-mexico (last visited June 9, 2021); BLM, Utah Lease Sales, *available at* https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/utah (last visited June 9, 2021); BLM, Wyoming Oil and Gas Lease Sales, *available at* https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/wyoming (last visited June 9, 2021).  This Court may take judicial notice of government records and materials available on government websites.  *See, e.g., Banks v. Warner*, No. 94-56732, 1995 WL 465773, at *1 (9th Cir. Aug. 7, 1995); *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015).

| Colorado | New Mexico | Utah | Wyoming |
|---|---|---|---|
| Sale Date: September 26, 2019  Decision Record: September 25, 2019  Lease Parcels: 49 | Sale Date: June 20, 2019  Decision Record: April 30, 2020  Lease Parcels: 8 | Sale Date: March 23, 2017  Decision Record: April 13, 2017  Lease Parcels: 4 | Sale Date: December 10-11, 2019  Decision Record: December 9, 2019  Lease Parcels: 123 |
| Sale Date: March 26, 2020  Decision Record: March 25, 2020  Lease Parcels: 9 | Sale Date: September 5, 2019  Decision Record: July 31, 2020  Lease Parcels: 12 | Sale Date: June 13, 2017  Decision Record: July 25, 2017  Lease Parcels: 20 | Sale Date: March 24, 2020  Decision Record: March 23, 2020  Lease Parcels: 75 |
| Sale Date: September 25, 2020  Decision Record: September 22, 2020  November 24, 2020  Lease Parcels: 55 | Sale Date: November 7, 2019  Decision Record: December 31, 2020  Lease Parcels: 10 | Sale Date: September 12, 2017  Decision Record: September 22, 2017  Lease Parcels: 9 | |
| Sale Date: December 17, 2020  Decision Record: December 16, 2020  Lease Parcels: 32 | Sale Date: February 6, 2020  Decision Record: December 31, 2020  Lease Parcels: 48 | Sale Date: December 12, 2017  Decision Record: January 9, 2018  Lease Parcels: 15 | |

| Colorado | New Mexico | Utah | Wyoming |
|---|---|---|---|
| | Sale Date: <br> August 27, 2020[3] <br> Decision Record: <br> December 31, 2020 <br> Lease Parcels: <br> 93 | Sale Date: <br> March 20, 2018 <br> Decision Record: <br> May 17, 2018 <br> Lease Parcels: <br> 43 | |
| | Sale Date: <br> August 26, 2020 <br> Decision Record: <br> September 30, 2020 <br> Lease Parcels: <br> 9 | Sale Date: <br> June 12, 2018 <br> Decision Record: <br> August 9, 2018 <br> Lease Parcels: <br> 3 | |
| | Sale Date: <br> October 29, 2020 <br> Decision Record: <br> October 28, 2020 <br> Lease Parcels: <br> 11 | Sale Date: <br> September 11, 2018 <br> Decision Record: <br> October 23, 2018 <br> Lease Parcels: <br> 94 | |
| | | Sale Date: <br> December 11, 2018 <br> Decision Record: <br> February 8, 2019 <br> February 9, 2019 <br> Lease Parcels: <br> 105 | |

---

[3] The lease sale originally scheduled for May 2020 was cancelled and the parcels were instead offered at the time of the August 2020 lease sale.

| Colorado | New Mexico | Utah | Wyoming |
|---|---|---|---|
|  |  | Sale Date:<br>March 25-26, 2019<br>Decision Record:<br>September 4, 2019<br>Lease Parcels:<br>90 |  |
|  |  | Sale Date:<br>June 11, 2019<br>Decision Record:<br>October 8, 2019<br>Lease Parcels:<br>7 |  |
|  |  | Sale Date:<br>September 9-11, 2019<br>Decision Record:<br>December 18, 2019<br>Lease Parcels:<br>7 |  |

Prior to each lease sale, BLM conducted environmental reviews under NEPA—through either an Environmental Assessment ("EA") or Determination of NEPA Adequacy ("DNA")—of the proposed decisions to offer oil and gas leases for sale.  Relying on these NEPA documents, the resulting BLM Decision Records for each lease sale document the Federal Defendants' decision approving the conduct of the challenged lease sales and issuance of the resulting leases. *See*, *e.g.*, BLM, Decision Record for June 2019 Colorado Lease Sale, DOI-BLM-CO-040-2018-0087-EA, at 1 (June 26, 2019) ("It is my decision to implement the PREFERRED ALTERNATIVE as identified in the [EA] . . ., in which the [BLM] will offer six parcels of land

for lease in the June 2019 oil and gas competitive lease sale."); BLM, Decision Record for

March 2019 New Mexico Lease Sale, DOI-BLM-NM-P020-2019-0012-EA, at 1 (Dec. 30, 2019)

("I have decided to issue the lease parcels . . . to the successful bidders of the competitive oil and

gas lease sale conducted March 28, 2019."); BLM, Decision Record for December 2016 Utah

Lease Sale, DOI-BLM-UT-G010-2016-0033, at 1 (Feb. 10, 2017) ("It is my decision to select

and implement" the EA's proposed action "for the competitive oil and gas lease sale held on

December 13, 2016" and "issue oil and gas leases for the 24 parcels of land"); BLM, Decision

Record for September 2019 Wyoming Lease Sale, DOI-BLM-WY-0000-2019-0008-EA, at 1

(June 24, 2019) ("[I]t is my decision to select the proposed action described in the EA, which is

to offer and issue leases for the subject lands should they receive qualifying bids.").[4]

With one exception (which itself gives rise to a waiver),[5] Plaintiffs allege that WildEarth

submitted public comments or filed protests (or both) prior to Federal Defendants' decisions

approving each lease sale. *See* Am. Compl., ¶¶ 126–37. WildEarth's protests were denied.

Plaintiffs subsequently filed the present lawsuit "for declaratory and injunctive relief

against BLM, challenging as arbitrary federal leasing authorizations encompassed in [the] 28

---

[4] The Decision Records for each lease sale are available on BLM's website, *see supra* n.2, and are attached for reference in Appendix A hereto.

[5] Plaintiffs do not allege that WildEarth submitted public comments or a protest to BLM with respect to the March 23, 2017 Utah lease sale. *See* Am. Compl., ¶¶ 132–34. Indeed, no public comments or protests raised NEPA challenges to that lease sale. *See* BLM, National NEPA Register, DOI-BLM-UT-Y020-2016-0042-EA, *available at* https://eplanning.blm.gov/eplanning-ui/project/61831/570 (last visited June 9, 2021). In addition to being barred by the applicable statute of limitations, *see infra* Section I, Plaintiffs' challenge to this lease sale is waived. *See, e.g.*, *Sierra Club v. Fed. Energy Regul. Comm'n*, 827 F.3d 36, 50–51 (D.C. Cir. 2016) ("'[P]ersons challenging an agency's compliance with NEPA must structure their participation so that it alerts the agency to the parties' position and contentions,' and failure to do so 'forfeits any objection' to the environmental analysis on that ground.") (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004)) (alterations omitted).

separate lease sales across four Western states in violation of NEPA[.]"  Am. Compl., ¶ 15.  To remedy these allegedly improper "leasing decisions," *id*. ¶ 101, made on the basis of allegedly inadequate NEPA reviews, Plaintiffs ask this Court to, *inter alia*, (1) "[d]eclare that Federal Defendants' leasing authorizations . . . violate NEPA"; (2) "[v]acate Federal Defendants' leasing authorizations"; and (3) "[o]rder Federal Defendants to prepare an [Environmental Impact Statement ("EIS")] analyzing . . . the leasing authorizations challenged herein," *id*., Requested Relief, ¶¶ A, B, E.  *See also*, *e.g.*, *id*. ¶ 140 ("For all of the leasing authorizations . . ., BLM failed to take the required hard look" under NEPA.); ¶ 150 ("BLM's leasing authorizations will result in high levels of [greenhouse gas emissions] that could significantly impact climate.").

This lawsuit mirrors a series of NEPA challenges to Federal Defendants' oil and gas leasing authorizations filed by Plaintiffs across the country in recent years.  Before this Court, Plaintiffs are also currently challenging the Federal Defendants' decisions to conduct numerous other oil and gas lease sales in Colorado, Montana, New Mexico, Utah, and Wyoming between 2014 and 2019.  *See Jewell*, No. 16-cv-01724-RC, Dkt. No. 1 (D.D.C. Aug. 25, 2016); *Bernhardt*, No. 20-cv-00056-RC, Dkt. No. 1 (D.D.C. Jan. 9, 2020).  Notably, twenty of the twenty-eight lease sales challenged in this case took place prior to Plaintiffs' filing of their complaint in *Bernhardt*, and eleven of the lease sales took place either during the same month as the latest challenged lease sale in *Bernhardt* or earlier.

WildEarth has also filed, *inter alia*, similar NEPA challenges to Federal Defendants' decisions authorizing three New Mexico lease sales conducted in 2017 and 2018, *see WildEarth Guardians v. Bernhardt, et al.*, No. 19-cv-00505, Dkt. No. 1 (D.N.M. June 3, 2019), two Utah lease sales conducted in 2017 and 2018, *see Rocky Mountain Wild, et al. v. Bernhardt, et al.*, No. 19-cv-00929, Dkt. No. 1 (D. Utah June 5, 2019), and two Colorado lease sales conducted in 2017

and 2018, *Rocky Mountain Wild, et al. v. Bernhardt, et al.*, No. 18-cv-02468, Dkt. No. 1 (D. Colo. June 5, 2019).

## ARGUMENT

Despite their admitted contemporaneous knowledge of the leasing decisions challenged in this lawsuit, Plaintiffs sat on their rights and are therefore barred from challenging a large majority of the leasing decisions at issue in this case for failure to comply with the applicable statute of limitations; attempting to re-litigate claims that were, or could have been filed in a prior action (*res judicata*); and/or under the equitable doctrine of laches.

Plaintiffs' failures to comply with Section 226-2 and *res judicata* trigger Federal Rule of Civil Procedure 12(b)(6), which "tests the legal sufficiency of a complaint." *Alford v. Providence Hosp.*, 60 F. Supp. 3d 118, 123 (D.D.C. 2014). Having failed to satisfy these threshold requirements with respect to the bulk of the challenged leasing decisions, Plaintiffs cannot "state a claim that is plausible on its face" with respect to those lease sales. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).[6]

Evaluation of laches typically involves consideration of facts outside the pleadings and is therefore unsuited to review under Federal Rule of Civil Procedure 12(b)(6). *See, e.g., Major v.*

---

[6] Although API submitted its Answer to the Amended Complaint as required by Federal Rule of Civil Procedure 24(c), the Court may review its challenges to the Amended Complaint for failure to state claim pursuant to Rule 12(b)(6)—rather than for a judgment on the pleadings under Federal Rule of Civil Procedure 12(c)—because the Federal Defendants have not yet answered the Amended Complaint. *See Commonwealth of Va. v. Ferriero*, --- F. Supp. 3d ---, 2021 WL 848706, at *3 n.1 (D.D.C. Mar. 5, 2021). At any rate, regardless of the label, this Court applies the same standard in assessing this motion. *See, e.g., Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 58 (D.D.C. 2007) ("The appropriate standard for reviewing a motion for judgment on the pleadings is virtually identical to that applied to a motion to dismiss under Rule 12(b)(6)."); *id.* at 60 (explaining that "the court may consider a premature Rule 12(c) motion under Rule 12(b)(6)").

*Plumbers Loc. Union No. 5 of United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe-Fitting Indus. Of the U.S. & Canada, AFL-CIO*, 370 F. Supp. 2d 118, 128 (D.D.C. 2005). But even viewing all reasonable inferences "in a light most favorable" to Plaintiffs, *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016), the Amended Complaint, public BLM records subject to judicial notice, and relevant facts regarding development of the challenged oil and gas leases leave no genuine material factual dispute that Plaintiffs' conscious delay in seeking legal relief to the detriment of oil and gas lessees warrants a dismissal on summary judgment pursuant to Federal Rule of Civil Procedure 56.

As further detailed below, each of these grounds for precluding late-filed claims bars Plaintiffs' NEPA claims against a subset of the leasing decisions challenged in the Amended Complaint.

## I.   The MLA's Statute of Limitations Bars Plaintiffs' Challenges to 23 of the 28 Leasing Decisions.

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. N. Dakota ex rel. Bd. Of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). "A necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied." *Id.* Such conditions include statutes of limitations.

Plaintiffs' challenges to 23 of the 28 leasing decisions at issue are barred by Section 226-2's 90-day limitations period created by Congress as part of its MLA amendments designed to remove "obstacles" to oil and gas development. *See* 1960 U.S.C.C.A.N. at 3314–15. Failure to comply with the applicable statute of limitations triggers dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Jackson v. Modly*, 949 F.3d 763, 767 (D.C.

Cir. 2020).  In making this determination, the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which the court may take judicial notice."  *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up).  As detailed below, the Amended Complaint and judicially noticeable public records make clear that 23 of Plaintiffs' leasing decision challenges are barred.

### A.    Section 226-2 Applies to Plaintiffs' NEPA Claims Brought Under the APA.

While Plaintiffs allege that Federal Defendants' challenged leasing decisions violated NEPA, *see supra*, "NEPA itself does not provide a cause of action," *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 177 (D.C. Cir. 2019).  Rather, the APA supplies Plaintiffs' cause of action.  *See*, *e.g.*, *id*. ("[A]ny challenge to agency action based on NEPA must be brought under the Administrative Procedure Act[.]"); *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002).  In other words, by challenging Federal Defendants' leasing decisions under NEPA, Plaintiffs "invoke the limited waiver of sovereign immunity provided for in the APA." *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1245 (10th Cir. 2012). *See also*, *e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990).

### 1.    Section 226-2's Specific Statute of Limitations Applies to Plaintiffs' APA Cause of Action.

In the absence of a specific statute of limitations, APA claims "are subject to the statute of limitations contained in 28 U.S.C. § 2401," which generally allows for claims against the United States filed within six years of accrual.  *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014).  But the APA does not "affect[] other limitations on judicial review . . . ."  5 U.S.C. § 702(1).  As the *Attorney General's Manual on the Administrative Procedure Act* ("*APA Manual*") explains, "the time within which review must be sought" for a cause of action under the APA "will be governed, as in the past, by relevant statutory provisions," and "the general

principles stated in [the APA's judicial review provisions] must be carefully coordinated with existing statutory provisions and case law."[7]

Indeed, a specific statute of limitations superseding the general 28 U.S.C. § 2401 limitations period otherwise applicable to APA claims is consistent with the "commonplace of statutory construction that the specific governs the general." *Howard v. Pritzker*, 775 F.3d 430, 438 (D.C. Cir. 2015) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). "This is no less true with respect to statutes of limitations." *Id*. *See also*, *e.g.*, *Kannikal v. Att'y Gen. United States*, 776 F.3d 146, 155 (3rd Cir, 2015) ("Section 2401(a) is meant to apply when other limitations periods are lacking[.]"); *Nagahi v. INS*, 219 F.3d 1166, 1171 (10th Cir. 2008) ("***In the absence of a specific statutory limitations period***, a civil action against the United states under the APA is subject to the six year limitations period found in 28 U.S.C. § 2401(a).") (emphasis added).

Taken together, the APA "prohibits review of agency decisions 'to the extent that . . . statutes preclude judicial review.'" *Impact Energy*, 693 F.3d at 1245 (quoting 5 U.S.C. § 701(a)). "The MLA includes such a prohibition." *Id*. Section 226-2 provides:

> No action contesting ***a decision*** of the Secretary ***involving any oil and gas lease*** shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary ***relating to*** such matter.

30 U.S.C. § 226-2 (emphases added). This statutory deadline constitutes "a condition to the waiver of sovereign immunity and thus must be strictly construed." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990). The plain language, legislative history, and congressional

---

[7]   *APA Manual* at 98, *available at* https://www.fsulawrc.com/fall/admin/AttorneyGeneralsManual.pdf (last visited June 9, 2021). The Supreme Court has long found the *APA Manual* to be "persuasive" in interpreting the APA. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004).

purpose make clear that Section 226-2's 90-day limitations period applies to bar the bulk of Plaintiffs' challenges to Federal Defendants' leasing decisions.

Construction of Section 226-2 "begin[s] . . . with the plain language of the statute." *AT&T Inc. v. FCC*, 452 F.3d 830, 835 (D.C. Cir. 2006) (quotation omitted).  That language is broad.  First, the term "'involving' is broad and indeed the functional equivalent of 'affecting.'" *Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 273–74 (1995).  Likewise, "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)).  Finally, the phrase "relating to" is "a broad one" that means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association or connection with."  *Morales*, 504 U.S. at 383 (quotation omitted).  In short, where a party files an action contesting a decision of the Secretary that "involv[es]" at least one oil and gas lease, Congress limited such claims to those filed within 90 days of the decision.

The legislative history confirms that Section 226-2 bars challenges to oil and gas leasing decisions filed more than 90 days after the final decision.  The Conference Committee that drafted the final version of Section 226-2 "accepted the principle of the Senate language" on the statute of limitations.  1960 U.S.C.C.A.N. 3313, 3337.  That language was meant to enact "[a] statute of limitations providing that ***any action under the Administrative Procedure Act*** to review a decision of the Secretary involving an oil and gas lease must be initiated within 90 days after the final decision of the Secretary."  *Id*. at 3317 (emphasis added).  Indeed, the 1960 MLA

amendments as a whole were designed to remove "obstacles" to oil and gas exploration and development, "and spur greater activity for increasing our domestic reserves." *Id*. at 3314–15.[8]

Here, Plaintiffs challenge Federal Defendants' decisions "involving any oil and gas lease." 30 U.S.C. § 226-2. Their NEPA challenge relates to NEPA analyses performed solely for purposes of Secretarial decisions regarding the conduct of oil and gas lease sales, and thus plainly "involve" and "relate to" oil and gas decisions. Indeed, the Amended Complaint expressly challenges Federal Defendants' "leasing decisions," Am. Compl., ¶ 101, to authorize the challenged lease sales resulting in the issuance of oil and gas leases. *See also*, *e.g.*, *id*., ¶ 15 (explaining that Plaintiffs brought "this civil action for declaratory and injunctive relief against BLM, challenging as arbitrary federal leasing authorizations encompassed in [the] 28 separate lease sales across four Western states in violation of NEPA"); *id*., Relief Requested, ¶ A (requesting that the Court "[d]eclare that Federal Defendants' leasing authorizations . . . violate NEPA"); *supra* pp. 5–10.

Those challenged leasing decisions, made in reliance upon the challenged NEPA analyses, were finalized in BLM's Decision Records approving the conduct of the lease sales. *See supra* Table 1; Appendix A. *See also*, *e.g.*, BLM, Decision Record for June 2019 Colorado Lease Sale, DOI-BLM-CO-040-2018-0087-EA, at 1 (June 26, 2019) ("It is my decision to implement the Preferred Alternative as identified in the [EA] . . ., in which the [BLM] will offer six parcels of land for lease in the June 2019 oil and gas competitive lease sale."); BLM,

---

[8] A conference committee report is entitled to "great weight" in assessing congressional intent. *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 833 n.28 (1983). *See also*, *e.g.*, *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981) ("Because the conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent.").

Decision Record for March 2019 New Mexico Lease Sale, DOI-BLM-NM-P020-2019-0012-EA, at 1 (Dec. 30, 2019) ("I have decided to issue the lease parcels . . . to the successful bidders of the competitive oil and gas lease sale conducted March 28, 2019."); BLM, Decision Record for December 2016 Utah Lease Sale, DOI-BLM-UT-G010-2016-0033, at 1 (Feb. 10, 2017) ("It is my decision to select and implement" the EA's proposed action "for the competitive oil and gas lease sale held on December 13, 2016" and "issue oil and gas leases for the 24 parcels of land"); BLM, Decision Record for September 2019 Wyoming Lease Sale, DOI-BLM-WY-0000-2019-0008-EA, at 1 (June 24, 2019) ("[I]t is my decision to select the proposed action described in the EA, which is to offer and issue leases for the subject lands should they receive qualifying bids.").

Because the Federal Defendants' Decision Records to "offer and issue leases," *id.*, for 23 of the challenged lease sales issued more than 90 days before Plaintiffs filed their original January 19, 2021 Complaint in this case, *see supra* Table 1, Section 226-2 bars Plaintiffs' challenges to those sales. *See*, *e.g.*, *Miami Bldg. & Constr. Trades Council v. Sec'y of Defense*, 143 F. Supp. 2d 19, 24–25 (D.D.C. 2001) (statute of limitations began to run on the date agency decided to prepare a Supplemental Environmental Impact Statement because plaintiffs challenged that decision).  Specifically, Section 226-2 bars Plaintiffs' challenges to the: (1) June 27, 2019, September 26, 2019, March 26, 2020, and September 25, 2020 Colorado lease sales; (2) March 28, 2019, June 20, 2019, September 5, 2019, and August 26, 2020 New Mexico lease sales; (3) December 13, 2016, March 23, 2017, June 13, 2017, September 12, 2017, December 12, 2017, March 20, 2018, June 12, 2018, September 11, 2018, December 11, 2018, March 25-26, 2019, June 11, 2019, and September 9-11, 2019 Utah lease sales; and (4) September 17-18, 2019, December 10-11, 2019, and March 24, 2020 Wyoming lease sales.

Plaintiffs' challenges must therefore be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *E.g.*, *Jackson*, 949 F.3d at 767, 776–79.

### 2.     NEPA Does Not Salvage Plaintiffs' Time-Barred Challenges.

That Plaintiffs' APA causes of action allege violations of NEPA does not alter application of Section 226-2.  Rather, federal courts—including this Court—regularly apply to NEPA claims specific statutes of limitations that are shorter than the default six-year limitations period for APA claims under 28 U.S.C. § 2401(a).  *See*, *e.g.*, *Miami Bldg. & Constr. Trades Council*, 143 F. Supp. 2d at 24–25 (NEPA challenge to disposition of former Air Force base property barred pursuant to sixty day limitation period in Defense Base Closure and Realignment Act); *Nuclear Info. & Res. Serv. v. U.S. Dep't of Transp.*, 457 F.3d 956, 958, 962 (9th Cir. 2006) (sixty day limitations period in 28 U.S.C. § 2344 barred NEPA challenges to agency regulations); *New Jersey Dep't of Envtl. Prot. & Energy v. Long Island Power Auth.*, 30 F.3d 403, 405–06, 410,  414 (3rd Cir. 1994) (explaining that 28 U.S.C. § 2344's sixty day limitation period would bar petition for review of agency order); *Goos v. Interstate Com. Comm'n*, 911 F.2d 1283, 1288–89 (8th Cir. 1990) (applying sixty day limitations period of 28 U.S.C. § 2344 to bar petitioners' NEPA claims).

These decisions are consistent with the similar rule that exclusive jurisdictional provisions restricting certain lawsuits to the Courts of Appeals equally apply to NEPA claims, and supersede the general federal questions jurisdiction conferred on district courts by 28 U.S.C. § 1331.  *See*, *e.g.*, *Edwardsen v. U.S. Dep't of the Interior*, 268 F.3d 781, 784 (9th Cir. 2001) ("Because the alleged NEPA violation arises under [the Outer Continental Shelf Lands Act ("OCSLA")], which provides for exclusive jurisdiction in the court of appeals, we have original jurisdiction over the NEPA claim."); *City of Rochester v. Bond*, 603 F.2d 927, 936 (D.C. Cir. 1979) ("[W]e disagree that the district court may exercise concurrent jurisdiction merely because

a violation of NEPA is alleged.  The allegation may be raised directly in the courts of appeals; and insofar as it may affect the lawfulness of a directly appealable order we think it must be.").[9]

Again, NEPA's procedural mandates do not negate the "commonplace of statutory construction that the specific governs the general." *Howard*, 775 F.3d at 438.  *See also Nuclear Info. & Res. Serv.*, 457 F.3d at 959 ("[W]here a federal statute provides for direct review of an agency action in the court of appeals, such specific grants of exclusive jurisdiction to the courts of appeals override general grants of jurisdiction to the district courts."); *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989) (explaining that "specific jurisdictional provisions" "control over the general and widely applicable procedures"); *Media Access Project v. FCC*, 883 F.2d 1063, 1067 (D.C. Cir. 1989) ("The courts uniformly hold that statutory review in the agency's specially designated forum prevails over general federal question jurisdiction in the district courts."); *Geertson Farms, Inc. v. Johanns*, 439 F. Supp. 2d 1012, 1020 (N.D. Cal. 2006) (explaining that "courts regularly hold that a challenge to the procedure of an agency action is tantamount to challenging the action itself"). *Cf. Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 684 (D.C. Cir. 2004) ("When an agency decision has two distinct bases, one of which provides for exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court.") (internal quotations and citation omitted).

---

[9] Exercise of exclusive jurisdiction over NEPA claims in the Court of Appeals is common for challenges to the Department of Interior's five-year leasing programs under OCSLA.  *See, e.g.*, *Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015) (asserting OCSLA and NEPA violations); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 471–72 (D.C. Cir. 2009) (asserting NEPA, APA and other violations); *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) (same); *California v. Watt*, 712 F.2d 584 (D.C. Cir. 1983) (asserting NEPA and other violations); *California v. Watt*, 668 F.2d 1290 (D.C. Cir. 1981) (asserting NEPA, APA and other violations).

The Ninth Circuit's application of a specific statute of limitations to NEPA claims in *Turtle Island Restoration Network v. United States Department of Commerce*, 438 F.3d 937 (9th Cir. 2006), is instructive.  In that case, environmental groups contended that a regulation issued pursuant to the Magnuson-Stevens Fisheries Act violated NEPA (among other statutes).  *See Turtle Island*, 438 F.3d at 942.  While the environmental groups contended that their NEPA claims were subject to the general six-year limitations period of 28 U.S.C. § 2401(a) that applies to APA claims, the Government argued that the plaintiffs' claims were barred by the Magnuson Act's specific thirty-day limitations period for challenges to "[r]egulations promulgated by the Secretary" of Commerce under the Magnuson Act.  *See id*. at 940 (quoting 16 U.S.C. § 1855(f)); *id*. at 942–43.  The Ninth Circuit concluded that the "plain language" of the Magnuson Act settled the dispute by broadly applying to any challenges to regulations promulgated pursuant to the Magnuson Act.  *See id*. at 943–44.  Because the fisheries reopening that the environmental groups challenged "came about as a result of" a Magnuson Act regulation, *id*. at 944, the Magnuson Act's limitations period applied to bar the plaintiffs' NEPA claims, *id*. at 949.

The Ninth Circuit's analysis mirrors the application of Section 226-2 here.  As in *Turtle Island*, the language of Section 226-2 is "clear and uncomplicated."  *Id*. at 943.  *See supra* p. 15.  Just as the challenge in *Turtle Island* was aimed at the Magnuson Act regulation, Plaintiffs' complaint is "directed at," *Turtle Island*, 438 F.3d at 945, Federal Defendants' oil and gas "leasing decisions," Am. Compl. ¶ 101; *see also supra*, and asks this Court to, among other things, "[d]eclare that Federal Defendants' leasing authorizations . . . violate NEPA," *id*., Relief Requested, ¶ A.  Further, the MLA limitations period effectuates "Congress's intent to ensure" expeditious leasing and exploration of public lands for oil and gas development "and that challenges are resolved swiftly."  *Turtle Island*, 438 F.3d at 948.  *See also supra* pp. 15–16.

Consistent with the reasoning in *Turtle Island* and the broad language of Section 226-2, Plaintiffs' NEPA claims are likewise barred.

Although the Tenth Circuit declined to apply Section 226-2's broad provisions to NEPA claims in *Park County Resource Council v. United States Department of Agriculture*, 817 F.2d 609 (10th Cir. 1987), that 34 year-old out-of-Circuit decision is neither controlling nor persuasive and, indeed, was sharply criticized by the Ninth Circuit in *Turtle Island*.  In rejecting application of Section 226-2, *Park County* relied on the Ninth Circuit's earlier decision in *Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986), and the twin assumptions that (1) no statute of limitations (or the APA) applies to NEPA claims, and (2) all NEPA claims must be subject to a uniform limitations period.  Each of these underlying bases were misplaced and have been further undermined during the intervening years.

First, *Park County* relied on a purported distinction in *Jones v. Gordon* between substantive challenges to an agency action—to which a statute of limitations applies—and procedural NEPA challenges—to which the limitations period does not apply.  *See Park County*, 817 F.2d at 616; *see also id.* ("The thrust of our reasoning parallels that of the Ninth Circuit in *Jones v. Gordon*[.]")).  But in *Turtle Island*, the Ninth Circuit noted that *Park County*'s distinction between substantive and procedural challenges for limitations purposes reflected a "misapplication of *Jones*" to the "broad wording" of Section 226-2.  *Turtle Island*, 438 F.3d at 947 n.9.  As the Ninth Circuit made clear, the "conclusion in *Jones* flowed not from any general proposition about NEPA but from a plain reading of the" particular limitations period at issue in that case.  *Id.* at 947.  Unlike the statute of limitations at issue in *Jones*, which narrowly applied to challenges to the "terms and conditions" of certain permits, *see Jones*, 792 F.2d at 824 (quoting 16 U.S.C. § 1374(d)(6)), Section 226-2 applies broadly to "a decision of the Secretary

involving any oil and gas lease," 30 U.S.C. § 226-2; *supra* pp. 15–16.  Like the Magnuson Act

limitations provision at issue in *Turtle Island*, "[n]othing in [Section 226-2] purports to

distinguish between procedural and substantive challenges" to leasing decisions.  *Turtle Island*,

438 F.3d at 946.  *Cf. Block*, 461 U.S. at 285 (applying limitation period to challenge by State

where "[t]he statutory language makes no exception for civil actions by States").  *Turtle Island*

and the broad language of Section 226-2 thus fatally undermine *Park County*'s reasoning.[10]

Second, applying its reading of *Jones*, the Tenth Circuit assumed that the absence of a

specific statute of limitations in NEPA meant that no limitations period applies to NEPA claims.

Instead, NEPA claims were only subject to the equitable doctrine of laches.  *See Park County*,

817 F.2d at 616–17.  Alongside this assumption, *Park County* applied a "reasonableness

standard" to the NEPA claims under review.  *See id*. at 621 n.4.  Taken together, these positions

make clear *Park County*'s assumption that the APA—to which the general limitations period in

28 U.S.C. § 2401(a) applies and which imposes an arbitrary and capricious standard of review—

does not supply the cause of action for NEPA claims.  It is now well-settled, however, that the

APA provides the cause of action for any NEPA claim and such claims are subject to statutes of

limitations, not simply the equitable doctrine of laches.  *See supra* pp. 13–14.

Now unequivocally subject to the APA, Plaintiffs' NEPA claims are barred in order to

effectuate Congress's intent to preclude "any action under the Administrative Procedure Act to

review a decision of the Secretary involving an oil and gas lease [that is not] initiated within 90

---

[10] *Turtle Island* likewise undercuts a related decision in *Conservation Law Foundation v. Mineta*, 131 F. Supp. 2d 19 (D.D.C. 2001), which relied on *Park County* and *Jones* to conclude that "NEPA-only challenges may proceed pursuant to the APA, which has no time limitation, rather than pursuant to a more limited substantive statute."  *Id*. at 24.  Again, the Ninth Circuit explained that *Conservation Law Foundation* reflected the same "misreading of *Jones*" without "interpreting the relevant statutory language" at issue in the case.  *Turtle Island*, 438 F.3d at 947.

days after the final decision of the Secretary."   1960 U.S.C.C.A.N. 3313, 3317.   Allowing Plaintiffs to evade Section 226-2 simply "by artful[ly] pleading," *Block*, 461 U.S. at 285 (quotation omitted), their claim as a NEPA challenge, when their challenge so clearly and directly relates to an MLA oil and gas leasing decision, would "resurrect the very problems that Congress sought to eliminate," *Yeutter*, 887 F.2d at 912, by imposing a 90 day limitations period—late filed legal challenges and other "obstacles" that would undercut prompt development of oil and gas reserves.  *See* 1960 U.S.C.C.A.N. at 3314–15.

Finally, *Park County* erroneously assumed that claimed violations of NEPA should not be subject to differing limitations periods "depending upon which statute the underlying agency action is based."  *Park County*, 817 F.2d at 616.  To the contrary, federal courts have long applied specific limitations periods to NEPA claims depending upon the underlying agency action, and likewise applied specific, exclusive jurisdictional provisions depending on the context.  *See supra* pp. 18–19.  In other words, it is well settled that there is no uniform time and forum for a NEPA claim.

Viewed as a whole, the reasoning of *Park County* cannot withstand decades of caselaw clarifying the nature and scope of NEPA claims.  This court should, as it must, apply "the plain language," *AT&T Inc.*, 452 F.3d at 835 (quotation omitted), of Section 226-2 to bar the bulk of Plaintiffs' claims.  *See supra*.

## B.     Plaintiffs Do Not Qualify for the Extraordinary Remedy of Equitable Tolling.

Where a statute of limitations is not jurisdictional, the doctrine of equitable tolling may "allow[] a plaintiff to avoid the bar of the limitations period[.]"  *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 393 (D.C. Cir. 2020).  But the remedy of equitable tolling is "appropriate only in rare instances where—due to circumstances external to the party's own

23

conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Jackson*, 949 F.3d at 778 (quotation omitted).  *See also*, *e.g.*, *Irwin*, 498 U.S.at 94 ("Federal courts have typically extended equitable relief only sparingly."); *Impact Energy*, 693 F.3d at 1245 ("Equitable tolling is granted sparingly.").  This case does not present the requisite rare circumstances.

To demonstrate an entitlement to this rare remedy, Plaintiffs "must show (1) that [they have] been pursuing [their] rights diligently, and (2) that some extraordinary circumstances stood in [their] way." *Jackson*, 949 F.3d at 778 (quotation omitted).  For example equitable tolling may be justified "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin*, 498 U.S. at 94.  *See also Impact Energy*, 693 F.3d at 1245 ("We have held that tolling is appropriate when the defendant's conduct rises to the level of active deception; where a plaintiff has been lulled into inaction by a defendant, and likewise, if a plaintiff is actively misled or has in some extraordinary way been prevented from asserting his or her rights." (quotation omitted)).

Here, Plaintiffs cannot "meet the high threshold for applying this rare remedy." *Jackson*, 949 F.3d at 778.  There is no indication that any extraordinary events outside Plaintiffs' control, let alone any misconduct by Federal Defendants, concealed the allegedly improper leasing decisions from Plaintiffs or otherwise misled Plaintiffs to file their NEPA claims after the 90-day limit prescribed by Section 226-2.  To the contrary, by detailing WildEarth's participation in the administrative process for each of the challenged lease sales, the Amended Complaint concedes Plaintiffs' knowledge—well within the limitations period—of the leasing decisions they now challenge.  *See* Am. Compl., ¶¶ 126–37.  In this light, Plaintiffs' decision to file their legal

challenges in January 2021 reflects a conscious decision, and the rare remedy of equitable tolling does not protect Plaintiffs from their own decisions.

## II.     Plaintiffs' Challenges to the December 2017 and June 2018 Utah Lease Sales Are Barred by *Res Judicata*.

Plaintiffs' challenges to the December 12, 2017 and June 12, 2018 Utah lease sales are also barred by *res judicata* (claim preclusion).  "When *res judicata* bars a claim, it is subject to dismissal under Rule 12(b)(6)."  *Alford*, 60 F. Supp. 3d at 123.

"Under [*res judicata*], a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in [a prior] action." *Jenkins v. District of Columbia*, 288 F. Supp. 3d 308, 312 (D.D.C. 2018) (citations omitted).  *Res judicata* applies where:

1.  [The] prior litigation . . . involv[es] the same claims or cause(s) of action;

2.  [B]etween the same parties or their privies; and

3.  [T]here has been a (a) final, (b) valid, (c) judgment on the merits;

4.  [B]y a court of competent jurisdiction.

*Arpaio v. Robillard*, 459 F. Supp. 3d 62, 66 (D.D.C. 2020) (citation omitted).  Because Plaintiffs' challenges to the December 12, 2017 and June 12, 2018 Utah lease sales satisfy these requirements, they are barred.[11]

---

[11] A court may dismiss specific claims pursuant to *res judicata* even if all the plaintiff's claims are not precluded.  *See Velikonja v. Ashcroft*, 355 F. Supp. 2d 197, 204 (D.D.C. 2005) ("[D]efendant's motion [to dismiss] is granted with respect to claims arising before April 3, 2003, but denied with respect to claims based on facts arising thereafter.").

**A.    Plaintiffs Raise the Same Cause of Action as Plaintiff WildEarth Raised in a Prior Federal Lawsuit.**

The "same cause of action" requirement bars "any further claim based on the same 'nucleus of facts,' for it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies." *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984) (citations omitted).   While "[r]es judicata does not bar parties from bringing claims based on material facts that were not in existence when they brought the original suit," *Velikonja*, 355 F. Supp. 2d at 202, "[t]wo claims need not be literally identical claims for *res judicata* to apply," *Peek v. SunTrust Bank, Inc.*, 313 F. Supp. 3d 201, 205 (D.D.C. 2018) (granting motion to dismiss where plaintiff presented "new legal theories based on the same facts known to him at the time he filed" his original complaint).

In *Rocky Mountain Wild, et al. v. Bernhardt, et al.*, No. 19-cv-00929 (D. Utah June 5, 2019), a group of plaintiffs including WildEarth challenged the December 12, 2017 and June 12, 2018 Utah lease sales.   *See* Compl. (Dkt. No. 1) (attached as Exhibit 1 hereto), ¶ 98 ("Plaintiffs challenge two recent BLM oil and gas lease sales in and around the Uinta Basin: the Vernal Field Office's December 2017 and June 2018 lease sales.").   Among other things, the *Rocky Mountain Wild* plaintiffs alleged that BLM violated NEPA by failing to prepare an EIS and to adequately consider the air quality and climate impacts of the decisions to conduct the two lease sales.   *See id.*, ¶¶ 145–50.   *See also id.*, ¶ 122 ("BLM refused to quantify or otherwise analyze the December 2017 lease sale's cumulative [greenhouse gas ('GHG')] emissions . . . .").[12]

---

[12] The *Rocky Mountain Wild* lawsuit was transferred from the District of Colorado to the District of Utah.  Courts may take judicial notice of "official court records."  *Peek v. SunTrust Bank, Inc.*, --- F. App'x ---, 2021 WL 2010678, at *1 (D.C. Cir. May 11, 2021).  *See also, e.g., Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) ("Among the information a court may consider on a motion to dismiss are public records subject to judicial (continued…)

Plaintiffs' NEPA challenges to the December 12, 2017 and June 12, 2018 Utah lease sales in this case include comparable claims that BLM failed adequately to quantify GHG emissions and climate impacts. *See*, *e.g.*, Am. Compl., ¶¶ 5–7, 101–25. More importantly, those claims arise from the "same nucleus of facts"—namely, Federal Defendants' decisions to conduct the December 12, 2017 and June 12, 2018 Utah lease sales, *see id*., ¶¶ 132–34, based on allegedly inadequate review under NEPA, which, in Plaintiffs' view, requires preparation of an EIS. *See id*., ¶¶ 138–61.

While the NEPA challenges in the *Rocky Mountain Wild* case were directed at the December 12, 2017 and June 12, 2018 leases issued in Utah's Vernal Field Office, and the present suit is directed at the December 12, 2017 and June 12, 2018 leases issued in Utah's Price and Richfield Field Offices, *compare* Exhibit 1, ¶ 98 *with* Am. Compl., Table A, that is a distinction without a difference. All of the leases were noticed, offered, and issued together through the same internet-based December 12, 2017 and June 12, 2018 Utah lease sales. *See*, *e.g.*, BLM, Utah State Office, Notice of Competitive Oil and Gas Internet-Based Lease Sale, at https://eplanning.blm.gov/public_projects/nepa/80165/119124/145379/1UtahDec2017NoticeOfSale.pdf (explaining that all offered leases "are located in the Green River District" and the unified bidding process) (last visited June 9, 2021). The facts of the lease sales and the underlying NEPA reviews were available for all aspects of the December 12, 2017 and June 12, 2018 Utah lease sales at the time WildEarth, as a plaintiff in the *Rocky Mountain Wild* lawsuit, chose to challenge only the Vernal Field Office portion of the December 12, 2017 and June 12, 2018 lease sales. *See Jenkins*, 288 F. Supp. 3d at 312 (explaining that, under *res judicata*, "a final judgment

notice."); *Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987) ("Courts may take judicial notice of official court records[.]").

on the merits of an action precludes the parties or their privies from relitigating issues that ***were or could have been raised*** in [a prior] action") (citations omitted) (emphasis added).

### B.    Plaintiffs' Challenge Involves the Same Parties as *Rocky Mountain Wild*.

A party may only be precluded from asserting a claim if it was a party to the prior action, or in privity to a party in the prior action.  *See Sae Young Kim v. Nat'l Certification Comm'n for Acupuncture and Oriental Med.*, 888 F. Supp. 2d 78, 82 (D.D.C. 2012).  Here, WildEarth was a party to the first action in Utah federal court.  *See* Exhibit 1, ¶ 20 (describing "Plaintiff WildEarth Guardians").  Claim preclusion thus bars WildEarth from maintaining this second challenge to the December 12, 2017 and June 12, 2018 Utah lease sales.

Although Physicians for Social Responsibility was not a party (or in privity to a party) to the first lawsuit, "[t]he defense of *res judicata* is not avoided by joinder." *Sellers v. Nationwide Mut. Fire Ins. Co.*, 986 F.3d 1267, 1272 (11th Cir. 2020).  In other words, Plaintiffs collectively "cannot avoid the bar of *res judicata* by bringing in additional plaintiffs." *Bethesda Lutheran Homes and Servs. v. Born*, 238 F.3d 853, 857 (7th Cir. 2001) (citation omitted).  *See also*, *e.g.*, *Carmellino v. District 20 of New York City Dept. of Educ.*, No. 03-cv-5942-PKC, 2004 WL 736988, at *7 (S.D.N.Y. Apr. 6, 2004) ("A party may not avoid the preclusion of a second action merely because that action includes a larger number of plaintiffs and/or defendants.") (applying similar New York law).

Because WildEarth is precluded, it cannot avoid the impact of *res judicata* by the mere expedient of adding Physicians for Social Responsibility as a plaintiff in this case.  "If such were the case, any unsuccessful plaintiff could resurrect a claim *ad infinitum* by filing subsequent complaints, each with an incrementally larger number of co-plaintiffs." *Id*.  *See also*, *e.g.*, *Sheridan v. NGK Metals Corp.*, No. 06-cv-5510, 2008 WL 2156718, at *11 (E.D. Pa. May 22, 2018) (same); *Myeress v. Heidenry*, No. 19-cv-21568-RAR, 2019 WL 7956172, at *5 n.8 (S.D.

Fla. Nov. 25, 2019) ("[A] party may not avoid the application of *res judicata* by adding new parties."); *Gordon v. Cathey*, No. 13-cv-00229-FDW-DCK, 2013 WL 5561642, at *3 (W.D.N.C. Oct. 8, 2013) (granting motion to dismiss based on claim preclusion where "Plaintiff simply add[ed] other parties to the suit"); *Ramos v. Dominican Republic*, No. 12-cv-0481, 2012 WL 1067562, at *1 (D.D.C. Mar. 22, 2012) (holding plaintiff "cannot avoid application of the doctrine [of claim preclusion] by adding . . . a new party defendant"). *Rosenthal v. State of Nev.*, 514 F. Supp. 907, 912 (D. Nev. 1981) ("[T]he bringing in of additional parties in the second suit that contributed to the same alleged wrong in the first suit, does not violate the requirement for identity of the parties in the application of the doctrine of *res judicata*.").

## C. *Rocky Mountain Wild* Resulted in a Final Judgment on the Merits.

To have preclusive effect, the prior action must be "final." A "judgment is final regarding a specified cause of action only if that action could not become affected by further proceedings in the court where the judgment was rendered." *Mazaleski v. Harris*, 481 F. Supp. 696, 698 (D.D.C. 1979).

*Rocky Mountain Wild* satisfies the finality requirement because the District of Utah issued a decision rejecting the plaintiffs' claims with respect to most of the challenged leases, remanding the matter to BLM for further consideration of its NEPA analysis of leasing alternatives for a minority of the leases, and retaining no questions in the case for future determination by the court. *See Rocky Mountain Wild v. Bernhardt*, No. 19-cv-00929, 2020 WL 7264914 (D. Utah Dec. 10, 2020). *See also Richmond v. St. Joseph Care Ctr. West*, 190 F.3d 500, 502–03 (7th Cir. 1999) (applying Indiana law to hold that remand to agency satisfied *res judicata* final judgment requirement because it disposed of "the subject matter of the litigation as to the parties as far as the court in which the action is pending has the power to dispose of it, and reserves no further questions for future determination"). Although the plaintiffs have appealed

the District of Utah's decision in *Rocky Mountain Wild*, an "order is 'final' for *res judicata* purposes even though it is pending on appeal." *El-Amin v. Virgilio*, 251 F. Supp. 3d 208, 221 (D.D.C. 2017) (citations omitted). *See also*, *e.g.*, *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 262 (D.D.C. 2011) ("[U]nder well-settled federal law, the pendency of an appeal does not diminish the *res judicata* effect of a judgment rendered by a federal court.") (quotation omitted).

The District of Utah's *Rocky Mountain Wild* final judgment is likewise "on the merits" for purposes of claim preclusion. A judgment is "on the merits" if "the underlying decision actually passes directly on the substance of a particular claim before the court." *Brownback v. King*, 141 S. Ct. 740, 748 (2021) (quotation omitted). The *Rocky Mountain Wild* court directly passed upon—and largely rejected—the substance of the plaintiffs' claims. *See Rocky Mountain Wild*, 2020 WL 7264914, at *4–12. *See also McIntyre v. Fulwood*, 892 F. Supp. 2d 209, 215 (D.D.C. 2012) ("A judgment on the merits is one that reaches and determines the real or substantial grounds of action or defense as distinguished from matters of practice, procedure, jurisdiction or form.") (quotation omitted).

**D.     The *Rocky Mountain Wild* Decision Was Rendered by a Court of Competent Jurisdiction.**

A valid judgment requires the rendering court to have proper subject-matter and personal jurisdiction. *See*, *e.g.*, *Truett v. St. Tammany Parish Fire Dist. No. 12*, 909 F. Supp. 2d 552, 557 (E.D. La. 2012). The District of Utah exercised jurisdiction over the *Rocky Mountain Wild* plaintiffs' NEPA and APA claims pursuant to federal questions jurisdiction, *see* 28 U.S.C. § 1331, and over the federal defendants responsible for the challenged leasing decisions in Utah. Indeed, having invoked the District of Utah's jurisdiction in the *Rocky Mountain Wild* complaint, *see* Exhibit 1, ¶¶ 12–16, Plaintiffs are in no position now to challenge the exercise of that jurisdiction.

\*     \*     \*

Because Plaintiffs' challenges to the December 12, 2017 and June 12, 2018 Utah lease sales satisfies the requirements for claim preclusion, this Court should dismiss those challenges for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *See Alford*, 60 F. Supp. 3d at 123.

### III.   Laches Bars Plaintiffs' Challenges to Leasing Decisions Issued Prior to the *Bernhardt* Complaint.

Even if not barred by Section 226-2's limitations period, Plaintiffs' challenges to the 17 leasing decisions issued prior to Plaintiffs' *Bernhardt* complaint are barred by the equitable doctrine of laches and warrant a summary judgment pursuant to Federal Rule of Civil Procedure 56(a).

#### A.   Laches Applies to Plaintiffs' NEPA Claims.

"Laches is a defense developed by courts of equity to protect defendants against unreasonable, prejudicial delay in commencing suit."  *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S.Ct. 954, 960 (2017) (quotation omitted).  The doctrine is "founded on the notion that equity aids the vigilant and not those who slumber on their rights." *NAACP v. NAACP Legal Def. & Educ. Fund, Inc*., 753 F.2d 131, 137 (D.C. Cir. 1985).  If laches applies in a given case, the plaintiff is barred from pursuing "claims of an equitable cast[.]" *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014).

While laches is typically applied sparingly in environmental cases, "the doctrine of laches applies to NEPA cases as it does to other types of litigation."  *Nat'l Parks & Conservation Ass'n v. Hodel*, 679 F. Supp. 49, 53 (D.D.C. 1987).  Nor does the six-year limitations period provided in 24 U.S.C. § 2401(a)—again, assuming the Section 226-2 does not apply (which it does, *see supra* Section I)—shield Plaintiffs' claims from the application of laches.  Rather, laches can bar

claims for equitable relief filed within the applicable statute of limitations.  *See Petrella*, 572 U.S. at 679, 685 (while laches cannot be invoked to bar legal relief within a statute of limitations set by Congress, "the consequences of a delay in commencing suit may be of sufficient magnitude to warrant, at the very outset of the litigation, curtailment of the relief equitably awardable"); *Holland v. Bibeau Construction Co.*, 774 F.3d 8, 16 (D.C. Cir. 2014) (noting that when a claim seeks equitable relief, "delay might still serve as a defense when [the] claim is filed within the statute of limitations") (citing *Petrella*, 572 U.S. at 667–68); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 84 (D.D.C. 2017) (noting that while laches cannot bar claims for damages filed within the statute of limitations, it can bar claims for equitable relief in "extraordinary circumstances") (quoting *Petrella*, 572 U.S. at 667).  Because the remedies for NEPA claims are equitable, *see*, *e.g.*, *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1081 (9th Cir. 2010) ("[R]elief for a NEPA violation is subject to equity principles."); *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456 (D.C. Cir. 1977) (noting that remedy for a NEPA violation is an injunction), laches can "justify threshold dismissal" of Plaintiffs' NEPA claims in the presence of "extraordinary circumstances," *Petrella*, 572 U.S. at 687.

### B.   Extraordinary Circumstances Justify Dismissal of Plaintiffs' Challenges to Leasing Decisions Issued Prior to the *Bernhardt* Complaint.

In *Petrella*, the Supreme Court identified two examples of circumstances justifying the preclusion of equitable relief by laches.  First, in *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007), the defendants allegedly used, without permission, the plaintiffs' copyrighted architectural design in planning and building a housing development.  *Petrella*, 572 U.S. at 685.  Among other things, plaintiffs sought destruction of the already-completed housing development, but the Court agreed that laches was appropriate because "the plaintiffs knew of the defendants' construction plans before the defendants broke ground, yet failed to take readily

available measures to stop the project . . . and [because] the requested relief would work an unjust hardship upon the defendants and innocent third parties." *Id.* at 686 (quotation omitted). Thus, Plaintiffs' delay in seeking relief despite knowledge of the alleged violation and the expenditure of resources on the challenged project results in a hardship justifying laches.

Second, in *New Era Publications International v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir. 1989), plaintiffs, after a two-year delay, sought the destruction of copyright-infringing books already in circulation. *Id.* Explaining why the circumstances in *Petrella* did not rise to the level of *New Era Publications*, the Court noted that the *Petrella* plaintiff had notified defendant of its claim before defendant sunk "millions of dollars" into the allegedly-infringing film at issue and that the equitable relief plaintiff sought—disgorgement—would not result in the total destruction of the film, "or anything close to it." *Petrella*, 572 U.S. at 688–87. Again, the plaintiffs' delay in filing suit despite knowledge of the alleged violation and the significant expenditure of resources during the delay, may justify application of laches.

Taken together, the considerations outlined by the Supreme Court for the application of laches to equitable relief within the statute of limitations period coincide with the standard laches test. To establish a successful laches defense, the party asserting the defense must show "(1) [a] lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense[.]" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121–22 (2002) (quotation and citation omitted). In practice, "[l]aches does not depend solely on the time that has elapsed between the alleged wrong and the institution of suit; it is principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition of relations of the property or the parties." *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982) (quotation and citation omitted).

As detailed below, Plaintiffs' delay in seeking judicial relief with respect to the leasing decisions that occurred before Plaintiffs' filed their *Bernhardt* complaint in January 2020 satisfies the application of laches to bar those challenges.

### 1.  Plaintiffs Failed Diligently to Pursue Their Claims.

On January 9, 2020, Plaintiffs filed their complaint in *Bernhardt* challenging 23 lease sales conducted by Federal Defendants in Colorado, Montana, New Mexico, Utah, and Wyoming.  *See Bernhardt*, No. 20-cv-00056, Dkt. No. 1 (attached hereto of Exhibit 2), ¶¶ 121–35 & Table A.

Plaintiffs' allegations in this case closely mirror—and are in many instances identical to—Plaintiffs' allegations in *Bernhardt*.  *Compare generally* Exhibit 2 *with* Am. Compl.; *compare*, *e.g.*, Exhibit 2, ¶ 3 ("Federal public lands used for fossil fuel extraction contribute 24% of the United States' GHG emissions.  If federal lands were their own country, their GHG emissions would be ranked fifth globally.  Moreover, future development of unleased federal minerals represents a 'carbon bomb' that would likely push global climate change to catastrophic levels with incalculable consequences for the American people, the rest of humanity, and the global environment.  Yet, Federal Defendants have failed to seriously consider the cumulative climate impacts of opening up vast swaths of public lands for fossil fuel production, as exemplified by their approval of thousands of new oil and gas leases covering millions of acres of public lands in the West without a full analysis as required under NEPA.") *with* Am. Compl., ¶ 3 (same); Exhibit 2, ¶ 143 ("BLM failed to take a hard look at the direct, indirect, and cumulative impacts to the climate from GHG emissions, and failed to discuss the severity of these impacts, when authorizing thousands of new oil and gas leases through the challenged leasing decisions.  More broadly, BLM has demonstrated a systemic failure to account for these impacts in the agency's Oil and Gas Leasing Program affecting federal lands across the

American West.  BLM's systemic and leasing decision specific failures are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' in violation of NEPA, 42 U.S.C. § 4332(C)(ii), and its implementing regulations at 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27, and the APA at 5 U.S.C. § 706(2)(A).") *with* Am. Compl., ¶ 145 (same, with the exception of referring to "hundreds" of newly issued oil and gas leases).

Likewise, Plaintiffs' requested relief in this case is nearly identical to the relief requested in *Bernhardt*.  *Compare* Exhibit 2, Relief Requested (asking the Court to "A.  Declare that Federal Defendants' leasing authorizations challenged herein are arbitrary and violate NEPA and its implementing regulations; B.  Vacate Federal Defendants' leasing authorizations and accompanying EAs and FONSIs challenged herein; C. Set aside and vacate all of the leases issued pursuant to the leasing authorizations challenged herein; D.  Enjoin  Federal  Defendants from approving or otherwise taking action on any applications for permits to drill on the oil and gas leases challenged herein until Federal Defendants have fully complied with NEPA and its implementing regulations; E.  Order Federal Defendants to prepare an EIS analyzing the direct, indirect, and cumulative effects of the leasing authorizations challenged herein, including the incremental impact of the challenged leases, together with the other past, present, and foreseeable cumulative impacts from BLM's Oil and Gas Leasing Program; F.  Retain continuing jurisdiction of this matter until Federal Defendants fully remedy the violations of law complained of herein, in particular to ensure Federal Defendants take a meaningful hard look at the direct, indirect, and cumulative impacts of GHG emissions from BLM's Oil and Gas Leasing Program to climate; G.  Award the Citizen Groups their attorneys' fees, costs, and other expenses incurred in pursuing this action as provided by applicable law; and H.  Issue such other relief as this Court may deem just, proper, and equitable.) *with* Am. Compl., Relief Requested (same

except that the Amended Complaint replaces the term "Citizen Groups" with "Conservation Groups").

At the same time, Plaintiffs concede their contemporaneous knowledge of the leasing decisions challenged in this case through WildEarth's public comments and protests—submitted between November 2016 and November 2020—during the administrative processes conducted by Federal Defendants prior to Federal Defendants' decisions approving each lease sale. *See* Am. Compl., ¶¶ 126–37. Despite this knowledge, and the fact that the Federal Defendants issued their leasing decisions for 17 of these lease sales[13] prior to the January 2020 *Bernhardt* complaint, Plaintiffs waited another year—until January 2021—to file their original complaint in this lawsuit challenging these leasing decisions. Plaintiffs' conscious delay in filing and failure to raise the challenged leasing decisions in the *Bernhardt* suit weighs heavily against them. *See Save the Peaks Coalition v. U.S. Forest Serv.*, 669 F.3d 1025, 1032 (9th Cir. 2012) (finding plaintiffs' lacked diligence where they could have joined prior suit, noting that plaintiffs "appear to be little more than a vehicle for the [earlier plaintiffs'] counsel to evade *res judicata* and collateral estoppel"); *Standing Rock Sioux Tribe*, 239 F. Supp. 3d at 87 (plaintiff's failure to bring Religious Freedom Restoration Act claim when it previously brought claims under environmental statutes supported application of laches).[14]

---

[13] These include the: (1) June 27, 2019 and September 26, 2019 Colorado lease sales; (2) March 28, 2019 New Mexico lease sale; (3) December 13, 2016, March 23, 2017, June 13, 2017, September 12, 2017, December 12, 2017, March 20, 2018, June 12, 2018, September 11, 2018, December 11, 2018, March 25-26, 2019, June 11, 2019, and September 9-11, 2019 Utah lease sales; and (4) September 17-18, 2019 and December 10-11, 2019 Wyoming lease sales. *See supra* Table 1.

[14] API does not concede that a challenge to an oil and gas leasing decision made after Plaintiffs' filed their *Bernhardt* complaint could not be barred by laches. Rather, Plaintiffs' filing of the (continued…)

Delays of even a few months may justify application of laches to NEPA claims.  *See*, *e.g.*, *Matter of Defend H2O v. Town Bd. of the Town of East Hampton*, 147 F. Supp. 3d 80, 100 (E.D.N.Y. 2015) (laches barred NEPA preliminary injunction where plaintiffs "sat on their rights for at least five months and waited until . . . the day that construction on the Project was scheduled to commence").  And the delay is particularly unreasonable where time is of the essence.  *See LTMC/Dragonfly*, 699 F. Supp. 2d 281, 293 (D.D.C. 2010) (nineteen-month delay unreasonable in bid protest context where "time is of the essence"); *see also Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519, 531–32 (D.C. Cir. 2010) (laches "turns on whether the party seeking relief delayed inexcusably or unreasonably in filing suit, not simply whether the party delayed") (quotation and citation omitted).

Here, Plaintiffs' delay was unreasonable in light of the obligations that lessees are under expeditiously to pursue the exploration and development of their leases after issuance.  Each issued lease carries "a primary term of 10 years."  30 U.S.C. § 226(e).  The lease only continues after that term if the lease is producing oil or gas in paying quantities or "actual drilling operations were commenced prior to the end of its primary term and are being diligently prosecuted at that time[.]"  *Id*.  Before any of this necessary drilling activity can begin, however, the lessee must undertake lengthy preparatory operations to "submit . . . for approval an Application for Permit to Drill [("APD")] for each well."  43 C.F.R. § 3162.3-1(c).  *See also id*. ("No drilling operations, nor surface disturbance preliminary thereto, may be commenced prior to the authorized [BLM] officer's approval of the permit."); 30 U.S.C. § 226(g).  And NEPA requirements must be satisfied before BLM can issue a permit, *id*. § 226(p)(2)(A), with the

*Bernhardt* complaint provides compelling evidence of Plaintiffs' lack of diligence as to earlier leasing decisions.

NEPA review "used in determining whether or not an [EIS] is required and in determining any appropriate . . . conditions of approval of the submitted plan."  43 C.F.R. § 3162.5-1(a).  In other words, issuance of the lease starts an immediate ticking clock in which the lessee must invest significant sums, *see infra*, in the years-longs process of submitting an APD, subjecting that APD to NEPA review, and, if approved, undertaking the drilling process toward oil and gas production.  The penalty for falling behind on this schedule is loss of the lease, and the investments that went into obtaining the lease and preparing for development.

Viewed as a whole, Plaintiffs' conscious delay and the deadlines facing the lessees demonstrate that Plaintiffs failed diligently to pursue their legal rights, and the resulting delay is unreasonable.

### 2.     Plaintiffs' Conscious Delay in Seeking Legal Remedies Prejudices Lessees.

In assessing the prejudice of an unreasonably delayed lawsuit, among the factors to be considered are (1) "the percentage of estimated total expenditures disbursed at the time of suit," *Daingerfield Island Protective Society v. Lujan*, 920 F.2d 32, 38 (D.C. Cir. 1990), and (2) whether the relief plaintiffs seek is still practicable," which "turn[s] on the degree to which construction is complete," *id.* at 39.  The greater the percentage of expected expenditures incurred, and the further along any construction is to completion, the greater the prejudice.

By nature, large expenditures on oil and gas leases take place at the earliest stages of development due to the initial outlay required to successfully obtain the high bid in the competitive lease sale, and the up-front preparatory, infrastructure, and capital expenditures necessary to analyze the lease and drill the initial well.  *See* Declaration of Geoffrey Brand ("Brand Decl."), ¶¶ 10–11.  Indeed, lessees expend significant resources simply in assessing potential leases for oil and gas potential in order to decide whether—and how much—to bid on

particular parcels during competitive leases sales.  *See* Brand Decl., ¶ 9.  The front-loaded nature of lease expenditures supports the conclusion that Plaintiffs' conscious delay prejudices the lessees, which have already begun—if not completed—these initial expenditures.  *Cf. Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 480 (5th Cir. 1980) (finding that "about 11% of the total project cost" expenditure was sufficient to demonstrate prejudice); *Apache Survival Coal. v. United States*, 21 F.3d 895, 912 (9th Cir. 1994) ("At the time the plaintiffs filed their complaint, the construction of the telescopes was 35% complete . . . .  Not only has a substantial percentage of the project been completed, but also the portion that is complete includes much of the basic infrastructure that will alter permanently the character of the mountain.").

In developing a lease, "[d]rilling costs are affected by the depth, well type (oil, gas, dry), and location of the wells drilled."  Brand Decl., ¶ 13 (quoting Joint Association Survey on 2019 Drilling Costs).  A group of oil and gas associations, including API, conduct an annual survey of the drilling costs for developing oil and gas leases throughout the United States.  *See* Brand Decl., ¶ 12.  According to the 2019 Joint Association Survey, average nominal drilling costs per well in 2019 equaled $5,468,000.  *See* Brand Decl., ¶ 14.  Indeed, for onshore oil and gas development across the United States, the estimated average cost per exploratory well was $4,495,000, and $5,529,000 per development well.  *See* Brand Decl., ¶ 14.  By state, the estimated average cost per oil well was: (1) $6,836,000 per well in Colorado; (2) $7,834,000 per well in New Mexico; and (3) $5,345,000 in Wyoming.  *See* Brand Decl., ¶ 15.[15]

---

[15] Although no per well cost estimate was prepared for Utah in the 2019 Joint Association Survey, a subscription-based commercial database that tracks, among other things, federal leases, BLM-approved permits, and wells drilled on federal leases, estimates that the two wells drilled on challenged Utah leases cost: (1) $4.08 million for one of the wells that has been completed, and (2) $2.21 million for a well that has been started, but not yet completed.  *See* Brand Decl., (continued…)

Here, during the 17 competitive lease sales in which the leasing decision pre-dated Plaintiffs' *Bernhardt* complaint, lessees expended $42,123,865 in bonuses for 791 leases, including: (1) $594,118 and 66 lease parcels in Colorado; (2) $8,182,024 and 6 lease parcels in New Mexico; (3) $14,895,411 and 421 lease parcels in Utah; and (4) $18,452,312 and 298 lease parcels in Wyoming.  *See supra* n.2.  To date, lessees have expended resources to obtain BLM approval of 35 APDs for drilling operations on the affected leases, and three wells have been drilled.  *See* Brand Decl., ¶ 16.  If Plaintiffs' delayed challenges to these lease sales are allowed to proceed, and Plaintiffs' succeed in their demand to "[v]acate Federal Defendants' leasing authorizations" and "vacate all of the leases," Am. Compl., Relief Requested, ¶¶ B–C, then the lessees will lose, *inter alia*, their: (1) pre-sale preparatory efforts and expenditures; (2) confidential valuations of the leases upon which they bid following publication of the sale bid results; (3) expenditures in preparing for and filing APDs with BLM; and (4) expenditures undertaken in drilling wells.  *See* Brand Decl., ¶ 18.  These compounded losses on the path to completed wells strongly support application of laches to Plaintiffs' consciously delayed lawsuit. *See Nat'l Parks & Conservation Ass'n*, 679 F. Supp. at 53 (laches barred NEPA claim where construction was completed prior to suit).

## CONCLUSION

For the foregoing reasons, this Court should:

(1) dismiss the Plaintiffs' challenges to the following 23 leases sales pursuant to Section 226-2's 90 day limitations period: (a) June 27, 2019, September 26, 2019, March 26, 2020, and September 25, 2020 Colorado lease sales; (b) March 28, 2019, June 20, 2019, September 5,

---

¶¶ 15, 17.  The same database further estimates the cost of the well that has been started, but not yet completed, on the Wyoming lease as $1.08 million.  *See* Brand Decl., ¶ 17.

2019, and August 26, 2020 New Mexico lease sales; (c) December 13, 2016, March 23, 2017, June 13, 2017, September 12, 2017, December 12, 2017, March 20, 2018, June 12, 2018, September 11, 2018, December 11, 2018, March 25-26, 2019, June 11, 2019, and September 9-11, 2019 Utah lease sales; and (d) September 17-18, 2019, December 10-11, 2019, and March 24, 2020 Wyoming lease sales;

(2) dismiss the Plaintiffs' challenge to the following lease sale pursuant to waiver: March 23, 2017 Utah lease sale;

(3) dismiss the Plaintiffs' challenges to the following two lease sales pursuant to *res judicata:* December 12, 2017 and June 12, 2018 Utah lease sales; and/or

(4) enter summary judgment dismissing Plaintiffs' challenges to the following 17 lease sales pursuant to laches: (a) June 27, 2019 and September 26, 2019 Colorado lease sales; (b) March 28, 2019 New Mexico lease sale; (c) December 13, 2016, March 23, 2017, June 13, 2017, September 12, 2017, December 12, 2017, March 20, 2018, June 12, 2018, September 11, 2018, December 11, 2018, March 25-26, 2019, June 11, 2019, and September 9-11, 2019 Utah lease sales; and (d) September 17-18, 2019 and December 10-11, 2019 Wyoming lease sales.

June 9, 2021

Respectfully submitted,

/s/ Steven J. Rosenbaum
Steven J. Rosenbaum
  D.C. Bar No. 331728
Bradley K. Ervin
  D.C. Bar No. 982559
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

*Attorneys for American Petroleum Institute*