# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS; and )
PHYSICIANS FOR SOCIAL RESPONSIBILITY )
)
       Plaintiffs, )
)   Case No. 1:21-cv-00175-RC
   v. )
)
DEBRA HAALAND, Secretary, )
U.S. Department of the Interior, and )
U.S. BUREAU OF LAND MANAGEMENT )
)
      Defendants, )
)
AMERICAN PETROLEUM INSTITUTE; )
STATE OF WYOMING, )
)
      Intervenor-Defendants. )

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## AMERICAN PETROLEUM INSTITUTE'S MOTION TO DISMISS IN PART,
## OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………………………………i

TABLE OF AUTHORITIES …………………………………………………..ii

ABBREVIATIONS AND ACRONYMS ……………………………………..iv

LIST OF EXHIBITS …………………………………………………………..iv

INTRODUCTION …………………………………………………………..1

ARGUMENT ……………………………………………………………......2

I.  CONSERVATION GROUPS' CLAIMS ARE NOT TIME BARRED ………………………2

    A.  Conservation Groups' NEPA Claims Were Initiated Within the Governing
       Six-Year Statute of Limitations……………………………………………………..2

    B.  Even if the MLA Statute of Limitations Applied to NEPA Claims, Which It Does
       Not, Equitable Tolling Should Allow Plaintiffs' Claims to Proceed……………………11

II.  CONSERVATION GROUPS' CLAIMS ARE NOT BARRED BY RES JUDICATA …….13

III.  LACHES DOES NOT BAR PLAINTIFFS' CHALLENGES TO SALES THAT
     OCCURRED PRIOR TO JANUARY 2020 …………………………………………..19

    A. Laches Does Not Bar Plaintiffs' Timely Filed Claims………………………………...19

    B. API Has Not Met its Burden to Invoke Laches………………………………………..22

       1.  Conservation Groups diligently pursued their claims and there was no
          unreasonable delay………………………………………………………………..22

       2.  API will suffer no prejudice, as the Court can more appropriately address
          any financial outlay it has incurred at the remedy stage…………………………28

IV. CONSERVATION GROUPS DID NOT WAIVE THEIR CHALLENGE
     RELATED TO THE MARCH 23, 2017 UTAH LEASE SALE …………………………31

CONCLUSION ……………………………………………………………33

CERTIFICATE OF SERVICE …………………………………………………34

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Amber Res. Co. v. United States*, 73 Fed. Cl. 738 (2006) ............................................................. 34

*American Rivers, Inc. v. NOAA Fisheries*, No. CV 04-0061-RE, 2006 WL 468353 (D. Or. Feb. 27, 2006),........................................................................................................................ 19, 20

*Amigos Bravos v. United States*, Nos. CIV 09-0037-RB-LFG, 09-0414 RB/LFG, 2010 WL 11437250 (D.N.M. Feb. 9, 2010)................................................................. 4, 8, 11, 15

*Arpaio v. Robillard*, 459 F. Supp. 3d 62 (D.D.C. 2020) ............................................................. 16

*Aulston v. U.S.*, 915 F.2d 584 (10th Cir. 1990) ......................................................................... 4

*Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007) ................................. 24, 34

*Citizens Alert Regarding the Env't v. U.S. E.P.A.*, 259 F. Supp. 2d 9 (D.D.C. 2003) .................... 3

*City of Rochester v. Bond*, 603 F.2d 927 (D.C. Cir. 1979)........................................................... 6

*\*Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19 (D.D.C. 2001)................................ 6, 12

*Cornetta v. United States*, 851 F.2d 1372 (Fed. Cir. 1988).................................................. 29, 33

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004)........................................................ 36

*Diné Citizens Against Ruining Our Env't v. Klein*, 676 F. Supp. 2d 1198 (D. Colo. 2009) 4, 11, 15

*Dore v. Kleppe*, 522 F.2d 1369 (5th Cir. 1975)........................................................................ 19

*Drake v. F.A.A.*, 291 F.3d 59 (D.C. Cir. 2002) ........................................................................ 18

*Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221 (9th Cir. 2012)........................... 29

*Exxon Mobil Corp. v. Allapattah Serv., Inc.*, 545 U.S. 546 (2005)............................................. 10

*Friends of Cedar Mesa v. U.S. Dep't of the Interior*, No. 4:19-CV-00013-DN-PK, 2020 WL 999836 (D. Utah Mar. 2, 2020) ...................................................................................... 27

*Gaudreau v. Am. Promotional Events*, Inc., 511 F. Supp. 2d 152 (D.D.C. 2007). .... 22, 23, 25, 31, 32, 33

*Hardison v. Alexander*, 655 F.2d 1281 (D.C. Cir. 1981) ........................................................... 21

*Headwaters Inc. v. U.S. Forest Service*, 399 F.3d 1047 (9th Cir. 2005)...................................... 20

*Hutchins v. D.C.*, 188 F.3d 531 (D.C. Cir. 1999)...................................................................... 35

*Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239 (10th Cir. 2012) ....................................... 15

*Impro Prods., Inc. v. Block*, 722 F.2d 845 (D.C. Cir.1983) ........................................................ 3

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987)......................................................................... 10

*Jackson v. Modly*, 949 F.3d 763 (D.C. Cir.).............................................................................. 13

*Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986)...................................................................... 6, 7

*LTMC/Dragonfly, Inc. v. Metropolitan Washington Airports Authority*, 699 F. Supp. 2d 281 (D.D.C. 2010) ............................................................................................................. 32

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001) ................................ 22

*M.K. v. Tenet*, 216 F.R.D. 133 (D.D.C. 2002)......................................................................... 19

*Matter of Defend H2O v. Town Bd. of the Town of East Hampton*, 147 F. Supp. 3d 80 (E.D.N.Y. 2015) ..................................................................................................... 31, 32

*Matter of Defend H2O*, 147 F. Supp. 3d at 100 ....................................................................... 34

*Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519 (D.C. Cir. 2010) ............ 32

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011)......................................................................... 11

*Montana Wilderness Assoc. v. Fry*, 310 F. Supp. 2d 1127 (D. Mont. 2004) ..................... 4, 12, 15

*Morton v. Locke*, 387 Fed. Appx. 1 (D.C. Cir. 2010)........................................................... 17, 19

*New Era Publications International v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir. 1989) . 24, 25, 35

*Ouachita Watch League v. U.S. Forest Serv.*, No. 4:11CV00425 JM, 2014 WL 11498055 (E.D. Ark. Dec. 15, 2014) ........................................................................................ 12, 15

*P. Gas & Elec. Co. v. Energy Res. Conserv. & Dev. Commn.*, 461 U.S. 190 (1983) .................. 10

*Page v. United States*, 729 F.2d 818 (D.C. Cir. 1984), ............................................................. 18

*\*Park County Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609 (10th Cir. 1987) . 3, 5, 6, 7, 8, 9, 11, 15

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) ................................................................ 17

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014) .................................................. 23

*Pro-Football, Inc. v. Harjo*, 415 F.3d 44 (D.C. Cir. 2005) ...........................................22, 25, 33

*Rocky Mountain Wild, et al. v. Bernhardt*, et al., No. 19-cv-00929, 2020 WL 7264914 (D. Utah Dec. 10, 2020) ........................................................................... 16, 17, 18, 20, 21

*S. Utah Wilderness All. v. U.S. Dep't of Interior*, No. 2:06-CV-342-DAK, 2007 WL 2220525 (D. Utah July 30, 2007) ................................................................................. 27

*\*S. Utah Wilderness Alliance v. Norton*, No. 2:08-cv-64-DAK, 2008 WL 5245492 (D. Utah, Dec. 16, 2008) ..................................................................................... 4, 5, 11, 15

*San Luis Valley Ecosystem Council v. BLM*, No. 14-CV-00680-RM, 2015 WL 3826644 (D. Colo. June 19, 2015) ........................................................................................ 12, 15

*Save the Peaks Coalition v. U.S. Forest Serv.*, 669 F.3d 1025 (9th Cir. 2012) ..................... 29, 30

*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954 (2017) .......... 23

*Smalls v. United States*, 471 F.3d 186 (D.C. Cir. 2006) ............................................................ 16

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 239 F. Supp. 3d 77 (D.D.C. 2017) ................................................................................................................. 30, 34

*Tolerico v. Small Bus. Admin.*, No. CIV. A. 86-0040, 1987 WL 15518 (D.D.C. July 27, 1987) ......................................................................................................................... 21

*Turtle Island Restoration Network v. U.S. Department of Commerce*, 438 F.3d 937 (9th Cir. 2006) ............................................................................................................... 5, 6, 7

*U.S. Indus., Inc. v. Blake Const. Co., Inc.*, 765 F.2d 195 (D.C. Cir. 1985) ........................... 16, 19

*United States v.* Kwai Fun Wong, 575 U.S. 402 (2015) ............................................................. 13

*Whitfield v. U.S.*, 543 U.S. 209 (2005) ....................................................................................... 11

*Wild Fish Conservancy v. United States Env't Prot. Agency*, 331 F. Supp. 3d 1210 (W.D. Wash. 2018) ............................................................................................................... 20

*\*WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 259 (D.D.C. 2020) ....... 1, 2, 14, 26, 28

*\*WildEarth Guardians v. Bernhardt*, No. 20-cv-0056-RC, 2020 WL 6255294 (D.D.C. Oct. 23, 2020) ........................................................... 2, 14, 21, 26, 27, 28, 29, 30, 32

*\*WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) ................. 1, 2, 14, 26, 36, 37

*Young v. United States*, 535 U.S. 43 (2002) ................................................................................ 13

## Statutes

28 U.S.C. § 2401(a) ...................................................................................................... 3, 11

30 U.S.C. § 226-2 ................................................................................................... 2, 7, 8, 11

## Other Authorities

H.R. 10455, 86th Cong. (1960) ......................................................................................... 9

H.R.Rep. No. 2135, 86th Cong. (1960) ..................................................................... 9, 10, 11

S. 2983, 86th Cong. (1960). ............................................................................................. 9

S.Rep. 86-1549, 86th Cong. (1960) .................................................................................. 9

## Rules

Fed. R. Civ. P. 18 ........................................................................................................... 19

## ACRONYMS

APA              Administrative Procedure Act

API               Defendant-Intervenor American Petroleum Institute

BLM             U.S. Bureau of Land Management

EA                Environmental Assessment

EIS               Environmental Impact Statement

FONSI         Finding of No Significant Impact

GHG            Greenhouse Gas

MLA            Mineral Leasing Act

NEPA          National Environmental Policy Act

## LIST OF EXHIBITS

Exhibit 1: Plaintiffs' Statement of Genuine Issues

Exhibit 2: Declaration of Jeremy Nichols

Appendix 1: BLM Utah NEPA Documents

## INTRODUCTION

In two recent decisions, this Court has held that the U.S. Bureau of Land Management (BLM) failed to comply with the National Environmental Policy Act's (NEPA's) requirements for assessing the impacts of the agency's oil and gas leasing activities on greenhouse gas (GHG) emissions and climate change. *See WildEarth Guardians v. Zinke* ("*WildEarth Guardians I*"), 368 F. Supp. 3d 41, 85 (D.D.C. 2019); *WildEarth Guardians v. Bernhardt* ("*WildEarth Guardians II*"), 502 F. Supp. 3d 237, 259 (D.D.C. 2020). Plaintiffs WildEarth Guardians and Physicians for Social Responsibility (together, "Conservation Groups") now bring similar claims with respect to BLM's flawed NEPA analyses underlying the agency's approvals of more than 1,150 oil and gas leases covering more than 1.3 million acres of public lands across four western states. With the NEPA analyses challenged here suffering from similar defects to those previously identified by this Court in *WildEarth Guardians I and II*, Intervenor-Defendant American Petroleum Institute (API) now turns to various procedural and jurisdictional arguments in an attempt to avoid the merits of this legal challenge. Each of API's arguments is without merit and should be rejected by this Court.

*WildEarth Guardians I* and *II* exposed systemic failures in BLM's compliance with the procedural requirements of NEPA in its oil and gas leasing program. In response to *WildEarth Guardians I*, BLM recognized the deficiency of its NEPA analyses regarding greenhouse gas emissions and climate change impacts for similar oil and gas leasing decisions in Utah and Colorado, and agreed to a voluntary remand of those decisions. Mot. for Voluntary Remand, No. 1:16-cv-01724-RC, ECF No. 107 (D.D.C. May 24, 2019). In a separate related case, Conservation Groups challenged BLM's approval of 23 oil and gas lease sales across five Western states based on the agency's similar failures to fully analyze the direct, indirect, and

cumulative impacts of oil and gas leasing on climate. *WildEarth Guardians v. Bernhardt* ("*WildEarth Guardians III*"), No. 20-cv-0056-RC (D.D.C. Jan. 9, 2020). Before Conservation Groups' claims were briefed, the Court granted Federal Defendants' motion for a voluntary remand of 24 of the 27 challenged oil and gas leasing decisions, covering 20 of the 23 lease sales. 2020 WL 6255291, at *1-2.

Yet, the present case proceeds because BLM, to date, has not sought to remedy similarly unlawful NEPA analyses supporting the leasing authorizations challenged here, which fail to fully analyze the direct, indirect, and cumulative GHG emissions and climate impacts of BLM's leasing activities, and which suffer from similar defects as the NEPA assessments rejected by this Court in *WildEarth Guardians I*, 368 F. Supp. 3d at 85, and *WildEarth Guardians II*, 502 F. Supp. 3d at 259.

Seeking to avoid litigating the merits of Conservation Groups' claims, API now argues that the bulk of Conservation Groups' claims are barred by (1) the Mineral Leasing Act's (MLA's) 90-day statute of limitations, 30 U.S.C. § 226-2, (2) *res judicata*, (3) laches, and (4) waiver. In advancing these arguments, API seeks to close the courthouse doors to the public and insulate federal agency decisions from public scrutiny and judicial review. However, each of these desperate procedural and jurisdictional gambits lack merit, and so API's motion should be denied.

## ARGUMENT

## I.   CONSERVATION GROUPS' CLAIMS ARE NOT TIME BARRED

### A.   Conservation Groups' NEPA Claims Were Initiated Within the Governing Six-Year Statute of Limitations.

API argues that Conservation Groups' NEPA claims are time barred by the MLA's 90-day statute of limitations, 30 U.S.C. § 226-2. API Memo. at 12. However, courts have uniformly

rejected application of the MLA's 90-day limitations period to NEPA claims, and API offers no compelling reason for this Court to take a different approach. Because Conservation Groups' claims arise under NEPA, not the MLA, they are not subject to the MLA's narrow 90-day limitations period, which only "applies in cases challenging the lack of compliance with all the intricate requirements of Subchapter IV of the [MLA] which deals with oil and gas leasing." *Park County Res. Council, Inc. v. U.S. Dep't of Agric*., 817 F.2d 609, 616 (10th Cir. 1987), overruled on other grounds by *Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992). NEPA claims, conversely, are brought under the APA, which is subject to the general six-year limitations period provided by 28 U.S.C. § 2401(a). *Citizens Alert Regarding the Env't v. U.S. E.P.A*., 259 F. Supp. 2d 9, 25 (D.D.C. 2003), *aff'd sub nom. Citizens Alert Regarding Env't v. E.P.A.*, 102 F. App'x 167 (D.C. Cir. 2004); *Impro Prods., Inc. v. Block*, 722 F.2d 845, 850 (D.C. Cir.1983).

In *Park County*, the Tenth Circuit squarely rejected the argument raised by API that the MLA's narrow statute of limitations applies to NEPA challenges related to federal oil and gas leasing activities. 817 F.2d at 616. While that case has been overruled on other grounds, it remains good law and persuasive precedent on the issue at hand – the inapplicability of the MLA's statute of limitations to NEPA claims. *See e.g. S. Utah Wilderness Alliance v. Norton* ("*SUWA II*"), No. 2:08-cv-64-DAK, 2008 WL 5245492 at *5 (D. Utah, Dec. 16, 2008) (acknowledging *Park County's* holding that the MLA's 90-day statute of limitations does not apply to NEPA claims); *Amigos Bravos v. United States*, Nos. CIV 09-0037-RB-LFG, 09-0414 RB/LFG, 2010 WL 11437250 at *5 (D.N.M. Feb. 9, 2010) (acknowledging *Park County*'s holding that Section 226-2 "does not apply to NEPA claims"); *Diné Citizens Against Ruining Our Env't v. Klein* ("*Diné CARE*"), 676 F. Supp. 2d 1198, 1212 (D. Colo. 2009) (acknowledging

*Park County*'s holding that MLA statute of limitations "did not apply to challenges to the agency's decision-making regarding NEPA's separate procedural requirements," as opposed to substantive decisions under the MLA); *Montana Wilderness Assoc. v. Fry*, 310 F. Supp. 2d 1127, 1142 (D. Mont. 2004) ("Plaintiffs were not required to file suit within 90 days of the lease sales unless they were bringing a claim under the [MLA]."); *Aulston v. U.S.*, 915 F.2d 584, 588 n.4 (10th Cir. 1990) (explaining *Park County*'s holding that Section 226-2 only "applies to actions contesting agency decisions made under the [MLA]").

API's attempts to call into doubt the continued validity of *Park County* have been previously considered – and rejected – by numerous other courts. For example, in *SUWA II*, Judge Kimball rejected the identical argument now raised by API, that the MLA's 90-day limitations period applied to a NEPA challenge of BLM's sale of oil and gas leases. 2008 WL 5245492 *5 (D. Utah, Dec. 16, 2008). *SUWA II* emphasized *Park County's* distinction between an action contesting an MLA decision versus an action challenging non-MLA decisions, holding that the MLA's limitations period did not apply to NEPA claims. *Id*. at *4. As *Park County* explained:

> The present action is not one "contesting decisions of the Secretary of the Interior under the Mineral Leasing Act." H.R.Rep. No. 2135, 86th Cong., 2d Sess. 14 (1960), pp. 3313, 3337 (emphasis added). It is an action contesting a decision under NEPA, challenging defendants' decision to forego preparation of an EIS that plaintiffs contend is statutorily mandated.

817 F.2d at 616. Here, as in *Park County* and its progeny, Conservation Groups bring claims only under NEPA and the APA, not the MLA, and specifically challenge, *inter alia*, Federal Defendants' inadequate NEPA analyses and decisions to forego preparation of the EISs and site-specific and programmatic analyses required by NEPA. *See* Am. Compl. ¶¶ 138-161, ECF No. 13.

4

*SUWA II* also specifically rejected the contention – now asserted here by API – that *Park County* should be revisited because of the Ninth Circuit's decision in *Turtle Island Restoration Network v. U.S. Department of Commerce*, 438 F.3d 937 (9th Cir. 2006); API Memo. at 20-21. *Turtle Island* held that the Magnuson Act's 30-day limitations period barred a challenge – under, *inter alia*, NEPA – to regulations re-opening a swordfish fishery. 438 F.3d at 949. In so doing, *Turtle Island* clarified *Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986) – which held that a NEPA challenge was not subject to the specific limitations period contained in the Marine Mammal Protect Act and thus not time barred – and criticized *Park County's* interpretation of *Jones*. *Id*. at 946-47, 947 n.9. Thus, according to API, "the reasoning of *Park County* cannot withstand decades of caselaw clarifying the nature and scope of NEPA claims." API Memo. at 23. But, contrary to API's assertion, *Park County*'s holding that the 90-day MLA statute of limitations does not apply to NEPA remains good law, continues to bind district courts in the Tenth Circuit, and is similarly persuasive here. *Turtle Island* does not compel a different result. *Turtle Island* merely explained that the "conclusion in *Jones* flowed not from any general proposition about NEPA but from a plain reading of [the Marine Mammal Protection Act's] jurisdictional provision." 438 F.3d at 947. *Jones* and *Park County* both remain good law, as courts within this District have recognized. *See Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19, 24 (D.D.C. 2001) (citing *Jones* and specifically upholding persuasiveness of *Park County*).[1]

---

[1] *Conservation Law Foundation* also distinguished the line of cases cited by API, including *City of Rochester v. Bond*, 603 F.2d 927, 936 (D.C. Cir. 1979), which "address the question of which federal court (district or appellate) should provide judicial review of a particular administrative challenge, not which time period should apply to such a challenge." 131 F. Supp. 2d at 24 ("The policy rationale behind *City of Rochester,* to avoid the inefficient result of "bifurcating jurisdiction … between district court and the court of appeals," 603 F.2d at 936, has no applicability to the issue raised here of which time limitation should apply to a NEPA challenge.").

For example, in *Conservation Law Foundation v. Mineta*, the District of D.C. expressly found *Park County* to be "well-reasoned and persuasive in determining the correct time limitations to apply to NEPA challenges." 131 F. Supp. 2d at 24. There, federal defendants argued that the 30-day statute of limitations applicable to certain challenges to rules promulgated under the Magnuson-Stevens Act barred plaintiffs from bringing their challenge to two "framework adjustments" to an existing fishery management plan, promulgated by final rule published in the Federal Register. *Id.* at 23-24. Judge Kessler, however, rejected this argument, acknowledging *Park County's* ruling that "NEPA challenges are 'procedural in nature,' and that to permit individual statutes' time limitations to apply to NEPA challenges would be 'arbitrary and inconsistent' and would severely undermine NEPA's purpose (protection of the 'human environment' from federal action)." *Id.* at 24 (quoting *Park County*, 817 F.2d at 616-17). While *Turtle Island* admittedly took issue with *Conservation Law Foundation*'s description of the *Jones* decision, *Turtle Island*, 438 F.3d at 947, this Court need not resolve the question of whether NEPA-only challenges can *ever* be subject to a narrower statute of limitations. Here, the plain language and legislative history of the MLA establish that the MLA's narrow statute of limitations is applicable only to substantive challenges to leasing decisions under that statute, not to challenges brought under NEPA or other statutes.

Turning to the MLA statute of limitations, *Park County* premised its holding on the plain language of the MLA limitations period itself. 817 F.2d at 616-17. And, unlike the "fine-tuned" and "well-oiled" statutory scheme provided by the Magnuson Act at issue in *Turtle Island*, 438 F.3d at 948, BLM's oil and gas leasing process is a hodge-podge of intersecting Federal Land Policy Management Act (FLPMA), NEPA, and MLA planning and decision-making processes that are not unified by a single statutory judicial review scheme, let alone the narrow limitations

period prescribed by the MLA. As *Turtle Island* emphasized, the Magnuson Act contained not only a limitations period, but a "bar on preliminary injunctive relief, and [a] provision for expedited review" which "demonstrate[d] Congress's intent to ensure that regulations promulgated under the Magnuson Act are effectuated without interruption and that challenges are resolved swiftly" – provisions that are entirely absent from the MLA. *Id*. *Turtle Island* also emphasized that "the sky…is not falling" and carefully noted that the judicial review and limitations period in the Magnuson Act "applies only to a very specific class of claims" and would not bar all legal claims, even with regard to commercial fisheries. 438 F.3d at 948-49. *See also Amigos Bravos*, 2010 WL 11437250, at *6 (distinguishing *Turtle Island* and explaining that "[t]he Ninth Circuit emphasized that the Magnuson Act's high level of specificity indicated that other, more general statutes of limitations would not supplant [the Magnuson Act's statute of limitations]," and finding "the reasoning of *Turtle Island* [to be] inapplicable" to claims not brought under the Magnuson Act").

Moreover, courts have expressly recognized that *Park County* took into account "the plain language of the statute," *Amigos Bravos*, 2010 WL 11437250, at *6, further undercutting API's argument that it is "clear" from the statutory language that Section 226-2's limitations period applies to NEPA claims. API Memo at 24-25. Accordingly, API's attempt to stretch the language of Section 226-2 to impose a broad bar on challenges after 90 days to all Secretarial decisions that "stand in some relation" to an oil and gas lease goes too far. API Memo at 15. There is no indication that Congress intended to apply the MLA's narrow statute of limitations to bar challenges to agency decisions made pursuant to other statutes and raising only non-MLA claims.

API's reliance on the MLA's legislative history to suggest that Congress intended to sweep NEPA claims – and, for that matter, all APA-based claims – within the ambit of the MLA's narrow limitations period is also misplaced. *Park County* was fully cognizant of the MLA's legislative history, and explained, quite specifically, that the MLA limitations period only "applies in cases challenging the lack of compliance with all the intricate requirements of Subchapter IV of the [MLA] which deals with oil and gas leasing[,]" in holding that a NEPA challenge was "not one 'contesting decisions of the Secretary of the Interior *under the Mineral Leasing Act.*'" 817 F.2d at 609 (quoting H.R.Rep. No. 2135, 86th Cong. (1960), 1960 U.S.C.C.A.N. 3313, 3337) (emphasis in *Park County*).

*Park County* was – and is – correct, as attested to by the fact that Congress appears to have specifically eliminated reference to the APA from the codified MLA limitations period in 30 U.S.C. § 226-2. The House of Representatives passed its version of proposed revisions to the MLA on March 21, 1960. H.R. 10455, 86th Cong. (1960) (enacted). The House Bill lacked a limitations period. *See id.* A predecessor to the House Bill, Senate Bill 2983, also lacked a limitations period. *See* S. 2983, 86th Cong. (1960). In fact, the only legislative language dealing with a limitations period within the legislative history is the codified text of 30 U.S.C. § 226-2 itself, which notably does not reference the APA. The Senate Report did refer to a "statute of limitations providing that any action under the [APA] to review a decision of the Secretary involving an oil and gas lease must be initiated within 90 days after the final decision of the Secretary has been added as section 5." S.Rep. No. 1549 (1960), 1960 U.S.C.C.A.N. 3313, 3317. But the Conference Report explains that the Conference Committee then "reworked" the Senate's limitations language in reaching the final language of the limitations period and thus, given the codified language in 30 U.S.C. § 226-2, actually eliminated reference to the APA

(assuming, *arguendo*, that the text of any of the draft bills actually referenced the APA in the first place). H.R.Rep. No. 2135 (1960), 1960 U.S.C.C.A.N. at 3337. The Committee's apparent and deliberate elimination of references to the APA constrains application of the MLA's limitations period to MLA claims only – an interpretation consistent with the statutory text itself.[2] *Park County*, 817 F.2d at 609; *Exxon Mobil Corp. v. Allapattah Serv., Inc*., 545 U.S. 546, 568 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material"); *P. Gas & Elec. Co. v. Energy Res. Conserv. & Dev. Commn*., 461 U.S. 190, 220 (1983) ("it would…appear improper for us to give a reading to the Act that Congress considered and rejected" in determining that a final version of a bill eliminated Senate language to insure no preemption); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language") (quotations and citation omitted).

API's belabored reliance on the MLA's legislative history to contrive an ambiguity and thereby undermine *Park County* simply does not justify the extension of the MLA's limitations period to Conservation Groups' NEPA claims. *Whitfield v. U.S.*, 543 U.S. 209, 216-17 (2005) (Court "will not override [Congress's choice] based on vague and ambiguous signals from legislative history."); *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to

---

[2] API is thus correct when they argue that conference committee reports are entitled to "great weight." *See* API Memo at 16 n.8; *Garcia v. U.S.*, 469 U.S. 70, 75 (1984) (when looking to legislative history, "the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill"). API, however, reaches precisely the wrong conclusion in its interpretation of the MLA's legislative history.

muddy clear statutory language.")

API further cherry-picks language from Conservation Groups' Amended Complaint in an attempt to characterize the NEPA claims in this case as challenges to BLM's MLA "leasing decisions." API Memo at 16. But fundamentally, Conservation Groups challenge BLM's inadequate environmental analyses under NEPA and the agency's decisions to forego the preparation of more rigorous EISs, and do not "contest[] decisions of the Secretary of the Interior *under the Mineral Leasing Act*.'" H.R.Rep. No. 2135 at 14, 1960 U.S.C.C.A.N. at 3337 (emphasis added).

API attempts to recycle arguments that have already been heard and universally rejected. *See e.g.*, *Park County*, 817 F.2d at 616-17; *SUWA II*, 2008 WL 5245492 at *5; *Amigos Bravos*, 2010 WL 11437250 at *5-*6"); *Diné CARE*, 676 F. Supp. 2d at 1212 (acknowledging *Park County*'s holding that MLA statute of limitations "did not apply to challenges to the agency's decision-making regarding NEPA's separate procedural requirements," as opposed to substantive decisions under the MLA); *Montana Wilderness Assoc.*, 310 F. Supp. 2d at 1142; *Conservation Law Found.*, 131 F. Supp. 2d at 24; *San Luis Valley Ecosystem Council v. BLM*, No. 14-CV-00680-RM, 2015 WL 3826644, at *5 (D. Colo. June 19, 2015) ("Claims under NEPA, MLA, and FPLMA are subject to the APA's general six-year statute of limitations."); *Ouachita Watch League v. U.S. Forest Serv.*, No. 4:11CV00425 JM, 2014 WL 11498055, at *3 (E.D. Ark. Dec. 15, 2014) ("As Plaintiff's claims were not brought pursuant to the MLA, the Court declines to adopt its limitations period."). API offers no justification for this Court to depart from such precedent. API is unable to provide *any* on-point case law where *any* court has found the MLA's 90-day statute of limitations applicable to a NEPA challenge, and API offers no compelling reason for this Court to reject the reasoning of *Park County* and its progeny. Conservation

Groups' NEPA claims are therefore subject to the limitations period provided by 28 U.S.C. § 2401(a), not 30 U.S.C. § 226-2, and, accordingly, are not time barred.[3]

> **B.      Even if the MLA Statute of Limitations Applied to NEPA Claims, Which It Does Not, Equitable Tolling Should Allow Plaintiffs' Claims to Proceed.**

If this Court finds – in contravention of prevailing caselaw – that the MLA's 90-day statute of limitations applies to Conservation Groups' NEPA challenges, the Court should allow this litigation to proceed under the doctrine of equitable tolling. As the Supreme Court has stated, "[i]t is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute." *Young v. United States*, 535 U.S. 43, 49 (2002) (internal quotations omitted). Applying a "clear statement rule," the Supreme Court has "made plain that most time bars are nonjurisdictional," explaining that "Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it." *United States v. Kwai Fun Wong,* 575 U.S. 402, 410 (2015). *See also Jackson v. Modly*, 949 F.3d 763, 777 (D.C. Cir. 2020), *cert. denied*, 141 S. Ct. 875 (2020).

Here, if the MLA's statute of limitations is found applicable to the NEPA claims in this case, Conservation Groups would still be entitled to equitable tolling because: (1) they have been

---

[3] Even assuming *arguendo* that the MLA statute of limitations were generally to apply to Conservation Groups' claims, here the Amended Complaint was filed within 90 days of BLM's issuance on January 14, 2021 of a Supplemental EA which "replace[d]" the analysis of GHG emissions and climate impacts in the original EAs covering BLM Utah's December 2016, March 2017, June 2017, September 2017, December 2017, March 2018, June 2018, September 2018, December 2018 lease sales. Am. Compl. ¶ 134, ECF No. 13; Appendix 1 at 403, 409, 411, 414, 424. Accordingly, Conservation Groups' claims with respect to the environmental analyses underlying these lease sales would not be barred even if the Court were to apply the MLA statute of limitations. Similarly, BLM denied Conservation Groups' protest for 43 Royal Gorge parcels sold as part of BLM Colorado's September 2020 lease sale on November 24, 2020, less than 90 days from the filing of Plaintiffs' complaint. Am. Compl. ¶ 128, ECF No. 13. Accordingly, Conservation Groups' claims regarding the environmental analyses for these parcels would also not be barred.

11

pursuing their rights diligently, and (2) extraordinary circumstances stood in their way. *Jackson*, 949 F.3d at 778. With respect to the first factor, as discussed further in Part III below, Conservation Groups have not slept on their rights. Instead, Conservation Groups have routinely filed timely NEPA comments and administrative protests with BLM related to the lease sales at issue in this case. Am. Compl. at ¶¶ 133-137. Moreover, Conservation Groups have been diligently pursuing litigation in two related cases, *WildEarth Guardians I-II and WildEarth Guardians III*, establishing important judicial precedent clarifying BLM's obligation to take a hard look at the GHG emissions and climate impacts associated with its oil and gas leasing activities.

With respect to the second equitable tolling factor, extraordinary circumstances existed that resulted in Conservation Groups not challenging certain leasing decisions within 90 days of issuance. *See also supra* n.3. As a result of this Court's decision in *WildEarth Guardians I*, BLM sought, and was granted, voluntary remand of the vast majority of the leases challenged by Conservation Groups in the *WildEarth Guardians III* litigation. No. 20-cv-0056-RC, ECF Nos. 41, 46.  Moreover, the agency also suspended many of the Utah leases challenged herein as it developed new NEPA analyses to "replace[]" the analyses of GHG emissions and climate impacts underlying BLM's Utah leasing decisions from 2014 through 2018. BLM, Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah, Environmental Assessment, DOI-BLM-UT-0000-2021-0001-EA (January 2021) (attached at Appendix 1, CG-403, 409, 411, 414, 424). BLM only completed its supplemental NEPA analysis and lifted these suspensions on January 14, 2021. Appendix 1 at GC-403, 462, 471. Meanwhile, this Court's November 2020 decision in *WildEarth Guardians II* further clarified the inadequacy of BLM's efforts to quantify and analyze the climate impacts of its leasing actions, providing important guidance for

12

Conservation Groups in pursuing this case. Nichols Decl. at ¶ 11 (attached as Exhibit 2). Further, in each of these other cases, neither BLM nor API have argued that the MLA's 90-day statute of limitations barred Conservation Groups' claims, despite these earlier cases also involving multiple lease sales finalized substantially more than 90 days in advance of Conservation Groups filing suit. *See* Compl. ¶¶ 104–119, *WildEarth Guardians I*, No. 1:16-cv-01724-RC, ECF No. 1 (Aug. 25, 2016); Compl. at 52 tbl.A, *WildEarth Guardians III*, No. 1:20-cv-0056, ECF No. 1 (Jan. 9, 2020). And as discussed above, every court to have directly addressed the MLA's statute of limitations has found it inapplicable to NEPA challenges related to BLM's oil and gas leasing activities. *Park County*, 817 F.2d at 616; *SUWA II*, 2008 WL 5245492 at *5; *Amigos Bravos* 2010 WL 11437250 at *5; *Diné CARE*, 676 F. Supp. 2d at 1212; *Montana Wilderness Assoc.*, 310 F. Supp. 2d at 1142; *San Luis Valley Ecosystem Council*, 2015 WL 3826644, at *5; *Ouachita Watch League*, 2014 WL 11498055, at *3. Hence, in light of the well-established case-law on this issue, coupled with BLM's and API's failure to raise it in highly-contested litigation in recent years, Conservation Groups reasonably understood that the law was settled on this point – that NEPA challenges related to BLM oil and gas leasing activities are governed by the six-year limitations period generally applicable to APA actions. Accordingly, Conservation Groups were "lulled into inaction by a defendant," making any conceivable omission subject to equitable tolling in the circumstances. *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1246 (10th Cir. 2012). As explained above and below, no such omission has occurred.

## II.    CONSERVATION GROUPS' CLAIMS ARE NOT BARRED BY RES JUDICATA

Conservation Groups' challenges to the December 12, 2017 and June 12, 2018 Utah lease sales are not barred by *res judicata*, or claim preclusion. While one plaintiff, WildEarth Guardians, was involved in separate litigation related to other leases sold contemporaneously –

*Rocky Mountain Wild, et al. v. Bernhardt*, et al., No. 19-cv-00929, 2020 WL 7264914 (D. Utah June 5, 2019) – the two cases do not involve the "same claims or cause(s) of action," as required to bar claims under the doctrine of *res judicata. Arpaio v. Robillard*, 459 F. Supp. 3d 62, 66 (D.D.C. 2020). Instead, Conservation Groups challenge *different* BLM leasing decisions, underlain by *different* environmental analyses and decision documents, which therefore arise from a fundamentally *different* "nucleus of facts" than those at issue in *Rocky Mountain Wild*.

"Under the doctrine of res judicata, or claim preclusion, a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006). Here, however, Conservation Groups raise different claims than those at issue in *Rocky Mountain Wild*, so *res judicata* is inapplicable.

As the D.C. Circuit has explained, plaintiffs are generally required to "present in one suit all the claims for relief that he may have arising out of the same transaction or occurrence." *U.S. Indus., Inc. v. Blake Const. Co., Inc.,* 765 F.2d 195, 205 (D.C. Cir. 1985). Hence, *res judicata* essentially "prevents a party from filing a new civil action which is based on the same operative facts as underlay a previously-litigated civil action." *Morton v. Locke,* 387 Fed. Appx. 1, 1 (D.C. Cir. 2010) (per curiam) (citations omitted); *see Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5 (1979). "In making this decision it should be remembered that *res judicata* is a principle of public policy and should be applied so as to give rather than deny justice." *Dore v. Kleppe*, 522 F.2d 1369, 1374 (5th Cir. 1975).

In *Rocky Mountain Wild*, plaintiffs challenged, *inter alia*, BLM's "reli[ance] on a flawed EA prepared for the Vernal Field Office lease sale in December 2017 to conclude that leasing 59

parcels, encompassing 61,910.92 acres, in the Uinta Basin would not have a significant impact on the environment," as well as the agency's "reli[ance] on a DNA to forego any additional NEPA analysis for its decision to lease eight [Vernal Field Office] parcels in June 2018." ECF No. 28-4 ¶¶ 149, 152 (Exhibit 1 to API MTD). In the current case, however, Conservation Groups challenge different EAs and FONSIs underlying *wholly-separate* BLM decisions for leases in a different BLM field office.

Accordingly, the "operative facts" governing the *Rocky Mountain Wild* case and the current litigation are plainly different, as evidenced by Appendix A attached to API's motion. ECF No. 28-3. That appendix specifically includes the "Challenged Utah Lease Sale Decision Records" at issue in the current litigation, including those for the relevant parcels sold as part of BLM Utah's December 2017 and June 2018 lease sales, but does not include the decision records at issue in *Rocky Mountain Wild*. ECF No. 28-3 at Appendix151-55; Appendix161-64. The decision record for the December 2017 lease parcels challenged here covers 15 oil and gas leases, encompassing 32,025.34 acres, based on the EA prepared by the Price Field Office. *See* Appendix 1 at CG-138, 139 (attached hereto). But notably, that decision record does *not* cover any of the leases sold within the Vernal Field Office, and does *not* rely on the separately-prepared Vernal Field Office EA challenged in *Rocky Mountain Wild*. *Compare* Appendix 1 at CG-139 *with id.* at CG-144, 249–50. Similarly, for the June 2018 lease sale, the Vernal Field Office relied on a Determination of NEPA Adequacy to support its decision to sell the eight lease parcels challenged in *Rocky Mountain Wild*, whereas the three Richfield Field Office parcels at

issue in this case were evaluated in a separate EA, FONSI, and accompanying decision record.[4]

*Compare* Appendix 1 at CG-255 to 260 *with id.* at 266-313, 314-321, 322-325.

API argues that "Federal Defendants' decisions to conduct the December 12, 2017 and June 12, 2018 lease sales" constitute the "same nucleus of facts," and posits that the fact that the leases at issue here and in *Rocky Mountain Wild* were issued in different field offices is "a distinction without a difference." API Memo at 27. But API obfuscates the fundamental issue – that the leases challenged in *Rocky Mountain Wild* and those at issue here were issued through *separate decision records* based on *separate NEPA analyses*. Hence, different final agency actions and records of decision are at issue in the two cases, so the "operative facts" are not the same. *Morton,* 387 Fed. Appx. at 1. That the leases at issue in *Rocky Mountain Wild* and in this case were all sold by BLM through the same online auction process is factually and legally irrelevant to the claims at issue in either of the two cases. The specific final agency actions at issue in this case and *Rocky Mountain Wild* constitute separate "transaction[s] or occurrence[s]," so *res judicata* is inapplicable.[5] *U.S. Indus., Inc.*, 765 F.2d at 205.

---

[4] Further, Conservation Groups' claims with respect to the Supplemental EA cannot be barred by *res judicata* because the Supplemental EA was not issued by BLM until January of 2021, *after* the final *Rocky Mountain Wild* decision. *Compare* Appendix 1 at CG-409, 471 *with Rocky Mountain Wild*, 2020 WL 7264914 (D. Utah Dec. 10, 2020). Accordingly, because plaintiffs in *Rocky Mountain Wild* "obviously could not have asserted claims based on facts that were not yet in existence, the dismissal of that action cannot be res judicata" of Conservation Groups' claims related to the Supplemental EA, FONSIs, and related decisions covering BLM Utah's December 2016, March 2017, June 2017, September 2017, December 2017, March 2018, June 2018, September 2018, December 2018 lease sales. Am. Compl. ¶ 134, ECF No. 13. *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984), *disapproved of on other grounds by Beard v. Edmondson & Gallagher*, 790 A.2d 541 (D.C. Cir. 2002); *see also Drake v. F.A.A.*, 291 F.3d 59, 66 (D.C. Cir. 2002) ("*Res judicata* does not preclude claims based on facts not yet in existence at the time of the original action.").

[5] For that reason, API's attempt to emphasize the notion that *res judicata* bars future claims that "***could have been raised*** in a [prior] action" goes too far. API Memo at 28 (emphasis in original). *Res judicata* does not bar future litigation of *unrelated* claims that could have been brought under Fed. R. Civ. P. 18's permissive standard for joinder of claims. While the

In an analogous situation, *American Rivers, Inc. v. NOAA Fisheries*, No. CV 04-0061-RE, 2006 WL 468353, at *2 (D. Or. Feb. 27, 2006), recognized that *res judicata* does not bar claims against different agency actions. Where two biological opinions were separately challenged – each "with a different administrative record" and "addressing a different proposed action" – the court held that "the *res judicata* defense cannot apply across different biological opinions," despite both cases raising ESA claims related to biological opinions authored by the same agency related to the same Upper Snake River dam operations. Instead, the court recognized that "[e]ach biological opinion is a separate agency action that gives rise to its own 'nucleus of facts' creating a legal bar to the required 'identity of claims' element of *res judicata*." *Id*. (quoting *Headwaters Inc. v. U.S. Forest Service,* 399 F.3d 1047, 1052 (9th Cir. 2005). So too here. The separate agency decisions at issue in this case and *Rocky Mountain Wild* give rise to a different nucleus of operative facts relevant to the claims at issue in each challenged decision.

API argues that the two cases involve the same "nucleus of facts" because the leases were "noticed, offered, and issued together through the same internet-based December 12, 2017 and June 12, 2018 Utah leases sales." API might have a point if Conservation Groups now raised claims related to BLM's process for providing public notice, offering the leases through the online auction system, or issuing the leases. But any procedural overlap is irrelevant to the

---

"unrestricted joinder provision" of Fed. R. Civ. P. 18 "permits the claimant to join all claims the claimant may have against the defendant regardless of transactional relatedness," *M.K. v. Tenet*, 216 F.R.D. 133, 141 (D.D.C. 2002) (quoting Moore's Federal Practice § 21.02[1] (3d ed.2000), a party's failure to join unrelated claims in one action does not preclude subsequent litigation of such claims. *See Dore v. Kleppe*, 522 F.2d 1369, 1374–75 (5th Cir. 1975) ("Rule 18 merely permits the joinder of other claims against the same party, but, faced with a very real controversy, the pleader, to flee from *res judicata*, need not dream up all the imaginable disputes with the adversary dependent on the outcome of the then controversy and as to which predictions on consequential impact would involve theorizing on hypotheticals.").

"operative facts" of the case at bar – which are based upon the fundamentally different NEPA analyses underlying the separate BLM decisions challenged in this case. Accordingly, "substantially the same evidence" is not at issue in the two actions, weighing heavily against the application of res judicata. *Wild Fish Conservancy v. United States Env't Prot. Agency*, 331 F. Supp. 3d 1210, 1218 (W.D. Wash. 2018).

Barring the relitigation of issues related to the same transaction or occurrence – but not unrelated claims – also serves "to prevent inconsistent judgments," "one of the purposes of the doctrine of *res judicata*." *Tolerico v. Small Bus. Admin.*, No. CIV. A. 86-0040, 1987 WL 15518, at *3 (D.D.C. July 27, 1987); *see also Hardison v. Alexander*, 655 F.2d 1281, 1289 (D.C. Cir. 1981) ("avoiding inconsistent results" among purposes of *res judicata)*. Here, because the *Rocky Mountain Wild* case and the case at bar relate to separate transactions, there would be nothing inconsistent or irreconcilable about different courts reaching different conclusions regarding whether BLM fully complied with its NEPA obligations in *separate decisions* based on *different NEPA documents*.

Finally, API's *res judicata* argument relies on an implicit assumption that if BLM's leasing decisions in one Utah field office have been found to pass muster under NEPA, then BLM's separate decisions out of another field office – based on wholly different environmental documents – must also be assumed to meet NEPA's requirements. That is simply not the case. This case and the *Rocky Mountain Wild* case involve separate agency leasing decisions based on separate environmental documents. Hence, there is no overlap in the "nucleus of facts" relevant to the claims at bar, and *res judicata* is inapplicable.

**III.    LACHES DOES NOT BAR PLAINTIFFS' CHALLENGES TO SALES THAT OCCURRED PRIOR TO JANUARY 2020**

API asserts that Conservation Groups' challenges to the 17 decisions in this case that were issued prior to Plaintiffs' earlier filed complaint in *WildEarth Guardians III*, should be barred by the doctrine of laches and thus dismissed. API is wrong both legally and factually. Laches cannot be used to bar claims that are timely filed within a statutorily prescribed limitations period (as detailed in Section I.A. above), and it cannot be invoked to prevent prospective injunctive relief (as Conservation Groups seek here). Moreover, API has failed to meet its evidentiary burden.

Laches is an equitable doctrine "founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 47 (D.C. Cir. 2005) (*quoting NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985)). To establish laches, the defendant has the burden to demonstrate (1) lack of diligence in prosecuting its claims by the plaintiff, and (2) prejudice to the defendant. *Id.*; *see also Gaudreau v. Am. Promotional Events*, Inc., 511 F. Supp. 2d 152, 158 (D.D.C. 2007). API has met neither burden.

**A.    Laches Does Not Bar Plaintiffs' Timely Filed Claims.**

As a predicate matter, API is legally incorrect that laches can preclude claims found to be brought within the APA's statute of limitations applicable to Conservation Groups' NEPA claims. *See, e.g. Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 797 (4th Cir. 2001) ("separation of powers principles dictate that an equitable timeliness rule adopted by courts cannot bar claims that are brought within the legislatively prescribed statute of limitations."). As discussed *supra*, Plaintiffs' claims were timely filed under the APA's 6-year statute of limitations. This being so, API cannot take another bite at the apple by invoking the doctrine of

laches. Laches is an equitable defense that cannot be used to sidestep a congressionally mandated statute of limitations. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014) ("laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation."); *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 967 (2017) (court should not overrule congress's judgment where it set forth a statutory time period for initiating suit). Moreover, "it is well established that laches generally does not apply to bar claims for prospective injunctive relief." *Gaudreau*, 511 F. Supp. 2d at 159; *Lyons P'ship, L.P.*, 243 F.3d at 799 ("[I]f the claim is one for injunctive relief, laches would not apply. A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm. Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches."). Where, as here, Conservation Groups seek injunctive relief as part of their NEPA claims, "laches is unavailable to bar such claims." *Gaudreau*, 511 F. Supp. 2d at 159.

API asserts that this case represents an exception to these widely accepted rules, but its reliance on *Petrella* and its antecedents for support of this argument is unavailing. Of primary relevance, the Supreme Court in *Petrella* ultimately upheld the general rule and refused to allow laches to derail plaintiff's claims, holding instead that the lower courts had inappropriately applied laches to bar the plaintiff's case and finding that a congressionally determined statute of limitations under the Copyright Act could not be proscribed by application of the doctrine of laches. *Petrella*, 572 U.S. at 685. This holding is more analogous to API's claim than are the "extraordinary circumstances" identified by *Petrella* as an exception to the general rule. Those "extraordinary circumstances," which may warrant application of laches notwithstanding a statutorily prescribed limitations period, are confined to instances where a plaintiff's delay *and*

its consequences are so egregious as to warrant the overturning of a congressionally prescribed limitations period. *Id.* at 685-686. Those circumstances do not exist here.

This is demonstrated by the very cases on which API relies to support its claim of "extraordinary circumstances," both of which actually contravene API's argument. The first, *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007), involved a litigant who was aware of allegedly fraudulent use of building plans for a long period of time, but failed to act on that knowledge until 168 of the resultant units were built and 109 occupied. *Id.* at 230. Although the suit was initiated within the statutory period, the court granted summary judgment to the defendants and dismissed the case on grounds of laches. The appellate court subsequently determined that the trial court had overstepped, but nonetheless upheld the judgment to the extent that plaintiffs could not obtain relief in the form of destruction of the housing project, because to do so would effectively reward the plaintiffs for their knowing delay and would "work an *unjust* hardship" on the defendants and the innocent occupants of the housing. *Id.* at 236 (emphasis in original).

In the second case on which API relies, *New Era Publications International v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir. 1989), the court denied injunctive relief based on the fact that a copyright holder had been aware of alleged copyright violations for two years before filing suit to enjoin them, at which point 12,000 copies of a disputed book had been printed and packed, and 9,000 had been shipped. The court observed that "[a]n earlier application [for relief] would have permitted the court to explore the issues of law without causing [defendant] catastrophic harm." *Id.* at 584 (*citing New Era Publications Int'l, ApS v. Henry Holt and Co.*, 684 F.Supp. 808, 809–10 (S.D.N.Y.1988)).

By contrast, API has demonstrated no such "extraordinary circumstances" here. As detailed below, sunk oil and gas leasing costs, many of which are necessarily incurred as part of the bidding process before and shortly after a lease is awarded, and a pursuit of development on a miniscule number of potential wells cannot satisfy this burden. Certainly, this type of small and generalized harm – with no real evidence to support actual, concrete loss – does not amount to the "catastrophic" effect envisioned by *New Era Publications,* nor does it amount to the "extraordinary circumstances," described in *Petrella* and exemplified by *Chirco.*

At most, API's alleged harm goes to the ultimate question of remedy. It does not, however, support dismissal of Conservation Groups' claims, nor should it prevent this Court from reaching a decision on the merits.

**B.      API Has Not Met its Burden to Invoke Laches.**

As noted above, API bears the burden to demonstrate that, (1) Conservation Groups lacked diligence in prosecuting of their claims, and (2) that their lack of diligence resulted in prejudice to API. *Pro-Football, Inc.*, 415 F.3d 44, 47; *Gaudreau*, 511 F. Supp. 2d 152, 158. It has failed on both counts to carry this burden.

**1.   Conservation Groups diligently pursued their claims and there was no unreasonable delay.**

Conservation Groups' decision to litigate the current subset of challenged lease sales – particularly those which occurred prior to the filing of Plaintiffs' *WildEarth Guardians III* complaint – were strategic and deliberately made in response to circumstance (Nichols Decl. at ¶¶9-11), and, as previously described, within the APA's statute of limitations. There are three primary reasons why Plaintiffs did not include in earlier litigation the 17 sales API challenges here as barred by laches.

First, Conservation Groups' decision to challenge the NEPA analyses underlying the sales at issue in this case was heavily influenced by this Court's November 13, 2020 decision in *WildEarth Guardians II*, 502 F. Supp. 3d at 241 (D.D.C. 2020). In that decision, this Court – for the second time – rejected BLM's supplemental analysis of GHG emissions from the Wyoming lease sales challenged in *WildEarth Guardians I*, 368 F. Supp. 3d 41 (D.D.C. 2019). That decision contributed substantially to Conservation Groups' determination that the additional lease sales challenged here – including those pre-dating Conservation Groups' January 2020 *WildEarth Guardians III* Complaint – each suffered from the same fundamental deficiencies challenged there. Notably, *WildEarth Guardians II* clarified this Court's earlier *WildEarth Guardians I* decision and the scope of potentially unlawful BLM leasing decisions. With this Court's opinion in *WildEarth Guardians II,* issued months after Plaintiffs' *WildEarth Guardians III* complaint was filed, (Nichols Decl. at ¶¶ 9-11), a significant part of the rationale and legal authority for Conservation Groups' decision to bring the instant litigation had not occurred at the time Conservation Groups filed their *WildEarth Guardians III* Complaint.

Second, at the time the *WildEarth Guardians III* complaint was filed, a number of the 17 leasing decisions for which API claims laches applies were already being litigated – based on different claims – by other parties. As a result, many of the challenged leases were suspended by BLM for further analysis at the time Conservation Groups filed their *WildEarth Guardians III* litigation.[6] In particular, as a result of that separate litigation – along with the voluntary remand

---

[6] *See, e.g., SUWA v. Bernhardt,* 2:19-cv-00266 (D. Utah) (filed April 19, 2019) (challenged March 2018 and December 2018 sales from the Monticello Field Offices, dismissed as moot after BLM suspended all associated leases); *Living Rivers et al v. Hoffman*, 4:19-cv-00074-DN (D. Utah) (filed September 12, 2019) (challenged November 2014, December 2016, December 2017, March 2018, and December 2018 sales from the Price, Moab, Monticello, and Vernal Field Offices, all leases suspended by BLM); *SUWA et al v. BLM*, IBLA Nos. 2020-15 and 2020-

then being sought by BLM for most of the challenged parcels in *WildEarth Guardians III* – the agency had suspended 242 Utah leases issued between 2014 and 2018 that were associated with the various cases pending before the IBLA and in federal court. Where BLM had already suspended the leases to perform supplemental NEPA analyses, any challenge brought by Conservation Groups against BLM's original leasing decisions would have been moot from the start. *See e.g., Friends of Cedar Mesa v. U.S. Dep't of the Interior*, No. 4:19-CV-00013-DN-PK, 2020 WL 999836, at *3 (D. Utah Mar. 2, 2020) (BLM suspension of leases renders NEPA challenge moot); *S. Utah Wilderness All. v. U.S. Dep't of Interior*, No. 2:06-CV-342-DAK, 2007 WL 2220525, at *2 (D. Utah July 30, 2007) (BLM suspension of leases renders NEPA challenge moot). And, even where BLM had not formally suspended the leases, the agency's ongoing reassessment of the climate analyses underlying its decisions related to the 2014–2018 Utah leases had a clear potential to result in supplemental decisions covering additional leases within that time-frame, as well as subsequent lease sales covered by similarly-inadequate NEPA documents as those immediately being reevaluated. Accordingly, because of the existing challenges to a number of these leases, BLM's voluntary remand and suspension of related leases, and its ongoing NEPA review, Conservation Groups determined that additional challenges to these leases were not necessary at that time, particularly given the potential for future BLM action to moot potential claims related to BLM's original NEPA analyses.

That calculus changed when BLM finalized its Supplemental Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah in mid-January of 2021 to "replace[]" the analyses of climate impacts underlying the 2014–2018 lease sales, issued a new FONSI, and

---

32 (consolidated) (challenging March and June 2019 sales from the Salt Lake City Field Office); Appendix A at 409-411 (describing litigation background and lease suspensions).

decided to lift the lease suspensions. Appendix 1 at CG-403, 409, 411, 414, 424. Upon review of these new environmental and decision documents, Conservation Groups identified persistent deficiencies in that analysis that mirrored those of the earlier-challenged lease sales and failed to comport with this Court's *WildEarth Guardians II* decision. By that point, however, the *WildEarth Guardians III* litigation had been underway for a full year, and so Conservation Groups decided to include those leases in the instant case through an Amended Complaint, filed just one month after the Supplemental Analysis was finalized. Nichols Decl. at ¶11; ECF No. 13, ¶ 35 n.2.

Finally, Plaintiffs' decisions with regard to which leases to include in the multiple, ongoing challenges before this Court, were logically influenced by the complicated procedural history of these cases as well as the multiple mandated and voluntary remands, all of which played out over a period of nearly two years. These types of strategic and procedurally driven decisions, and any resultant delay – particularly for challenges filed well within the statute of limitations – do not demonstrate a lack of diligence or unreasonable delay, as asserted by API. *See Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1227 (9th Cir. 2012) ("Delay has been held permissible for a variety of reasons, such as when delay is required by an exhaustion of remedies through an administrative process, when it is "used to evaluate and prepare a complicated claim," or when its purpose is "to determine whether the scope of proposed infringement will justify the cost of litigation."); *see also Cornetta v. United States*, 851 F.2d 1372, 1384 (Fed. Cir. 1988) ("[A] valid excuse or justification for plaintiff's delay prevents a finding of laches only because the claimant's delay cannot be considered unreasonable.").

API's arguments to the contrary are unpersuasive. API first asserts that "Plaintiffs' conscious delay in filing and failure to raise the challenged leasing decisions in the *Bernhardt* [*WildEarth Guardians III*] suit weighs heavily against them." API Memo. at 46. Yet the authority API cites in support of this assertion is not analogous to the present situation. In *Save the Peaks Coalition v. U.S. Forest Service*, 669 F.3d 1025, 1032 (9th Cir. 2012), plaintiffs engaged administratively, then neglected to take any action for four years before ultimately filing suit after a separate set of plaintiffs had litigated virtually identical claims and lost:

> The circumstances surrounding the four-year delay are egregious. The Save the Peaks Plaintiffs not only waited to bring an action until the Navajo Nation Plaintiffs' claims failed, but seem to have been solely motivated by the outcome in *Navajo Nation*. The "new" parties in this litigation appear to be little more than a vehicle for the Navajo Nation Plaintiffs' counsel to evade res judicata and collateral estoppel. We do not encourage successive challenges, where one plaintiff awaits the outcome of another plaintiff's [case] before bringing its own claim.

*Id*. at 1032 (internal quotation omitted). In contrast, Plaintiffs here chose not to include the 17 lease sales challenged here in their prior, *WildEarth Guardians III* challenge for the concrete and justifiable reasons identified above. Unlike in *Save the Peaks*, Plaintiffs were not "await[ing] the outcome of another plaintiff's case," but rather were making strategic litigation decisions in real time, based on then-existing litigation and Court decisions, and associated lease suspensions.

None of the remaining authority cited by API is any more compelling. In *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 239 F. Supp. 3d 77 (D.D.C. 2017), the Tribe cited an allegedly inadequate consultation process regarding construction of a pipeline under the Missouri River as justification for its delay in raising claims under the Religious Freedom Restoration Act. The court found the Tribes' assertions "unsatisfactory" in light of the fact that the Tribe had effectively, and timely, conveyed objections related to NEPA and the National Historic Preservation Act. *Id.* at 87. Here, by contrast, Plaintiffs consistently and fully

participated administratively during the agency's NEPA review process prior to bringing their claims under the same act. Moreover, both BLM and the API were put on notice of Plaintiffs' objections by this administrative engagement before initiation of the present litigation.

Nor is *Matter of Defend H2O v. Town Board of the Town of East Hampton*, 147 F. Supp. 3d 80 (E.D.N.Y. 2015) of greater help to API. There, plaintiffs, who were made aware of the disputed project approximately five months before construction commenced, did not initiate litigation until the day that construction on the project was scheduled to commence. *Id*. at 100. Of equal relevance was the fact that "the Plaintiffs failed to make their objections to the Project known to the Corps by participating in the administrative approval process in September 2014, when the Corps released the draft EA and FONSI for public review." *Id.* In addition, the court determined that the applicable test when applying the doctrine of laches in a NEPA case "is whether the plaintiff's delay in bringing the suit has resulted in construction proceeding 'to a point where any significant environmental damage has already been done.'" *Id.* at 98. The facts of the instant case are wholly distinguishable. First, as already noted, Plaintiffs participated consistently and extensively in the administrative process for each of the challenged lease sales, as well as having litigated these same issues before this Court since 2016, which thereby put both BLM and API on notice of their concerns. *Gaudreau*, 511 F. Supp. 2d 152, 159 ("Plaintiffs' opposition of defendant's trademark application before TTAB put defendant on notice that plaintiffs contested its use of the "TNT FIREWORKS" mark, and the doctrine of laches is therefore inapplicable to this case"). Second, API admits only 35 APDs have been requested and only three wells drilled across 791 challenged leases covering more than a million acres. Am. Compl. tbl.A. By any measure, only a tiny fraction of the potential "significant environmental damage has been done." *Matter of Defend H2O*, 147 F. Supp. 3d at 98.

Finally, neither *LTMC/Dragonfly, Inc. v. Metropolitan Washington Airports Authority*, 699 F. Supp. 2d 281, 293 (D.D.C. 2010), nor *Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519, 531–32 (D.C. Cir. 2010), are more persuasive. The former involves a straightforward application of laches with no statutorily prescribed limitations period in issue, and is therefore inapposite. The latter does more to support Plaintiffs' assertion of reasonableness attached to its decision to defer inclusion of the 17 challenged sales in its earlier litigation: "[L]aches is not, like limitation, a mere matter of time," but "attaches only to parties who have *unjustifiably* delayed in bringing suit." *Id.* at 214 (internal citations omitted, emphasis in original). Here, Plaintiffs have demonstrated eminently reasonable justifications for the inclusion of the disputed leases in the instant litigation, rather than in *WildEarth Guardians III.* API's assertion that Plaintiffs failed to diligently pursue their claims and delayed in bringing the claims must fail. *Gaudreau*, 511 F. Supp. 2d 152, 158-59 ("defendant's laches argument fails because it is unable to establish plaintiffs' lack of diligence on the facts before the Court. Far from sleeping on their rights, plaintiffs began the process of opposing [the challenged action] when they filed their opposition to [it], and they have been actively pursuing their opposition since that time.").

### 2. API will suffer no prejudice, as the Court can more appropriately address any financial outlay it has incurred at the remedy stage.

API must demonstrate not only that a delay occurred, *and* that it was unreasonable, but also that the delay prejudiced its interests. *Pro-Football, Inc.*, 415 F. 3d 44, 47; *Gaudreau*, 511 F. Supp. 2d 152, 158.

> The two prongs of the laches test are separate and must be independently satisfied. Thus, even if the delay is not or cannot be justified, the government still must show actual prejudice in order to satisfy the second prong of the laches test, and must do so without reliance on the unreasonableness of the delay.

*Cornetta*, 851 F.2d at 1384.

28

API claims "large expenditures" that "take place at the earliest stages of development" of the oil and gas leasing process, "due to the initial outlay required to successfully obtain the high bid in the competitive lease sale, and the up-front preparatory, infrastructure, and capital expenditures necessary to analyze the lease and drill the initial well," as evidence of such prejudice. ECF No. 28-1 at 48. But these expenditures have no bearing on laches, or any delay on the part of Conservation Groups alleged by API.

As an initial matter, any costs incurred to obtain a lease – including costs associated with assessing prospective leases for oil and gas development potential through "proprietary geological assessments," Brand Decl. ¶ 20, ECF No. 28-2 – are wholly unrelated to any conceivable delay in Conservation Groups' decision to file suit. Instead, such "initial outlay" is by definition incurred prior to the ripening of any possible legal challenge to the underlying NEPA analyses. API Memo. at 38. Yet API places great weight on such up-front expenses associated with "assessing potential leases for oil and gas potential in order to decide whether— and how much—to bid on particular parcels," and on the initial bonus bid payments, API Memo. at 38-40, ignoring the fact that Conservation Groups had little or no meaningful opportunity to challenge BLM's NEPA analyses prior to these initial costs being incurred.

Such sunk costs are necessarily incurred prior to the ripening of a potential legal challenge and therefore cannot be evidence of prejudice associated with any delay in the filing of litigation, which instead must occur between when a lease is secured and a challenge is filed. They do not, therefore, count toward API's burden of showing prejudice as a result of Plaintiffs' alleged delay. *Cf. Amber Res. Co. v. United States*, 73 Fed. Cl. 738, 752 (2006), aff'd, 538 F.3d 1358 (Fed. Cir. 2008) (sunk costs do not constitute benefits for purposes of restitution.)

With regard to specific costs incurred as a result of Conservation Groups' alleged delay, API asserts that its members have expended "resources" to obtain 35 APDs and to drill three wells – which is meant to suggest some undefined expenditure of resources. Yet API has neither enumerated these development-specific resources, nor demonstrated that they amount to the level of prejudice necessary to invoke laches, particularly in comparison to the total expenditures needed to fully develop the leases at issue. *See e.g., Standing Rock Sioux Tribe*, 239 F. Supp. 3d at 80 (pipeline nearly complete when tribe brought PI motion raising RFRA for first time); *Chirco*, 474 F.3d at 230 (168 dwelling units built and 109 occupied at time of plaintiffs' challenge); *Matter of Defend H2O*, 147 F. Supp. 3d at 100 (plaintiffs waited until day construction was scheduled to commence to move for PI).

In the 17 lease sales API claims should be dismissed, 791 leases were purchased covering nearly 1.1 million acres. Am. Compl. tbl.A. To date, however, only 35 APDs have been submitted and only three wells have been drilled. API Memo. at 40. Yet, even here, API has failed to provide any evidence of the actual costs expended, but simply refers to unverifiable estimates from an undisclosed proprietary industry database.[7] *See* API Memo. at 39 n.15. Such general and unspecified harm cannot satisfy API's burden. Moreover, although BLM failed to project expected well development in the EAs underlying each of the 17 challenged lease sales, it is clear that only a miniscule fraction of actual development costs have been expended to date. For example, for less than 100 parcels sold as part of BLM Utah's March 2019 lease sale alone, BLM projected the development of up to 400 new wells. Appendix 1 at CG-327, 367. Again,

---

[7] As explained in Plaintiffs' Statement of Genuine Issues, attached hereto as Exhibit 1, API's references to the cost estimates from the proprietary 2019 Joint Association Survey and the undisclosed database constitute inadmissible hearsay which should not be considered by this Court.

only 35 APDs have been requested and three wells drilled on more than one million acres of lands sold as part of the 17 lease sales to which API claims laches should bar Conservation Groups' claims. API has not met its burden to show that an adverse judgment against it would have the "catastrophic" effect referenced in *New Era Publications*. Nor does its alleged prejudice amount to the "extraordinary circumstances" described in *Petrella* and exemplified by *Chirco*.

At most, API's claimed expenditures go to the question of remedy – they do not support dismissal of Conservation Groups' claims under a theory of laches that is inconsistent with the facts and procedural posture of this suit.

## IV.    CONSERVATION GROUPS DID NOT WAIVE THEIR CHALLENGE RELATED TO THE MARCH 23, 2017 UTAH LEASE SALE

Finally, the Court need not address API's argument that Conservation Groups waived any challenge related to BLM Utah's March 2017 lease sale, as API only raised this argument briefly in a footnote. *Compare* API Memo. at 9 n.5 *with Hutchins v. D.C.*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) ("We need not consider cursory arguments made only in a footnote …."). But API's cursory argument also fails on the merits because, during all parts of BLM's NEPA review, the agency was fully aware of Conservation Groups' concerns regarding BLM's systemic failure to fully analyze the environmental impacts of greenhouse gas emissions, including climate impacts, in all of the agency's leasing decisions.

As the Supreme Court has recognized, "the agency bears the primary responsibility to ensure that it complies with NEPA, and an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004) (internal citation omitted). Here, at the time of BLM's initial NEPA review for the March 2017 lease sale, the *WildEarth Guardians I* litigation had already been filed, with Conservation

Groups raising similar claims regarding similar environmental analyses underlying previous BLM Utah lease sales. Compl., *WildEarth Guardians I*, No. 1:16-cv-1724-RC, ECF No. 1 (Aug. 25, 2016). Conservation Groups had also filed numerous contemporaneous comments, protests, and administrative appeals related to BLM Utah's consistent failure to fully analyze climate impacts in its NEPA reviews supporting its oil and gas leasing activities. *See id*. at ¶¶ 110-13; Am. Compl. ¶ 134, ECF No. 13. Moreover, BLM's original EA for the March 2017 lease sale specifically identified "Greenhouse Gas Emissions/Climate Change" as a resource "requiring detailed analysis in the EA." Appendix 1 at CG-011. Hence, even if Conservation Groups did not bring this issue to BLM's attention in one lease sale, the need to address the climate impacts of leasing was obvious to the agency. BLM was fully aware of Conservation Groups' well-documented concerns with the agency's consistent failure to fully analyze GHG emissions and climate impacts of its leasing decisions, including for the March 2017 lease sale.

Moreover, BLM subsequently acknowledged that the climate analysis underlying the March 2017 lease sale (and other BLM Utah lease sales between 2014 and 2018) was "similar to the NEPA analysis at issue in [*WildEarth Guardians I*]," which the Court had found inadequate. Appendix 1 at CG-414. In response to the *WildEarth Guardians I* decision, BLM "replace[d]" the agency's original GHG analysis with supplemental analysis on GHG emissions and climate impacts. *See* Appendix 1 at CG-403, 409, 411, 414, 424. During that supplemental NEPA process, Plaintiff WildEarth Guardians provided substantive comments to BLM regarding the draft Supplemental EA, raising the same concerns now at issue in this litigation, including *inter alia*, BLM's failure to fully analyze the cumulative impacts of BLM Utah's leasing decisions

when added to other BLM leasing activities in the region.[8] BLM's decision to replace its original

analysis of climate impacts for the March 2017 Utah lease sale with a new analysis from the

Supplemental EA has rendered irrelevant Conservation Groups' lack of participation in the

original NEPA process for the March 2017 lease sale. Accordingly, Conservation Groups' claims

regarding the NEPA analyses underlying the March 2017 lease sale have not been waived.

## CONCLUSION

For the reasons detailed above, this Court should deny API's Motion to Dismiss in Part,

or, in the Alternative, for Partial Summary Judgment.

Respectfully submitted this 23rd day of July, 2021,

/s/ Daniel L. Timmons
Daniel L. Timmons
Bar No. NM0002
WildEarth Guardians
301 N. Guadalupe Street, Suite 201
Santa Fe, NM 87501
(505) 570-7014
dtimmons@wildearthguardians.org


/s/ Samantha Ruscavage-Barz
Samantha Ruscavage-Barz
Bar No. CO0053
301 N. Guadalupe Street, Suite 201
Santa Fe, NM 87501
(505) 410-4180
sruscavagebarz@wildearthguardians.org

/s/ Melissa Hornbein
Melissa Hornbein
Bar No. MT0004
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 708-3058
hornbein@westernlaw.org


/s/ Kyle Tisdel
Kyle Tisdel
Bar No. NM0006
Western Environmental Law Center
208 Paseo del Pueblo Sur, Suite 602
Taos, NM 87571
(575) 613-8050
tisdel@westernlaw.org

*Attorneys for Plaintiffs*

---

[8] https://eplanning.blm.gov/public_projects/2002778/200390662/20028760/250034961/2020-10-27-GHG2020-WEG.pdf

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23rd, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this case.

*/s/ Daniel L. Timmons*
Daniel L. Timmons