**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WILDEARTH GUARDIANS; and
PHYSICIANS FOR SOCIAL
RESPONSIBILITY,

                Plaintiffs,

v.

DEBRA HAALAND,[1]  Secretary, U.S.
Department of the Interior; and U.S. BUREAU
OF LAND MANAGEMENT,

                Defendants,

AMERICAN PETROLEUM INSTITUTE;
STATE OF WYOMING,

                Intervenor-Defendants.

No. 1:21-cv-00175-RC

---

**INTERVENOR-DEFENDANT AMERICAN PETROLEUM INSTITUTE'S REPLY
MEMORANDUM IN SUPPORT OF MOTION TO DISMISS IN PART, OR, IN THE
ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

Steven J. Rosenbaum
Bradley K. Ervin
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

*Attorneys for American Petroleum Institute*

August 6, 2021

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Secretary of the Interior Debra Haaland has been automatically substituted for former Secretary David L. Bernhardt.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.    The MLA's Statute of Limitations Bars Plaintiffs' Challenges to 23 of the 28
Leasing Decisions. ..................................................................................................... 2

        A.    Section 226-2 Applies to Plaintiffs' NEPA Claims Brought Under the
APA ................................................................................................................. 2

        B.    Plaintiffs Do Not Qualify for the Extraordinary Remedy of Equitable
Tolling. ........................................................................................................... 9

II.    Plaintiffs Waived Their Challenge to the March 23, 2017 Utah Lease Sale. ................... 11

III.    Plaintiffs' Challenges to the December 2017 and June 2018 Utah Lease Sales Are
Barred by *Res Judicata*. ........................................................................................... 13

IV.    Laches Bars Plaintiffs' Challenges to Leasing Decisions Issued Prior to the
*Bernhardt* Complaint. ............................................................................................... 17

        A.    Plaintiffs Unreasonably Delayed in Filing Suit. .................................................. 19

        B.    Plaintiffs' Delay Prejudices Lessees. ................................................................. 20

CONCLUSION .................................................................................................................... 21

# TABLE OF AUTHORITIES

## <u>Cases</u>

*American Rivers, Inc. v. NOAA Fisheries*,
   No. 04-cv-0061, 2016 WL 468353 (D. Or. Feb. 27, 2006) ..................................................... 16

*Arpaio v. Robillard*,
   459 F. Supp. 3d 62 (D.D.C. 2020) .......................................................................................... 14

*AT&T Inc. v. FCC*,
   452 F.3d 830 (D.C. Cir. 2006) .................................................................................................. 5

*Boling v. United States*,
   220 F.3d 1365 (Fed. Cir. 2000) ............................................................................................... 11

*Bowden v. United States*,
   106 F.3d 433 (D.C. Cir. 1997) ................................................................................................ 10

*Chung v. U.S. Dep't of Justice*,
   333 F.3d 273 (D.C. Cir. 2003) ................................................................................................ 10

*Conservation Law Found. v. Mineta*,
   131 F. Supp. 2d 19 (D.D.C. 2001) ............................................................................................ 4

*Cooper v. Jackson*,
   941 F. Supp. 2d 75 (D.D.C. 2013) .......................................................................................... 17

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ................................................................................................................. 12

*Exxon Mobil Corp. v. Allapattah Serv., Inc.*,
   545 U.S. 546 (2005) ................................................................................................................... 6

*Food & Water Watch v. U.S. Dep't of Agric.*,
   No. 17-cv-1714, 2019 WL 2423833 (D.D.C. June 10, 2019) ................................................ 12

*Ford v. Tait*,
   163 F. Supp. 2d 57 (D.D.C. 2001) .......................................................................................... 12

*Galloway v. Watt*,
   185 F. Supp. 3d 130 (D.D.C. 2016) ........................................................................................ 10

*Gresham v. Dist. of Columbia*,
   66 F. Supp. 3d 178 (D.D.C. 2014) .......................................................................................... 15

*Harvey v. Udall*,
   384 F.2d 883 (10th Cir. 1967) .............................................................................................. 1, 6

*Holland v. Bibeau Constr. Co.*,
   774 F.3d 8 (D.C. Cir. 2014) .................................................................................................... 18

*\*Irwin v. Dep't of Veterans Affairs*,
   498 U.S. 89 (1990) ............................................................................................................... 9, 10

*Jackson v. Modly*,
    949 F.3d 763 (D.C. Cir. 2020) ...................................................................................... 9

*Jenkins v. District of Columbia*,
    288 F. Supp. 3d 308 (D.D.C. 2018) ............................................................................ 14

*Jones v. Gordon*,
    792 F.2d 821 (9th Cir. 1986) ........................................................................................ 3

*King v. Union Oil Co. of Cal.*,
    117 F.3d 443 (10th Cir. 1997) .................................................................................... 15

*\*Menominee Indian Tribe of Wisconsin v. United States*,
    577 U.S. 250 (2016) .................................................................................................... 11

*Moore v. New York Cotton Exchange*,
    270 U.S. 593 (1926) .................................................................................................... 15

*Musacchio v. United States*,
    577 U.S. 237 (2016) ...................................................................................................... 9

*\*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) ...................................................................................... 12

*Norman v. United States*,
    467 F.3d 773 (D.C. Cir. 2006) .................................................................................... 10

*Ouachita Watch League v. U.S. Forest Serv.*,
    No. 11-cv-00425, 2014 WL 11498055 (E.D. Ark. Dec. 15, 2014) ............................... 4

*Page v. United States*,
    729 F.2d 818 (D.C. Cir. 1984) .................................................................................... 14

*Park County Resource Council v. U.S. Department of Agriculture*,
    817 F.2d 609 (10th Cir. 1987) ............................................................................. 2, 3, 5

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014) .................................................................................................... 18

*Petromanagement Corp. v. Acme–Thomas Joint Venture*,
    835 F.2d 1329 (10th Cir. 1988) .................................................................................. 16

*\*Poblete v. IndyMac Bank*,
    657 F. Supp. 2d 86 (D.D.C. 2009) ........................................................................ 15, 16

*Remy Enterprise Grp., LLC v. Davis*,
    37 F. Supp. 3d 30 (D.D.C. 2014) ............................................................................... 15

*Rocky Mountain Wild v. Bernhardt*,
    506 F. Supp. 3d 1169 (D. Utah 2020) ........................................................................ 13

*S. Utah Wilderness All. & Nat. Res. Def. Council v. Bur. of Land Mgmt.*,
    No. 08-cv-64, 2008 WL 5245492 (D. Utah, Dec. 16, 2008) ....................................... 4

*Save the Peaks Coalition v. U.S. Forest Service*,
    669 F.3d 1025 (9th Cir. 2012) ............................................................................... 19, 20

*Sierra Club v. Fed. Energy Reg. Comm'n*,
827 F.3d 36 (D.C. Cir. 2016) ......................................................................... 12

*Sierra Club, Inc. v. Bostick*,
787 F.3d 1043 (10th Cir. 2015) ............................................................... 12, 13

*Siqing Wang v. U.S. Citizenship & Immigrations Servs.*,
306 F. Supp. 3d 1 (D.D.C. 2018) ................................................................... 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
239 F. Supp. 77 (D.D.C. 2017) ...................................................................... 18

*Stanton v. D.C. Ct. of Appeals*,
127 F.3d 72 (D.C. Cir. 1997) ......................................................................... 15

*\*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
438 F.3d 937 (9th Cir. 2006) ............................................................... 3, 4, 5, 6

*Univ. of Colorado Health at Mem. Hosp. v. Burwell*,
233 F. Supp. 3d 69 (D.D.C. 2017) ................................................................. 15

*Washington v. Washington Metropolitan Area Transit Auth.*,
160 F.3d 750 (D.C. Cir. 1998) ....................................................................... 10

*Webb v. Hyman*,
861 F. Supp. 1094 (D.D.C. 1994) .................................................................. 12

*WildEarth Guardians v. Bernhardt*,
502 F. Supp. 3d 237 (D.D.C. 2020) ............................................................... 19

*WildEarth Guardians v. Zinke*,
368 F. Supp. 3d 41 (D.D.C. 2019) ................................................................. 19

*WildEarth Guardians, et al. v. Bernhardt, et al.*,
No. 20-cv-00056-RC (D.D.C. Jan. 9, 2020) .................................................... 2

## Statutes

30 U.S.C. § 226(b)(1)(A) ................................................................................ 15

30 U.S.C. § 226-2 ........................................................................................ 1, 5

Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437 ............................................. 1

## Other Authorities

Conf. Rep. No. 86-2135 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 1313 ................... 7

S. Rep. No. 85-1549 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 1313 ................... 6, 7

## Treatises

RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1982) ............................................. 15

## INTRODUCTION

Despite filing a raft of lawsuits in recent years challenging oil and gas leasing decisions across the western United States by Defendants Secretary of the Interior and Bureau of Land Management ("BLM," collectively, the "Federal Defendants"), and their contemporaneous knowledge of the leasing decisions challenged in this lawsuit, Plaintiffs WildEarth Guardians ("WildEarth") and Physicians for Social Responsibility (collectively, "Plaintiffs") waited many months—and in some instances, years—to file this lawsuit.  Plaintiffs' lawsuit comes too late.

In the Mineral Leasing Act ("MLA"), Congress both directed Federal Defendants through quarterly lease sales "to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise," *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967); *see also* Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437 (purpose of MLA is "[t]o promote the mining of . . . oil . . . on the public domain"), and sought to promote this developmental purpose by foreclosing any lawsuit "contesting a decision of the Secretary involving any oil and gas lease" unless the lawsuit is "taken within ninety days" of the Secretary's final decision.  30 U.S.C. § 226-2 ("Section 226-2").  As the American Petroleum Institute ("API") demonstrated in its Memorandum in Support of Motion to Dismiss in Part, or, in the Alternative, for Partial Summary Judgment ("Opening Memorandum" or "API Mem.") (Dkt. No. 28-1), Section 226-2 applies to Plaintiffs' National Environmental Policy Act ("NEPA") claims brought pursuant to the Administrative Procedure Act ("APA").  *See* API Mem. at 12–25.  Section 226-2 accordingly bars Plaintiffs challenges to the 23 leasing decisions finalized more than 90 days before Plaintiffs' January 1, 2019 Complaint.

Even if Section 226-2 does not bar Plaintiffs' claims, Plaintiffs' barrage of recent lawsuits precludes a significant number of their present leasing decision challenges.  First, *res judicata* precludes Plaintiffs' challenge to leasing decisions made as part of two Utah oil and gas

1

leases sales already unsuccessfully challenged by WildEarth in a prior lawsuit.  *See* API Mem. at 25–31.  Second, the equitable doctrine of laches bars Plaintiffs' belated challenges to 17 leasing decisions that occurred before Plaintiffs filed a substantively identical lawsuit in *WildEarth Guardians, et al. v. Bernhardt, et al.* ("*Bernhardt*"), No. 20-cv-00056-RC (D.D.C. Jan. 9, 2020). *See* API Mem. at 31–40.

In response, Plaintiffs mischaracterize API's arguments, governing law, and their own claims.  As further explained below, having sat on their rights while simultaneously filing similar—if not identical—lawsuits, Plaintiffs cannot maintain these challenges to leasing decisions upon which lessees have relied in making enormous expenditures in pursuit of the oil and gas development directed, incentivized, and protected by Congress in the MLA.

## ARGUMENT

I. **The MLA's Statute of Limitations Bars Plaintiffs' Challenges to 23 of the 28 Leasing Decisions.**

A. **Section 226-2 Applies to Plaintiffs NEPA Claims Brought Under the APA.**

API's Opening Memorandum demonstrated, among other things, that (1) the APA supplies Plaintiffs' cause of action, (2) a specific statute of limitations serves to displace the general six-year limitations period otherwise applicable to causes of action brought under the APA, (3) Section 226-2's plain terms apply broadly to bar after 90 days a challenge to "a decision . . . involving any oil and gas lease" like Plaintiffs' challenges to the leasing decisions in this case, (4) courts routinely apply such specific limitations to NEPA claims, and (5) the sole Court of Appeals decision holding otherwise—*Park County Resource Council v. U.S. Department of Agriculture*, 817 F.2d 609 (10th Cir. 1987)—is not persuasive, and has been fatally undermined by subsequent caselaw regarding the nature of NEPA claims, and explicitly negating *Park County*'s reasoning.  *See* APA Mem. at 13–23; *Turtle Island Restoration Network*

*v. U.S. Dep't of Commerce*, 438 F.3d 937, 946–47 (9th Cir. 2006).  Plaintiffs' challenges to 23 of the 28 leasing decisions in this case are therefore barred.  *See* API Mem. at 17, 23.

Plaintiffs do not contest the nature of their APA cause of action or NEPA claims, or the application of specific limitations periods to NEPA claims through the APA.  Rather, Plaintiffs principally contend that "courts have uniformly rejected application of the MLA's 90-day limitations period to NEPA claims[.]"  Plaintiffs' Opposition ("Pls.' Opp.") (Dkt. No. 41), at 2–4.  But Plaintiffs point almost exclusively to district court decisions within the Tenth Circuit, *see* Pls.' Opp. at 3–4, 10, which are compelled to follow the holding in *Park County* whether or not it was misguided and wrongly decided.  *See* API Mem. at 21–23 (explaining that *Park County*'s reasoning was "misplaced" at the time it was decided and has "been further undermined during the intervening [34] years").  *See also* Pls.' Opp. at 5 (acknowledging that *Park County* continues to bind district courts in the Tenth Circuit").  Plaintiffs' resulting defense of *Park County*, *see* Pls.' Opp. at 5, is unpersuasive.

First, *Park County* rested on a purported distinction between substantive challenges to agency action and NEPA challenges to agency action made by the Ninth Circuit in *Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986).  *See* APA Mem. at 21–22.  *See also*, *e.g.*, *Park County*, 817 F.2d at 616 ("The thrust of our reasoning parallels that of the Ninth Circuit in *Jones v. Gordon*[.]").  The Ninth Circuit has since made clear that such a distinction—and, particularly, *Park County*'s application of that distinction—between substantive and NEPA claims reflects a "misapplication of *Jones.*"  *Turtle Island*, 438 F.3d at 947 n.9.  Indeed, *Turtle Island* expressly criticized *Park County*'s application of *Jones*—which considered a statute of limitations provision limited narrowly to the "terms and conditions" of certain permits, *Jones*, 792 F.2d at

824 (quotation omitted)—to the wholly different "broad wording" of Section 226-2's limitations language.  *See Turtle Island*, 438 F.3d at 947 & n.9.

For their part, Plaintiffs conclusorily assert that "*Turtle Island* does not compel a different result" by largely ignoring *Turtle Island*'s reasoning and its express criticism of *Park County*'s misapplication of *Jones* to the language of Section 226-2 itself.  *See* Pls.' Opp. at 5.  To the extent Plaintiffs instead point to district court decisions finding *Park County* "persuasive," those decisions were either issued by a district court in the Tenth Circuit, *see* Pls.' Opp. at 5 (citing *S. Utah Wilderness All. & Nat. Res. Def. Council v. Bur. of Land Mgmt.*, No. 08-cv-64, 2008 WL 5245492 (D. Utah, Dec. 16, 2008)), or suffered the same errors as *Park County*, *see* Pls.' Opp. at 5–6 (citing *Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19, 24 (D.D.C. 2001)).  Indeed, the Ninth Circuit in *Turtle Island* directly criticized *Conservation Law Foundation* for incorrectly relying on *Jones* for a purported "general rule" distinguishing NEPA claims from other claims for limitations purposes.  *See Turtle Island*, 438 F.3d at 947 & n.9 ("*Jones* flowed not from any general proposition about NEPA but from a plain reading of the . . . jurisdictional provision" that was at issue).[2]

Moreover, despite their conclusory statements that *Park County* remains "persuasive," *see* Pls.' Opp. at 5, Plaintiffs do not address the misunderstanding of NEPA claims—in particular, the belief that no statute of limitations applied to NEPA claims—that also underlay the Tenth Circuit's decision in *Park County*.  *Compare* API Mem. at 22–23 *with* Pls.' Opp. at 2–

---

[2] *Ouachita Watch League v. U.S. Forest Serv.*, No. 11-cv-00425, 2014 WL 11498055 (E.D. Ark. Dec. 15, 2014), *see* Pls.' Opp. at 10, mechanically applied the general 6-year statute of limitations applicable to APA claims without analyzing the specific language of the MLA statute of limitations.  *Ouachita Watch* never cites or discusses, much less distinguishes, the myriad decisions applying a shorter statute of limitations to NEPA claims.  *See* API Mem. at 18.

11.   With its underlying bases having eroded over the years, *Park County* cannot sustain Plaintiffs' attempts to evade the plain application of Section 226-2 to their challenges to Federal Defendants' leasing decisions.[3]

Although construction of Section 226-2 must "begin[], as always, with the plain language of the statute," *AT&T Inc. v. FCC*, 452 F.3d 830, 835 (D.C. Cir. 2006) (quotation omitted), Plaintiffs—like *Park County* before them, *see Park County*, 817 F.2d at 616–17 (relying on *Jones v. Gordon* and statement in House of Representatives report)—pay little heed to Section 226-2's language:

> No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter.

30 U.S.C. § 226-2.  That prohibition is broad, *see* API Mem. at 15; *Turtle Island*, 438 F.3d at 947 n.9, and does not limit its scope, as Plaintiffs claim, to causes of action brought directly under the MLA.

Disregarding the language of Section 226-2, Plaintiffs instead claim that Section 226-2 must be narrowly construed because it is not part of a "fine-tuned" or "'well-oiled' statutory scheme" like the Magnuson Act that was at issue in *Turtle Island*.  *See* Pls.' Opp. at 6–7 (quoting

---

[3] Plaintiffs' brief and unsupported attempt to disassociate their claims from "leasing decisions," *see* Pls.' Opp. at 10, misses the mark.  To be sure, Plaintiffs claim that Federal Defendants conducted inadequate NEPA reviews; but those allegedly inadequate reviews were made to consider—and would not exist in the absence of—Federal Defendants' leasing decisions. Plaintiffs' Amended Complaint reflects that the leasing decisions are the core of their claims and intertwined with the NEPA reviews because, among other things, Plaintiffs ask this Court to "[d]eclare that Federal Defendants' leasing authorizations . . . are arbitrary and violate NEPA," and "[v]acate Federal Defendants' leasing authorizations and ***accompanying*** EAs and FONSIs," Am. Compl., Relief Requested, ¶¶ A–B (emphasis added).   By its terms, Section 226-2 applies to any "decision . . . involving any oil and gas lease," language that clearly encompasses the dispute here.  *See* API Mem. at 15–17.

*Turtle Island*, 438 F.3d at 948).  But Section 226-2 is part of a "fine-tuned" statutory scheme that directs Federal Defendants to conduct quarterly lease sales in order "to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise," *see Harvey*, 384 F.2d at 885; *supra* p. 1; API Mem. at 3–4, and then promotes this developmental purpose by foreclosing any lawsuit "contesting a decision of the Secretary involving any oil and gas lease" unless the lawsuit is "taken within ninety days" of the Secretary's final decision.

More importantly, *Turtle Island* made clear that, in considering the scope of a limitations provision, "it is the language of the specific . . . statute . . . that controls." *Turtle Island*, 438 F.3d at 947.  The Ninth Circuit merely explained that the structure of the Magnuson Act—to which Plaintiffs point—"is consistent with [the Court's] reading of the time limit." *Id*.  Notably, the Ninth Circuit noted that Section 226-2 included "broad wording," *id*. at 947 n.9, which was comparable to the Magnuson Act provision that did not "purport[] to distinguish between procedural and substantive challenges," *id*. at 946.  Plaintiffs concede the centrality of the statutory language.  *See* Pls.' Opp. at 9 (citing *Exxon Mobil Corp. v. Allapattah Serv., Inc.*, 545 U.S. 546, 568 (2005)).  For this reason, Plaintiffs' challenge to API's reading of the legislative history, *see* Pls.' Opp. at 8–9, is irrelevant in the face of Section 226-2's broad language.

At any rate, Plaintiffs misinterpret Section 226-2's legislative history.  As detailed in API's Opening Memorandum, *see* API Mem. at 4, Congress amended the MLA in 1960 to, among other things, include Section 226-2's statute of limitations.  The Senate first proposed a statute of limitations in its amendment in the nature of a substitute to the original bill from the House of Representative.  *See* S. Rep. No. 85-1549 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 1313, 1313.  The Senate proposed "[a] statute of limitations providing that any action under the

Administrative Procedure Act to review a decision of the Secretary involving an oil and gas lease must be initiated within 90 days after the final decision after the final decision of the Secretary[.]" *Id*. at 3317.

Having passed competing bills, a Conference Committee of the Senate and House worked out the final statute. *See* Conf. Rep. No. 86-2135 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 1313, 1337. The Conference Report makes clear that "[t]he conferees accepted the principle of the Senate language" providing for a statute of limitations. *Id*. But the Conference Committee "reworked" the language. *Id*.

For their part, Plaintiffs read too much into this "rework[ing]," and infer from the fact that Section 226-2's final language does not expressly mention the APA that the Conference Committee intended to "constrain[] application of the MLA's limitations period" only to claims brought under the MLA. Pls.' Opp. at 9. Plaintiffs' unsupported inference, however, contradicts the Conference Committee's stated "accept[ance]" of the "principle of the Senate language," 1960 U.S.C.C.A.N. at 1337, which aimed to apply a limitations period, at the very least, on "action[s] under the Administrative Procedure Act," *id*. at 3317. Indeed, by eliminating any specific reference to the APA, the Conference Committee returned a broader final version of Section 226-2—broad language that bars any "action" regardless of the source of the cause of action. As the Senate explained in passing its original statute of limitations, "[s]uch a provision will remove a potential cloud on acreage subject to leasing." S. Rep. No. 85-1549 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 1313, 1317. Plaintiffs' late-filed challenges create just such a cloud.

Finally, Plaintiffs attempt to salvage their challenges to nine Utah lease sales, *see* API Mem. at 5–8, by arguing that BLM issued a supplemental EA with respect to those sales on

January 14, 2021 and, therefore, Plaintiffs' January 19, 2021 Complaint and February 17, 2021 Amended Complaint were timely under Section 226-2.  *See* Pls.' Opp. at 11 n.3.  Notably, Plaintiffs do not dispute that, if Section 226-2 applies to their claims, Plaintiffs failed to file within 90 days their challenges to the following lease sales: (1) June 27, 2019, September 26, 2019, March 26, 2020, and September 25, 2020 Colorado lease sales; (2) March 28, 2019, June 20, 2019, September 5, 2019, and August 26, 2020 New Mexico lease sales; (3) March 25-26, 2019, June 11, 2019, and September 9-11, 2019 Utah lease sales; and (4) September 17-18, 2019, December 10-11, 2019, and March 24, 2020 Wyoming lease sales.[4]

With respect to the nine Utah lease sales, Plaintiffs' argument mischaracterizes the January 14, 2021 supplemental Utah EA, Pls.' Opp., Appendix 1 at CG-403 *et seq.*  The supplemental EA did *not* involve Federal Defendants' leasing authorizations—the decisions to conduct the lease sales and issue the leases, *see* API Mem. at 5–8 & Appendix A—but rather a separate BLM decision whether "to lift the suspension[s]" that BLM had  imposed on the subject leases, *see* Pls.' Opp., Appendix 1 at CG-464, those suspensions having had the effect of temporarily halting operations and production on the suspended leases, *see* 43 C.F.R. 3103.4-4. The BLM decisions lifting the suspensions were issued on January 14, 2021.[5]

In other words, the limitations period with respect to the nine Utah leasing decisions had long since run, and this separate suspension decision simply triggered Section 226-2 for any

---

[4]  As API's Opening Memorandum stated, a subset of the parcels leased during the challenged September 25, 2020 Colorado lease sale were offered for sale pursuant to a November 24, 2020 Decision Record.  *See* API Mem. at 6; Pls.' Opp. at 11 n.3.  Plaintiffs' challenge to that subset of leases was therefore timely under Section 226-2.  API has attached a revised proposed order hereto in order to more clearly reflect the application of Section 226-2 to this lease sale.

[5]  *See* BLM National NEPA Register, DOI-BLM-UT-0000-2021-0001-EA, *available at* https://eplanning.blm.gov/eplanning-ui/project/2002778/570 (last visited Aug. 5, 2021).

separate challenge to the Federal Defendants' decision to lift the suspensions.  Plaintiffs brought

no such challenge (which would by now also be time-barred), and their challenge to the nine

Utah lease sales themselves remains time-barred.

> **B.      Plaintiffs Do Not Qualify for the Extraordinary Remedy of Equitable Tolling.**

Having failed to comply with Section 226-2, Plaintiffs request that the Court "allow this

litigation to proceed under the doctrine of equitable tolling."  Pls.' Opp. at 11.  To be sure, *see*

Pls.' Opp. at 11, because "[s]tatutes of limitations and other filing deadlines ordinarily are not

jurisdictional," *Musacchio v. United States*, 577 U.S. 237, 246 (2016) (quotation omitted),

equitable tolling is potentially available to relieve a time-barred litigant.  *See*, *e.g.*, *Irwin v. Dep't*

*of Veterans Affairs*, 498 U.S. 89, 95–96 (1990) (recognizing availability of equitable tolling in

suits against the Government).  Plaintiffs mistake that potential availability, however, with its

application.  Equitable tolling remains "appropriate only in rare circumstances," *Jackson v.*

*Modly*, 949 F.3d 763, 778 (D.C. Cir. 2020) (quotation omitted), and is granted "only sparingly,"

*Irwin*, 498 U.S. at 90, 96.

At bottom, Plaintiffs claim that equitable tolling is warranted because they relied on the

fact that Federal Defendants and industry intervenors did not move to dismiss prior lawsuits

under Section 226-2, and they believed that *Park County* and its Tenth Circuit progeny settled

the inapplicability of Section 226-2 to NEPA claims.  *See* Pls.' Opp. at 12–13.  Plaintiffs'

arguments do not "meet the high threshold for applying this rare remedy."  *Jackson*, 949 F.3d at

778.

First, Plaintiffs identify no—and there was no—affirmative misconduct or other action by

opposing counsel in other lease sale cases that prevented Plaintiffs from filing suit within Section

226-2's limitations period.  *See*, *e.g.*, *Irwin*, 498 U.S. at 94 (noting equitable tolling may be

justified where adversary "tricked" a party into missing limitations period through "misconduct"); *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 279 (D.C. Cir. 2003) (equitable tolling "applies most commonly when the plaintiff despite all due diligence is unable to obtain vital information bearing on the existence of his claim" (quotation omitted)); *Washington v. Washington Metropolitan Area Transit Auth.*, 160 F.3d 750, 752–53 (D.C. Cir. 1998) ("[E]quitable principles favor tolling where, for example, a defendant engaged in affirmative misconduct or misled a plaintiff about the running of a limitations period" (quotations omitted)); *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997) (listing affirmative actions of adversary that may support equitable tolling).  *Cf. Galloway v. Watt*, 185 F. Supp. 3d 130, 134 (D.D.C. 2016) (distinguishing the case from instances of "attorney misconduct" or "misrepresentation" that may support equitable tolling).  That Plaintiffs can state a purported excuse for ignoring Section 226-2, is of no moment.  *See Norman v. United States*, 467 F.3d 773, 775–76 (D.C. Cir. 2006) (noting that equitable tolling is a rare remedy that is not applicable to "a garden variety claim of excusable neglect" (quoting *Irwin*, 498 U.S. at 96)).[6]

Second, neither the Tenth Circuit's *Park County* decision nor the numerous Tenth Circuit district court decisions that were bound to follow that decision are binding precedent on this Court, where Plaintiffs chose to file their claims.  And, as explained above, the Ninth Circuit's

---

[6] At any rate, answers to Plaintiffs' complaints consistently raised non-compliance with applicable statutes of limitations as an affirmative defense.  *See* API Answer to Compl. (Dkt. No. 20-1), at 43.  *See also WildEarth Guardians, et al. v. Bernhardt, et al.*, No. 20-cv-00056-RC, API Answer (Dkt. No. 28), at 41;  *WildEarth Guardians, et al. v. Jewell, et al.*, No. 16-cv-01724-RC, API Abbreviated Answer to Suppl. Compl. (Dkt. No. 188), at 7.  API has also recently moved to dismiss Plaintiffs' other lease sale challenges pursuant to Section 226-2.  *See WildEarth Guardians, et al. v. Bernhardt, et al.*, No. 20-cv-00056-RC, API Motion to Dismiss in Part (Dkt. No. 55);  *WildEarth Guardians, et al. v. Jewell, et al.*, No. 16-cv-01724-RC, API Motion to Dismiss (Dkt. No. 201).

*Turtle Island* decision had already expressly criticized *Park County*, including its central reliance on the Ninth Circuit's earlier decision in *Jones v. Gordon* in applying Section 226-2.  *See supra* pp. 3–6; *Boling v. United States*, 220 F.3d 1365, 1374 (Fed. Cir. 2000) (noting lack of "authority which would suggest that the presence of adverse precedent automatically leads to equitable tolling").

Plaintiffs' mistaken reliance on questionable precedent in another Circuit falls well short of clearing the high bar necessary to justify equitable tolling.  *See Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 257–58 (2016) (explaining that party's mistaken view of the law did not support equitable tolling, and differed from "relying on *actually binding* precedent that is subsequently reversed").[7]

## II.    Plaintiffs Waived Their Challenge to the March 23, 2017 Utah Lease Sale.

As API's Opening Memorandum explained—and Plaintiffs do not dispute—Plaintiffs do not allege that they submitted public comments or a protest to BLM with respect to the March 23, 2017 Utah lease sale.  Plaintiffs' challenges to that sale are accordingly waived.  *See* API Mem. at 9 & n.5.

Plaintiffs respond by arguing that API did not properly raise this waiver and, at any rate, the Federal Defendants were broadly aware—from other lawsuits and Plaintiffs' participation in the administrative processes for other lease sales—that Plaintiffs did not believe BLM was fully analyzing proposed lease sales' climate impacts under NEPA.  *See* Pls.' Opp. at 31–32.  Neither argument is persuasive.

---

[7] Notably, in *Menominee Indian Tribe*, the Supreme Court did not decide that reversal of binding precedent justified equitable tolling.  *See* 577 U.S. at 258 n.4.  The Court merely noted the Court of Appeals' "speculat[ion]" that such a situation "might merit tolling."  *Id.*

First, contrary to Plaintiffs' suggestion, district courts regularly consider arguments raised in footnotes. *See*, *e.g.*, *Ford v. Tait*, 163 F. Supp. 2d 57, 63–64 (D.D.C. 2001) (considering—and agreeing with—defendant's non-jurisdictional abstention argument raised only "in a footnote as an alternative ground for dismissal"); *see also Siqing Wang v. U.S. Citizenship & Immigrations Servs.*, 306 F. Supp. 3d 1, 7–8 (D.D.C. 2018) (considering defendant argument raised in footnote to motion to dismiss); *Webb v. Hyman*, 861 F. Supp. 1094, 1115 n.4 (D.D.C. 1994) (considering argument raised in footnote). At any rate, API did not bury a "cursory" waiver argument *see* Pls.' Opp. at 31, in a footnote. To the contrary, Plaintiffs' waiver is expressly identified in the text of API's Opening Memorandum and not merely in a footnote; in API's cover motion; and in the conclusion to API's Opening Memorandum. *See* API Mem. at 9, 41; API Mot. to Dismiss in Part, or, in the Alternative for Partial Summ. J. (Dkt. No. 28), at 2. Far from conclusory, API set out Plaintiffs' failure to participate—which Plaintiffs do not dispute—in the administrative process for the March 23, 2017 Utah lease sale, and identified the legal ramifications of Plaintiffs' failure. *See* API Mem. at 9 & n.5 (quoting *Sierra Club v. Fed. Energy Reg. Comm'n*, 827 F.3d 36, 50–51 (D.C. Cir. 2016)). Nothing more was necessary to make out the argument.

Second, the NEPA waiver rule is subject to two narrow exceptions: (1) "a commenter does not waive an issue if it is otherwise brought to the agency's attention"; and (2) "commenters need not point out an [EA's] . . . flaw if it is 'obvious.'" *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1048 (10th Cir. 2015) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004)). *See also*, *e.g.*, *Nevada v. Dep't of Energy*, 457 F.3d 78, 88 (D.C. Cir. 2006); *Food & Water Watch v. U.S. Dep't of Agric.*, No. 17-cv-1714, 2019 WL 2423833, at *6 (D.D.C. June 10, 2019). Neither exception applies here. Plaintiffs have not shown that any other commenter raised the waived issues on the March 23, 2017 Utah lease sale. *See Nevada*, 457 F.3d at 88

(waiver may be excused if "issue was raised at the administrative level by a" different party).  To demonstrate obviousness, Plaintiffs "must show that the assessment" of climate impacts in March 2017 "contained an obvious flaw, not that the agency failed to discuss impacts of an obvious risk associated with" lease development.  *Bostick*, 787 F.3d at 1049.  At most, Plaintiffs contend that BLM's analysis "should have been broader" on this subject, "[b]ut this criticism relates to the merits of the NEPA claim rather than the obviousness of the alleged deficiency" to BLM.  *Id*.  That Plaintiffs had filed a lawsuit—which had not yet been decided in 2017—alleging potential flaws in BLM's NEPA analysis with respect to other lease sales, *see* Pls.' Opp. at 31–33, does not indicate a flaw with respect to this lease sale that would have been obvious to BLM in March 2017.  Because BLM's climate analysis for the March 20017 sale "went unchallenged in the public comments," *Bostick*, 787 F.3d at 1050, there is no basis to infer BLM's contemporaneous knowledge of alleged deficiencies.

## III.    Plaintiffs' Challenges to the December 2017 and June 2018 Utah Lease Sales Are Barred by *Res Judicata*.

API's Opening Memorandum demonstrated that Plaintiffs' challenge to the December 2017 and June 2018 Utah lease sales are barred by *res judicata* because (1) WildEarth participated as a plaintiff in *Rocky Mountain Wild, et al. v. Bernhardt, et al.*, 506 F. Supp. 3d 1169 (D. Utah 2020), and the addition of Physicians for Social Responsibility in this case cannot defeat *res judicata*, *see* API Mem. at 28–29 & Exh. 1; (2) *Rocky Mountain Wild* challenged Federal Defendants' December 2017 and June 2018 Utah leasing decisions for the Vernal Field Office, and could have challenged Federal Defendants' Price and Richfield Field Office leasing decisions—challenged in this case—for those very same lease sales, *see id*. at 26–28; (3) the District of Utah issued a final judgment on the merits in *Rocky Mountain Wild*, *see id*. at 29–30; and (4) the District of Utah was a court of competent jurisdiction for *Rocky Mountain Wild*, *see*

*id*. at 30–31.  Accordingly, Plaintiffs' claims are barred by *res judicata*.  *See id*. at 25; *Jenkins v. District of Columbia*, 288 F. Supp. 3d 308, 312 (D.D.C. 2018); *Arpaio v. Robillard*, 459 F. Supp. 3d 62, 66 (D.D.C. 2020).

Plaintiffs do not dispute that this action includes the same parties as *Rocky Mountain Wild*, or that the District of Utah had jurisdiction over *Rocky Mountain Wild* and issued a final judgment on the merits.  *See* Pls.' Opp. at 13–18.  Instead, Plaintiffs contend that *res judicata* does not bar their present challenges to the December 2017 and June 2018 Utah lease sales because this case involves leases issued during that sale through the Price and Richfield Field Offices, while *Rocky Mountain Wild* involved leases issued during those very same sales through the Vernal Field Office.  *See* Pls.' Opp. at 13–18.  Plaintiffs' arguments are without merit.

First, Plaintiffs are wrong that their present challenge to the December 2017 and June 2018 Utah lease sales does not involve the same "nucleus of facts," *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984), as their *Rock Mountain Wild* challenge because the respective Field Offices issued "*different* BLM leasing decisions, underlain by *different* environmental analyses and decision documents," Pls.' Opp. at 14–15 (emphasis original).  Plaintiffs do not dispute that their legal challenges are essentially the same across the two cases, *see* API Mem. at 27, or that "the leases at issue in *Rocky Mountain Wild* and in this case were all sold by BLM through the same" internet-based December 2017 and June 2018 Utah lease sales.  Pls.' Opp. at 16; *see also* API Mem. at 27.  Far from being "factually and legally irrelevant," Pls.' Opp. at 16, these common claims and common lease sales clearly constitute a "nucleus of operative facts" giving rise to *res judicata*.

Courts applying *res judicata* have made clear that in determining the scope of a barred "nucleus of operative facts," "courts look at 'whether the facts are related in time, space, origin,

or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Poblete v. IndyMac Bank*, 657 F. Supp. 2d 86, 89–90 (D.D.C. 2009) (quoting *Stanton v. D.C. Ct. of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1982))). *See also*, *e.g.*, *Remy Enterprise Grp., LLC v. Davis*, 37 F. Supp. 3d 30, 36 (D.D.C. 2014) (noting that D.C. Circuit has defined the scope of preclusion "as a grouping of factual circumstances to be determined pragmatically, considering whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties expectations or business understanding and usage." (quotations omitted)); *Gresham v. Dist. of Columbia*, 66 F. Supp. 3d 178, 187 (D.D.C. 2014) (same).

Here, Plaintiffs challenge leasing decisions made by Federal Defendants in the same BLM State office in precisely the same "period of time," which have a "substantial overlap of related facts" by virtue of considering the impacts of oil and gas leasing and development. *See King v. Union Oil Co. of Cal.*, 117 F.3d 443, 445 (10th Cir. 1997). Indeed, the challenged leasing decisions and environmental reviews in this case and *Rocky Mountain Wild* were compiled into a statewide lease sale "unit" consistent with common "usage," *Poblete*, 657 F. Supp. 2d at 89–90, pursuant to BLM's statutory obligation to hold lease sales "for each State . . . at least quarterly." 30 U.S.C. § 226(b)(1)(A). In short, the challenged leasing decisions with respect to the Vernal, Richfield, and Price Field Offices reflect a "series of connected transactions, out of which" Plaintiffs' challenges all rose. *Univ. of Colorado Health at Mem. Hosp. v. Burwell*, 233 F. Supp. 3d 69, 79 (D.D.C. 2017) (quoting *Stanton*, 127 F.3d at 78). *Cf. Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926) ("'Transaction' is a word of

flexible meaning.  It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.").

The District of Oregon's decision in *American Rivers, Inc. v. NOAA Fisheries*, No. 04-cv-0061, 2016 WL 468353 (D. Or. Feb. 27, 2006), *see* Pls.' Opp. at 17, is not to the contrary.  In that case, the court concluded that a prior challenge to one Endangered Species Act biological opinion did not bar a challenge to a separate biological opinion where, *inter alia*, the second biological opinion issued years after the first, there was no factual connection between the "discrete issue[s]" raised against the biological opinions, and the two biological opinions "spann[ed] a different period of time."  *Am. Rivers*, 2006 WL 468353, at *2.  By contrast, as explained above, the December 2017 and June 2018 Utah leasing decisions challenged in this case and the December 2017 and June 2018 Utah leasing decisions at issue in *Rocky Mountain Wild* are connected in time, place, and purpose.  *See supra*.  That more than one agency decision is challenged does not foreclose a common nucleus of fact—and the similarity between Plaintiffs' claims against the same Federal Defendants across the two lawsuits confirm "that they would have formed a convenient trial unit."  *Poblete*, 657 F. Supp. 2d at 91 (applying *res judicata* to two lawsuits involving different pieces of property).  *See also Petromanagement Corp. v. Acme–Thomas Joint Venture,* 835 F.2d 1329, 1336 (10th Cir. 1988) ("Even if separate contracts governed the drilling and operation of [five] wells, the transactions challenged in the complaints in *Petro I* and *Petro II* are a sufficiently related 'series of connected transactions' to prohibit piecemeal litigation.").

Plaintiffs next suggest that API assumes that "if BLM's leasing decisions in one Utah field office have been found to pass muster under NEPA, then BLM's separate decisions out of another field office . . . must also be assumed to meet NEPA's requirements."  Pls.' Opp. at 18.

That is not the case.  API's argument simply recognizes that the December 2017 and June 2018 Utah leasing decisions challenged in *Rocky Mountain Wild* and here arise out of a common "nucleus of operative facts" and are part of a greater whole under the MLA.  *See supra*.

Nor do Plaintiffs point to any substantive differences between the leasing decisions that would necessitate separate lawsuits.  Having occurred in the same time period and the same area—and with Plaintiffs admittedly challenging the lease sales administratively—Plaintiffs could and should have challenged these analogous decisions to offer oil and gas leases in Utah as a unit.  *E.g.*, *Cooper v. Jackson*, 941 F. Supp. 2d 75, 82 (D.D.C. 2013) ("[T]he doctrine [of *res judicata*] embodies the principle that a party who once has had a *chance* to litigate a claim before an appropriate tribunal usually ought not to have another chance to do so." (quotation omitted)).  Plaintiffs' failure to do so, bars this attempted second bite at the apple.[8]

## IV.   Laches Bars Plaintiffs' Challenges to Leasing Decisions Issued Prior to the *Bernhardt* Complaint.

Plaintiffs' arguments against application of laches to their challenges to 17 leasing decisions issued prior to Plaintiffs' *Bernhardt* complaint, *see* Pls.' Opp. at 19–31, fare no better.  API's Opening Memorandum demonstrated that (1) laches is applicable to Plaintiffs' NEPA claims for equitable relief, even if filed within the applicable statute of limitations; (2) Plaintiffs unreasonably delayed in filing suit challenging the 17 lease sales in this case that occurred before Plaintiffs filed their nearly identical *Bernhardt* complaint; and (3) Plaintiffs' unreasonable delay

---

[8] Plaintiffs' attempt to avoid *res judicata* based on the January 2021 supplemental Utah EA considering the lifting of lease suspensions, *see* Pl.' Opp. at 16 n.4, fails for the same reasons as their attempt to evade Section 226-2's limitations period.  *See supra* pp. 7–8.

prejudices lessees in light of the up-front nature of oil and gas development expenditures.  *See* API Mem. at 31–40.[9]

In response, Plaintiffs first assert that "API is legally incorrect that laches can preclude claims found to be brought within the APA's statute of limitations."  Pls.' Opp. at 19.  But Plaintiffs rely on a Fourth Circuit case decided in 2001, more than a decade before the Supreme Court decided *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014).  As *Petrella* made clear, where a party seeks equitable relief—such as the relief available for a NEPA violation—"delay might still serve as a defense when [the] claim is filed within the statute of limitations."  *Holland v. Bibeau Constr. Co.*, 774 F.3d 8, 16 (D.C. Cir. 2014) (citing *Petrella*, 572 U.S. at 667–68).  *See also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 77, 84 (D.D.C. 2017).  In other words, Plaintiffs—not API—mischaracterize the governing law on laches.

Plaintiffs' attempts to distinguish this lawsuit from the cases that *Petrella* used as examples for the types of potential "extraordinary circumstances" that could justify application of laches within a limitations period, *see* Pls.' Opp. at 21–22, similarly misses the mark.  As API demonstrated, the general circumstances of the copyright cases cited by *Petrella* coincide with the long-standing, traditional test for laches: (1) lack of diligence; and (2) prejudice to the party asserting laches.  *See* API Mem. at 32–33.  For their part, Plaintiffs do not contest this broader principle, and instead argue that API failed to demonstrate that this case meets the two-prong laches test.  *See* Pls.' Opp. at 22–31.  Plaintiffs' arguments again fail.

---

[9] Because all of the leasing decisions barred by laches would also be barred by Plaintiffs' failure to comply with Section 226-2, laches is only relevant to the extent that the Court finds Section 226-2 inapplicable to Plaintiffs' claims.  *Contra* Section I.

A.      **Plaintiffs Unreasonably Delayed in Filing Suit.**

Plaintiffs propose a series of rationalizations for their year-long delay in challenging the

17 lease sales that took place before Plaintiffs filed their *Bernhardt* complaint.  *See* Pls.' Opp. at

23–25.  None are persuasive.

First, Plaintiffs contend that they reasonably waited until after this Court issued its second

decision in *WildEarth Guardians v. Bernhardt* ("*WildEarth II*"), 502 F. Supp. 3d 237 (D.D.C.

2020), because "a significant part of the rationale and legal authority . . . to bring the instant

litigation" came from that decision.  Pls.' Opp. at 23.  But Plaintiffs identify nothing specific in

the *WildEarth II* decision that would support this litigation where this Court's first decision in

*WildEarth Guardians v. Zinke* ("*WildEarth I*"), 368 F. Supp. 3d 41 (D.D.C. 2019), would not.

Plaintiffs' Amended Complaint underlines this specious reasoning—Plaintiffs rely on

*WildEarth I* and *WildEarth II* equally, and for the same proposition that BLM "systemic[ally]"

failed properly to consider leasing impacts.  *See* Am. Compl., ¶¶ 9–12, 14, 117–18.  Indeed, in

setting out their claims for relief, Plaintiffs cite only to *WildEarth I*.  *See id.*, ¶¶ 143, 151.  More

broadly, Plaintiffs wholly ignore that the allegations in the *Bernhardt* complaint are nearly

identical to—and in most cases verbatim of—the Amended Complaint in this case.  *See* API

Mem. at 34–36.

Second, Plaintiffs vaguely argue that they justifiably waited to see how litigation by

others and other administrative proceedings—such as the supplemental EA considering Utah

lease suspensions, *see supra* pp. 7–8—concluded before filing this lawsuit.  It is not clear,

however, how many of the challenged lease sales—or any outside of Utah—would be impacted

by this justification.  At any rate, Plaintiffs' unsupported statements about their intentions

notwithstanding, *see* Pls.' Opp. at 26, this wait-and-see approach is indistinguishable from the

plaintiffs in *Save the Peaks Coalition v. U.S. Forest Service*, 669 F.3d 1025 (9th Cir. 2012),

19

whose claims were barred by laches for "await[ing] the outcome of another plaintiff's [challenge] before bringing its own claim." *Id*. at 1032. *See also* API Mem. at 36. That Plaintiffs "participated administratively" in the leasing decisions, *see* Pls.' Opp. at 26–27, before waiting years to file suit makes the delay more, not less, unreasonable.

Finally, Plaintiffs do not dispute (or address) the unreasonable context of their delay. As API explained in its Opening Memorandum, Plaintiffs' delay is particularly unreasonable within the MLA statutory scheme, which consciously promotes oil and gas development by obligating lessees to expedite exploration and development of leases with significant up-front expenditures or face loss of the leases and corresponding investments. *See* API Mem. at 3–4, 37–39. At most, Plaintiffs suggest that Plaintiffs' administrative objections put lessees "on notice," Pls.' Opp. at 27, not to heed the oil and gas development policies enacted by Congress in the MLA.[10]

### B.    Plaintiffs' Delay Prejudices Lessees.

Plaintiffs dismiss API's showing of prejudice to the lessees from oil and gas development that proceeded during Plaintiffs' delay in bringing suit, *see* API Mem. at 38–40, as (1) "sunk costs" that are "unrelated to any conceivable delay in [Plaintiffs'] decision to file suit," Pls.' Opp. at 29, and (2) inadequately supported, *see* Pls.' Opp. at 30. Neither contention can withstand scrutiny.

Plaintiffs are wrong that the significant up-front expenditures made by lessees are unrelated to Plaintiffs' delay. As API explained, those up-front costs are driven by the nature of

---

[10] It is not clear what Plaintiffs mean in suggesting that the harm to lessees "goes to the ultimate question of remedy," Pls.' Opp. at 22, and whether Plaintiffs anticipate that lessees that have expended significant sums in advancing oil and gas development operations on their leases would continue to hold and operate the leases even if Plaintiffs were to succeed on the merits of their claims.

oil and gas development—which requires significant initial outlays to assess the oil and gas potential of leases—and invest in capital projects that will support development and production for the life of the lease.  *See* API Mem. at 38.  In short, these immediate expenditures are incentivized by the MLA's development imperative, *see supra* p. 1; API Mem. at 3–4, 37–38, are used—particularly geological assessments—in the design and development of drilling plans, and further drive the imperative to drill as soon as possible to offset the initial outlays.  *See* API Mem. at 38–39.

Nor was the scope of this prejudice inadequately supported.  Rather, API relied upon the declaration of a Senior Economist with more than 30 years of experience in the oil and gas industry.  *See* Declaration of Dr. Geoffrey Brand (Dkt. No. 28-6), ¶¶ 1–2, 4.  Dr. Brand both described the nature of oil and gas development, which drives immediate up-front expenditures, and provided examples of the data upon which his opinions rested.  *See id.*, ¶¶ 5–17.  That Dr. Brand relied on certain subscription-based and proprietary sources of oil and gas information—and listed specific, representative development costs from these proprietary sources—that he uses as part of his work as an oil and gas industry economist, *see* Pls.' Opp. at 30–31, does not undercut his opinion.  Plaintiffs cite neither support for rejecting this information, nor any contrary assessment of the expenditures typical of the initial years of oil and gas lease development.

As API has shown, those expenditures are substantial, represent the greater share of lease development costs, and are driven forward by statutory provisions while Plaintiffs sat on their long-held NEPA objections to the underlying leasing decisions.

## CONCLUSION

For the foregoing reasons, as well as the reasons set out in API's Motion, this Court should:

(1) dismiss the Plaintiffs' challenges to the following 23 leases sales pursuant to Section 226-2's 90 day limitations period: (a) June 27, 2019, September 26, 2019, March 26, 2020, and September 25, 2020 Colorado—with the exception of the 43 parcels issued from the Royal Gorge Field Office—lease sales; (b) March 28, 2019, June 20, 2019, September 5, 2019, and August 26, 2020 New Mexico lease sales; (c) December 13, 2016, March 23, 2017, June 13, 2017, September 12, 2017, December 12, 2017, March 20, 2018, June 12, 2018, September 11, 2018, December 11, 2018, March 25-26, 2019, June 11, 2019, and September 9-11, 2019 Utah lease sales; and (d) September 17-18, 2019, December 10-11, 2019, and March 24, 2020 Wyoming lease sales;

(2) dismiss the Plaintiffs' challenge to the following lease sale pursuant to waiver: March 23, 2017 Utah lease sale;

(3) dismiss the Plaintiffs' challenges to the following two lease sales pursuant to *res judicata:* December 12, 2017 and June 12, 2018 Utah lease sales; and/or

(4) enter summary judgment dismissing Plaintiffs' challenges to the following 17 lease sales pursuant to laches: (a) June 27, 2019 and September 26, 2019 Colorado lease sales; (b) March 28, 2019 New Mexico lease sale; (c) December 13, 2016, March 23, 2017, June 13, 2017, September 12, 2017, December 12, 2017, March 20, 2018, June 12, 2018, September 11, 2018, December 11, 2018, March 25-26, 2019, June 11, 2019, and September 9-11, 2019 Utah lease sales; and (d) September 17-18, 2019 and December 10-11, 2019 Wyoming lease sales.

August 6, 2021

Respectfully submitted,

*/s/ Steven J. Rosenbaum*
Steven J. Rosenbaum
  D.C. Bar No. 331728
Bradley K. Ervin
  D.C. Bar No. 982559
COVINGTON & BURLING, LLP

One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

*Attorneys for American Petroleum Institute*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August, 2021, I caused a true and correct copy of the foregoing, and all accompanying attachments, to be filed with the Court electronically and served by the Court's CM/ECF System upon the listed counsel:

Samantha Ruscavage-Barz
Daniel L. Timmons
WildEarth Guardians
301 N. Guadeloupe Street, Suite 201
Santa Fe, NM 87501
Tel: (505) 410-4180
sruscavagebarz@wildearthguardians.org
dtimmons@wildearthguardians.org

Kyle Tisdel
Western Environmental Law Center
208 Paseo del Pueblo Sur, Suite 602
Taos, NM 87571
Tel: (575) 613-8050
tisdel@westernlaw.org

*Counsel for Plaintiffs*

Michael Sawyer
Michelle-Ann Williams
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-5273
michael.sawyer@usdoj.gov
michelle-ann.williams@usdoj.goc

*Counsel for Federal Defendants*

Matt VanWormer
Kelly Shaw
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-7895
matt.vanwormer@wyo.gov
kelly.shaw@wyo.gov

*Counsel for Intervenor State of Wyoming*

Emily C. Schilling
Holland & Hart LLP
222 South Main, Suite 2200
Salt Lake City, UT 84101
Tel: (801) 799-5753
eschilling@hollandhart.com

*Counsel for Intervenor NAH Utah, LLC*

Andrew C. Lillie
Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202
Tel: (303) 899-7339
andrew.lillie@hoganlovells.com

*Counsel for Intervenor Anschutz Exploration
Corporation*

/s/ Steven J. Rosenbaum
Steven J. Rosenbaum

25